# Exhibit A
# REDACTED

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION (ICDR)**
**International Arbitral Tribunal**

**CASE NUMBER: 01-20-0015-6666**

UiPath, Inc.

Claimant

and

Shanghai Yunkuo Information Technology Co., Ltd., dba ENCOO Tech.

Respondent

**PARTIAL FINAL AWARD ON THE MERITS**

**Sole Arbitrator**
**John Fellas**

I.     The Parties and Counsel.................................................................................................. 1
  A.    Claimant .................................................................................................................. 1
  B.    Respondent ............................................................................................................. 1
II.    Constitution of the Tribunal ...................................................................................... 2
III.   Overview of the Dispute ............................................................................................ 2
  A.    Jurisdiction of the Tribunal ................................................................................ 2
  B.    Place of Arbitration .............................................................................................. 3
  C.    Applicable Substantive Law ............................................................................... 3
  D.    Procedural Rules ................................................................................................... 3
IV.    Procedural History ...................................................................................................... 3
V.     Requests for Relief ..................................................................................................... 35
  A.    Claimant ................................................................................................................ 35
  B.    Respondent ........................................................................................................... 36
VI.    Analysis ......................................................................................................................... 36
  A.    Misappropriation Claims .................................................................................. 37
  B.    Breach of the Settlement Agreement .............................................................. 91
  C.    Damages and Injunctive Relief ...................................................................... 118
  •     Calculation  1:.................................................................................................... 119
  •     Calculation  2:.................................................................................................... 120
  •     Calculation  3:.................................................................................................... 120
  D.    Claimant's Motion for Sanctions ................................................................... 130
VII.   Form of Relief ........................................................................................................... 140

**Glossary**

| | |
|---|---|
| AAA Commercial Rules | The Commercial Arbitration Rules and Mediation Procedures of American Arbitration Association, amended and effective October 1, 2013 |
| Arbitration Clause | Clause 4 of the Settlement Agreement |
| Chinese Authorities | Jointly, the Ministry of Commerce and the Ministry of Science and Technology of the People's Republic of China, which are the pertinent authority in China deciding on the granting of export licenses |
| Claimant or UiPath | UiPath, Inc. |
| Claimant's Misappropriation Claims | The claims asserted in the Claimant's Demand for Arbitration apart from the claim for breach of the Settlement Agreement. |
| Chinese Export Regulations | The newly adjusted Catalogue of Technologies Prohibited or Restricted from Export by China, a regulation jointly promulgated by the Ministry of Commerce and the Ministry of Science and Technology of the PRC on August 28, 2020. |
| Complaint | A Lawyer's Letter and Draft Complaint sent by the Claimant to the Respondent on May 22, 2020, indicating that the Claimant intended to file for litigation before the United States District Court for the Southern District of New York |
| Confidentiality Agreement | A nondisclosure agreement signed by Mr. Shichao Hu as a term of his employment with UiPath, executed on December 28, 2018. |
| Demand Letters | Respondent's Letters sent to Claimant on March 23 and 24, 2021 that triggered a legal process in China to ascertain Respondent's liability for trade secret misappropriation. |
| First Export Application | Application made by the Respondent in order to export its source code for review from China |
| Parties | Claimant and Respondent |

| | |
|---|---|
| Renewed Export Application | Export application started by the Parties after the First Export Application was denied |
| Respondent or ENCOO | Shanghai Yunkuo Information Technology Co. Ltd. dba ENCOO Tech. |
| RPA Products | Robotic process automation software products |
| SDNY | The United States District Court of the Southern District of New York |
| Settlement Agreement | The Settlement Term Sheet Agreement signed by both Parties on July 14, 2020 |
| Slide Deck | The presentation prepared by Respondent to the Chinese Authorities as a part of its application for an export license |
| Source Code | The Claimant's proprietary source code that Respondent is alleged to have misappropriated |
| Supplemental Settlement Agreement | A settlement agreement signed by Claimant and Shichao Hu on July 14, 2020 |

The undersigned Arbitrator, having been designated in accordance with the procedures agreed to in the Settlement Term Sheet Agreement signed by both Parties on July 14, 2020, and proceeding as agreed by the Parties pursuant to the AAA Commercial Arbitration Rules, FINDS AND AWARDS as follows:

I.      **The Parties and Counsel**

      A.      **Claimant**

1.  Claimant is UiPath, Inc. ("Claimant" or "UiPath"), a company incorporated under the laws of Delaware.

2.  Claimant's mailing address is 90 Park Ave. 20th Floor, New York, NY 10016.

3.  Claimant is represented by:

> Vincent Filardo, Jr.
> Robert A. Whitman
> Evan Zatorre
> Tori Misrok
> King & Wood Mallesons LLP
> 500 Fifth Avenue, 50th Floor
> New York, NY 10110
> USA

      B.      **Respondent**

4.  Respondent is Shanghai Yunkuo Information Technology Co. Ltd. dba ENCOO Tech. ("Respondent" or "ENCOO"), a company incorporated in and under the laws of China.

5.  Respondent's mailing address is Room 206, 1st Block, 955 Jianchuan Road Minhang District, Shanghai, P.R. China.

6.  Respondent is represented by:

> Kevin Duan
> Xianglin Chen
> Zhao Baao
> Han Kun Law Offices

1

9/F Oriental Plaza Office Tower C1,
No. 1 East Change An Avenue, Dongcheng District, Beijing 100738, P.R. China

Anton Ware
Tereza Gao
Arnold & Porter
Plaza 66 Bldg 2, #4306-4313
1266 Nanjing Xi Rd
Shanghai, China 200041

## II.     Constitution of the Tribunal

7. On January 27, 2021, the ICDR appointed John Fellas as the Sole Arbitrator in this

   arbitration.

8. With the exception of the question of whether Claimant's Misappropriation Claims fall

   within the scope of the Arbitration Clause, which was the subject of the Partial Final Award

   issued on October 26, 2021, there was no objection to the jurisdiction of the Sole Arbitrator.

## III.    Overview of the Dispute

### A.     Jurisdiction of the Tribunal

9. Clause 4 of the Settlement Agreement provides as follows:

> 4. Governing Law:
> This Agreement will be governed and enforced in accordance with the laws of the
> State of New York, without regard to its conflict of laws principles. The parties to
> this Agreement will submit all disputes arising under this agreement to arbitration
> in New York City, New York before a single arbitrator of the American
> Arbitration Association ("AAA"). The arbitrator shall be selected by application
> of the rules of the AA, or by mutual agreement of the parties, except that such
> arbitrator shall be an attorney admitted to practice law in New York. Arbitration
> shall be in accordance with the commercial rules of the American Arbitration
> Association. The Award of the Arbitrator shall be final, and judgment may be
> entered upon it in any court having jurisdiction thereof. No party to this
> Agreement will challenge the jurisdiction or venue provisions as provided in this
> section. Nothing contained herein shall prevent a party from obtaining an
> injunction. The prevailing party shall be entitled to reasonable legal fees expert
> fees, and costs.

10. The Sole Arbitrator's jurisdiction derives from the aforementioned Settlement Agreement, dated July 14, 2020, signed by both Parties.

11. The Respondent had previously raised an objection to the scope of this arbitration, arguing that the Arbitration Clause should be narrowly construed and only apply to disputes relating to the Settlement Agreement itself, which would exclude the Claimant's Misappropriation Claims. The Sole Arbitrator addressed these objections in a Partial Final Award dated October 26, 2021, which is incorporated herein, finding that Claimant's Misappropriation Claims were included in the scope of the Arbitration Clause.

12. No other objections to the Sole Arbitrator's jurisdiction were raised by either Party.

### B.    Place of Arbitration

13. As provided by Clause 4 of the Settlement Agreement, the place of arbitration is New York City, New York (U.S.A.).

### C.    Applicable Substantive Law

14. Clause 4 of the Settlement Agreement provides that "This Agreement will be governed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws principles."

### D.    Procedural Rules

15. Clause 4 of the Settlement Agreement provides that "Arbitration shall be in accordance with the commercial rules of the American Arbitration Association."

## IV.    Procedural History

16. On November 11, 2020, the Claimant commenced this Arbitration by submitting a Demand for Arbitration.

17. In its Demand for Arbitration, the Claimant advanced the following claims: "(i) breach of the Settlement Agreement (defined herein), (ii) violation of the Defend Trade Secrets Act (18

3

U.S.C. § 1831 et seq.), (iii) misappropriation of UiPath's trade secrets in violation of New York common law, (iv) unfair competition with UiPath in violation of New York common law, (v) unjust enrichment, and (vi) Shanghai Yunkuo's aiding and abetting Shichao Hu's breach of his fiduciary duty to UiPath" (Demand for Arbitration, ¶ 1).

18. On November 30, 2020, the Respondent submitted its Answering Statement in which it denied that it had breached the Settlement Agreement and argued that while claim (i) was covered by the Arbitration Clause, claims (ii) to (vi) (the "Misappropriation Claims") were outside the scope of the Arbitration Agreement.

19. On March 5, 2021, the Sole Arbitrator proposed a bifurcation of the proceedings with the first part focused on the issue of the Claimant's access to the Respondent's source code and the second part focused on addressing the remainder of the claims, including the Misappropriation Claims. Both Parties agreed to the bifurcation—Claimant on March 5, 2021 and Respondent on March 12, 2021.

20. On March 22, the Sole Arbitrator held a preliminary video-conference with the Parties to discuss the Claimant's access to the Respondent's source code under the Settlement Agreement, which Mr. Vincent Filardo and Mr. Robert Whitman from the law firm of King & Wood attended on behalf of Claimant, and Mr. Kevin Duan, Mr. Zhao Baao, and Mr. Xianglin Chen from the law firm of Han Kun attended on behalf of Respondent.

21. Also on March 22, following discussion with the Parties at the Conference, the Sole Arbitrator issued an email order directing, among other things, the following:

(i) The Claimant is invited to prepare requests directed at documents reflecting the efforts made by the Respondent to date to obtain approval from the relevant authorities to make the source code that is the subject of the Settlement Agreement available for review, and related documents. Any draft should be set to me and the Respondent, and the Respondent may submit any comments on the requests within 5 business days.

(ii)   The Claimant is invited to prepare written interrogatories directed to information reflecting whether source code or object code or log files would be available for review in Japan, and related information. Any draft should be sent to me and the Respondent, and the Respondent may submit any comments on the interrogatories within 5 business days.

22. On March 23 and 24, the Respondent sent letters of demand ("Demand Letters") to Claimant's Chinese and U.S. counsel, which, according to the Claimant, triggered a legal process in China that would require the Claimant to commence a trade secret misappropriation lawsuit in China and would entitle Respondent to a declaration from a Chinese court that it did not commit trade secret misappropriation.

23. On March 25, the Claimant submitted a draft of its First Request for the Production of Documents and First Set of Interrogatories in accordance to the email order of March 22, 2021. On the same day, the Sole Arbitrator invited the Respondent to comment.

24. On March 29, the Claimant submitted a Motion for Preliminary Injunction and Interim Award of Legal Fees and Costs, in which it asked the Sole Arbitrator to order the Respondent to withdraw the Demand Letters, enjoin the Respondent from making similar demands during the proceedings of this arbitration, and order and interim award of legal fees and costs associated with the motion to the Claimant.

25. Also on March 29, following a review of the Claimant's Motion, the Sole Arbitrator wrote to the Parties asking that they confer about a briefing schedule and revert by April 2 and that the Respondent was to take no further steps in connection to the Demand Letters, or in the alternative, to let the Sole Arbitrator know if it was unable or unwilling to follow the direction. The Sole Arbitrator also directed the Parties to let the Sole Arbitrator know by April 2 their positions on whether Chinese procedural law imposes any timetable for the initiation of the processes and, if so, what the timetable is.

26. On April 2, the Parties both made submissions on Chinese procedural law.

27. Also on April 2, in accordance with the five business day deadline set by the Sole Arbitrator, the Respondent provided its comments on the Claimant's document and interrogatory requests. In its response to the document production requests, the Respondent agreed to produce Document Requests Nos. 1, 2, and 9, and raised objections to the remaining document requests. In response to the Claimant's request for interrogatories, the Respondent agreed to answer the interrogatories to the best of its knowledge but raised concerns about its right to claim privileges and trade secrets.

28. On April 3, the Sole Arbitrator issued Procedural Order No. 1. The Sole Arbitrator reviewed the Claimant's First Request for Production of Documents and permitted the Claimant to seek Document Requests Nos. 3, 4, and 6 (subject to a protective order), but denied Document Request Nos. 5, 7, 8, 10, and 11 without prejudice to the Claimant's right to reassert such requests at a later stage of the case. To address the Respondent's concerns about revealing trade secrets, the Sole Arbitrator directed the Parties to enter into a confidentiality agreement by April 16 or failing at reaching an agreement, to submit separate proposals to the Sole Arbitrator after that date. The Sole Arbitrator also established a briefing schedule for the Parties' submissions on the Motion.

29. On April 9, the Respondent submitted its Opposition to Claimant's Motion for Preliminary Injunction and Interim Award of Legal Fees and Costs.

30. On April 14, the Claimant submitted its Reply to Claimant's Motion for Preliminary Injunction and Interim Award of Legal Fees and Costs.

31. On April 18, the Sole Arbitrator issued Procedural Order No. 2, which ordered the Respondent to withdraw the Demand Letters by April 20, 2021, enjoined the Respondent

from issuing similar demands, and invited the Respondent to propose an expedited procedure for final determination of the scope of the arbitration. The Sole Arbitrator also denied the Claimant's request for an interim award of costs.

32. On April 19, the Claimant submitted a response to the Sole Arbitrator's enquiry of March 22, 2021 about the possibility of appealing the decision of the pertinent authority in China ("Chinese Authorities") denying the Respondent's application for approval to make the Respondent's source code available for review in the United States and/or submit a new application with respect to the off-shore review of the source code ("Export Application"). In its submission, the Claimant requested that the Sole Arbitrator order the Respondent to, among other things, (i) make the source code available for review outside of China, (ii) initiate an appeal in relation to the Export Application, and (iii) affirmatively include the Claimant in the appeal process and (iv) all non-privileged documents responsive to Document Request No. 7.

33. On April 28, the Respondent submitted comments upon the Claimant's submission, asserting that the deadline for appealing the Export Application was on March 5, 2021, and had thus expired. The Claimant submitted an Application for Order on the Merits and Award of Sanctions.

34. On April 30, the Claimant submitted a reply to the Respondent's Comments in further support of its submission dated April 19, 2021. The Claimant requested the Tribunal to order Respondent to, among other things, (i) make the source code available for review outside of China, (ii) if necessary, submit a new export application requesting the relevant Chinese authorities to allow Claimant's review of Respondent's source code outside of China, (iii) affirmatively include in and copy Claimant on all export application processes and all

communications relating to any export applications and (iv) produce all non-privileged documents responsive to Document Request No. 7.

35. On May 7, the Respondent wrote to the Sole Arbitrator to add an agenda item to an upcoming video-conference with the Parties, asking that the Parties discuss the Respondent's motion and proposed timetable for the Sole Arbitrator to make a final decision on the scope of the arbitration clause

36. On May 11, the Sole Arbitrator held a video-conference with the Parties, in which Mr. Vincent Filardo and Mr. Robert Whitman from the law firm of King & Wood attended on behalf of the Claimant, and Mr. Zhao Baao, Mr. Xianglin Chen and Mr. Kevin Duan from the law firm of Han Kun attended on behalf of the Respondent.

37. Following the conference, the Sole Arbitrator issued the following e-mail communication to the Parties on May 11:

> After reviewing the various written submissions of the Parties and after hearing from the Parties on the call, I directed as follows:
>
> 1. The Sole Arbitrator determined to grant the relief set forth in points (i) to (iii) on pages 7 to 8 of UiPath's Reply To Encoo's Comments on Arbitrator's Enquiry of March 22, 2021 and UiPath's Request for Reconsideration of Document Request No. 7, April 30, 2021, and the Claimant was directed to prepare a draft order for review by the Sole Arbitrator;
>
> 2. The Sole Arbitrator directed the Claimant to circulate to the Sole Arbitrator and the Respondent a new draft Protective Order governing documents exchanged in discovery that included a provision for heightened protection, such as attorneys-eyes only;
>
> 3. Pending finalization of a Protective Order governing, the Respondent shall produce documents the production of which has been ordered or will, in the future, be ordered by the Sole Arbitrator within 5 business days of this email or of any subsequent order on an "Attorneys' Eyes Only" basis, with such designation to be revisited at the request of either party once the Protective Order is entered.
>
> 4. The Sole Arbitrator heard the Claimant's motion for reconsideration of the Sole Arbitrator's ruling on document requests nos. 3, 4 and 6, and the Respondent's

8

motion for reconsideration of the Sole Arbitrator's ruling on document request no. 7, and will issue his ruling shortly, after considering the Parties' arguments;

5. The Parties are directed to make submissions for the Sole Arbitrator's Final Decision on the Scope of the Present Arbitration on the following schedule:

- Respondent's Submission         – June 1, 2021
- Claimant's Opposition           – no later than June 22, 2021
- Respondent's Reply              – 14 days from submission of Claimant's Opposition

6. With respect to UiPath's Application for Order on the Merits and Award of Sanctions, April 28, 2021, the Respondent is directed to submit any opposition on or before June 8, 2021, and the Claimant a reply on or before June 29, 2021.

38. Also on May 11, the Claimant submitted a proposed Procedural Order No. 3 and a draft Protective Order.

39. On May 12, the Sole Arbitrator issued Procedural Order No. 3, in which he granted the Claimant's request for reconsideration for the production of non-privileged documents response to Document Request No. 7 and denied the Respondent's request for reconsideration of Document Requests 3, 4, and 6. The Sole Arbitrator also ordered Respondent to produce its source code for review outside of China and established a briefing schedule for submissions related to the scope of the arbitration.

40. On May 17, the Respondent submitted its proposed changes to the Protective Order.

41. On May 30, the Sole Arbitrator issued a Protective Order.

42. On June 1, the Respondent submitted the Respondent's Submission on the Scope of the Arbitration with accompanying legal and factual exhibits.

43. On June 3, the Respondent submitted English translations of certain exhibits.

44. On June 8, the Respondent submitted the Respondent's Opposition to the Claimant's Sanction Application.

45. On June 9, the Claimant submitted UiPath's Opposition to ENCOO's Submission on the Scope of the Arbitration with an accompanying factual exhibit.

46. On June 18, the Claimant submitted its Reply to the Respondent's Opposition to Claimant's Sanction Application.

47. On June 23, the Respondent submitted Respondent's Reply to Claimant's Opposition to Respondent's Submission on the Scope of the Arbitration.

48. On June 24, the Claimant submitted a motion to compel the Respondent to produce documents in English responsive to Document Request Nos. 3 and 4 of the Claimant's First Request for Production of Documents.

49. On July 5, the Respondent submitted its opposition to the Claimant's motion, arguing that it had produced all original documents in its possession responsive and relevant to Document Requests Nos. 3 and 4 and that any additional information sought by the Claimant would require Respondent to create new documents. The Respondent further stated that it was not obligated to translate documents into English.

50. On July 12, the Claimant submitted a reply, asserting that the Respondent failed to provide sufficient information to satisfy Document Requests Nos. 3 and 4 and that the Respondent should be required to translate non-English documents into English.

51. On July 13, the Sole Arbitrator issued Procedural Order No. 4 in which he ordered the Respondent to produce documents, whether existing or not, that addressed the information requested by the Claimant in response to Document Requests No. 3 and 4. The Sole Arbitrator clarified that the Parties are not required to translate a non-English language document into English if a copy in English does not exist, but that any newly created documents should be provided in English.

52. On September 12, the Sole Arbitrator indicated that he was in the final stages of drafting the Partial Final Award on the Scope of Arbitration and invited the Parties to provide any comments on *David L. Threlkeld Co. v. Metallgesellschaft*, 923 F.2d 245, 250 (2d Cir. 1991) (and related cases) addressing the issue of the scope of an arbitration clause.

53. On September 25, the Respondent submitted a comment on *Threlkeld*.

54. On September 30, the Claimant submitted an unauthorized response upon the Respondent's comment and the Respondent objected to the Claimant's submission.

55. On October 4, the Claimant emailed the Respondent, with the Sole Arbitrator copied, to assert that the Respondent had failed to comply with its production obligations with respect to Document Request 9 by blocking most of Claimant's access with an authorization code and only providing the client side of the code rather than the complete code. With the email, Claimant submitted a Second Request for the Production of Documents with a single request identical to Document Request No. 9 but covering an extended time period for production to January 1, 2019.

56. On October 8, the Respondent submitted its response to the Claimant's complaints and Second Request for Production of Documents. The Respondent said it would produce the most recent server side Source Code but would be unable to provide historical versions of the Source Code because they are not stored. The Respondent also objected to the Second Request for Production of Documents as irrelevant and overly burdensome.

57. On October 13, the Claimant questioned the Respondent's assertion that it did not store historical versions of its software and arguing that the object code from January 1, 2019 onwards was relevant and its relevance outweighed any burden.

11

58. On October 20, the Sole Arbitrator held a video conference with the Parties to discuss the discovery issues and the schedule for the case going forward. Attending on behalf of Claimant were Vincent Filardo and Sharon Lee of King & Wood Mallesons LLP.  Attending on behalf of the Claimant, Zhichao (Kevin) Duan, Xiagling Chen and Zhao Baao of Han Kun Law Offices.

59. On the same day, the Sole Arbitrator issued Procedural Order No. 5, in which he ordered the production of all object code in response to Document Request No. 9, ordered the Respondent to produce a current version of the object code within 30 days and all historical versions of the object code responsive for Document Requests Nos. 9 and 12 within 60 days, indicated that he would entertain an application by the Claimant to draw adverse inferences from the Respondent's refusal to comply with the Sole Arbitrator's Orders with respect to the production of object code, directed the Parties to confer about the schedule and procedures for the arbitration and submit joint or separate proposals within 14 days, and ordered the Respondent to provide a translation of the Slide Deck supplied by the Respondent to the Chinese Authorities within 30 days.

60. On October 26, 2021, the Sole Arbitrator issued a Partial Final Award, finding that the scope of the arbitration did include the Misappropriation Claims and reiterating that the Sole Arbitrator's orders from Procedural Order No. 2 remain in full force and effect. Also, the Sole Arbitrator admitted the Respondent's submission on *Threlkeld* and declined to consider the Claimant's.

61. On October 28, the Sole Arbitrator issued Procedural Order No. 6, which addressed the arguments raised in the Claimant's Application for Order on the Merits and award of Sanctions submitted April 28. The Sole Arbitrator agreed with the Claimant that the

Respondent willfully disregarded the Sole Arbitrator's orders, but chose not to draw an adverse inference at that time. He reiterated the orders from Procedural Order No. 5 and put the Respondent on notice that any further non-compliance with the Sole Arbitrator's orders could lead the Sole Arbitrator to draw an adverse inference against the Respondent, and that Claimant had a right to reapply for sanctions should the Respondent continue to not comply.

62. On November 14, the Sole Arbitrator held a video-conference with the Parties to determine a schedule for the hearings.

63. On the same day, the Sole Arbitrator issued Procedural Order No. 7, which memorialized the schedule agreed upon by the Parties during the video-conference. Notably, the hearings were set to take place the week of March 28, 2022 and would be held virtually given the quarantine requirements in effect at that time for travelers entering the People's Republic of China from New York.

64. On December 21, the Claimant submitted a Renewed Application for an Order on the Merits and an Award of Sanctions.

65. On December 24, the Claimant submitted a Supplemental Brief in Further Support of Its Renewed Application for Order on the Merits and Award of Sanctions and Motion to Strike.

66. On December 25, the Respondent submitted its Response to the Application.

67. On January 1, 2022, the Respondent submitted a Supplementary Response to the Supplemental Brief.

68. On January 8, the Sole Arbitrator issued Procedural Order No. 8, which addressed the submissions related to the Claimant's Renewed Application for an Order on the Merits and an Award of Sanctions. The Sole Arbitrator declined to rule on the Application or Supplementary Brief because most of the issues raised would be best addressed on a full

record at the scheduled hearings. He did address two issues raised relating to Mr. Chungang

Liu's affidavit and ordered the Respondent to remedy all formal defects with the affidavit by

January 31, 2022 and to make Liu available for questioning at the merits hearing. The Sole

Arbitrator also recorded changes to the timetable made via email, including that the Hearings

had been moved to the week of April 25, 2022 and directed the Parties to discuss on a

protocol for the virtual hearings and submit joint or separate proposals for the protocol by

March 17, 2022.

69. On January 10, the Claimant wrote to the Sole Arbitrator asking for a clarification on some

deadlines in Procedural Order No. 8 and asking for the Sole Arbitrator to order document

production relating to damages, because these requests were not originally included in the

document requests due to the arbitration being bifurcated.

70. On the same day, the Sole Arbitrator invited the Parties to submit document requests relating

to damages.

71. On January 13, the Claimant submitted the Claimant's Third Request for Production of

Documents and Second Set of Interrogatories.

72. On January 29, the Claimant wrote the Sole Arbitrator to indicate that the Respondent had

failed to timely respond to Claimant's Third Request for Production of Documents and

Second Set of Interrogatories. The Respondent indicated it was unable to provide the

documents requested in the Claimant's Third Request for Production of Documents and

Second Set of Interrogatories because they were confidential. The Respondent also indicated

that the deadline of 10 days for document production was not feasible because the upcoming

Chinese Spring Festival meant Chinese companies were overwhelmed with financial matters

in the last lunar month.

73. On February 18, the Claimant wrote to indicate the Respondent's failure to produce the documents requested in the Claimant's Third Request for Production of Documents and Second Set of Interrogatories was unjustified and indicated it intended to seek another adverse inference against the Respondent.

74. On February 23, the Sole Arbitrator held a call with the Parties to discuss the Claimant's Third Request for Production of Documents and Second Set of Interrogatories and the timetable for the arbitration.

75. On the same day, the Sole Arbitrator issued Procedural Order No. 9, which addressed the Claimant's document requests and interrogatories regarding damages and the schedule for the case going forward. The merits hearings for the case were moved to the week of September 12, 2022. The Sole Arbitrator postponed the decision on whether the hearings would take place in person or virtually until July 2022 depending on the state of quarantine requirements for China at that time.

76. On March 4, the Claimant submitted an Application to Compel Production of Documents and Responses to Interrogatories.

77. On March 18, the Respondent submitted a Response to the Claimant's Application to Compel Production of Documents and Responses to Interrogatories.

78. On March 30, the Sole Arbitrator issued Procedural Order No. 10.

79. On April 1, the Respondent indicated that it would begin to produce the requested documents from Procedural Order No. 10 after April 5, 2022, due to vacation for the Qingming Festival.

80. On April 8, the Claimant informed the Sole Arbitrator that it had not yet received any documents from the Respondent and was concerned about meeting the deadline for submission of its witness statements.

81. On April 9, the Sole Arbitrator instructed the Respondent to complete its document production no later than April 15, 2022.

82. Also on April 9, the Respondent produced some of the requested documents but raised concerns about its ability to produce all requested documents by April 15 due to lockdowns in Shanghai related to a COVID-19 outbreak.

83. On April 14, the Claimant sent an email to the Sole Arbitrator indicating that the Respondent's document production had deficiencies. In order to remedy these deficiencies, the Claimant proposed that the Sole Arbitrator re-order the Respondent to produce its financial information on a rolling basis, consider sanctions against the Respondent, and set a status conference to further discuss the deficiencies.

84. On the same day, the Respondent indicated it would produce another batch of documents prior to the April 15 deadline and addressed the points raised in the Claimant's email.

85. On April 15, the Sole Arbitrator noted the Parties' positions and ordered the Respondent to produce all financial documents by April 15 and to produce all other documents and answer the interrogatories by April 22.

86. On the same day, the Respondent produced a second batch of documents and indicated the only remaining documents, which would be sent by April 22, were the Respondent's articles of incorporation and the responses to the interrogatories.

87. On April 19, the Claimant alleged that the financial information in the Respondent's second batch of documents had no supporting evidence and may have been doctored. As a result, the Claimant requested that the Sole Arbitrator order the Respondent to produce complete and accurate financials within 48 hours, requested a one-week extension on submission of the Claimant's witness statements, and reiterated its prior request for a status conference.

88. On April 20, the Sole Arbitrator granted the Claimant's request for an extension and reiterated that the Respondent must complete its document production by April 22.

89. On April 22, the Respondent submitted its third batch of document production along with the answers to the Claimant's Second Interrogatories.

90. On April 27, the Claimant raised concerns with the Respondent's responses to the Claimant's Second Interrogatories and that the Respondent failed to provide any audited financial statements for the 2021 calendar year. The Claimant also requested an extension on submission of its witness statements. The Sole Arbitrator granted the Claimant's extension request and gave the Respondent until May 2 to respond to the points raised by the Claimant. The Sole Arbitrator also indicated that his inclination, if the Parties failed to reach an agreement on the two points raised, was to ask Respondent to make one of its senior officers or founders available to answer the Claimant's questions.

91. On May 2, the Respondent submitted a response to the Claimant's email of April 27 along with a summary of its financial statistics from 2021. The Respondent also indicated that it would prefer to not have its senior managers attend a videoconference to respond to the Claimant's questions due to the lockdown in Shanghai, but that it would make best efforts to provide more information to the Claimant if the Claimant would provide the Respondent with specific instructions.

92. On May 4, the Claimant submitted a response to both the audited financial information provided by the Respondent on April 22 and to the Respondent's May 2 email. The Claimant alleged that the financial information provided did not seem accurate, objected to the Respondent's concerns with the questions in its interrogatories, argued that the supplemental

information provided by the Respondent was insufficient, and reiterated its request to hold a videoconference with one of the Respondent's senior managers.

93. On the same day, the Sole Arbitrator invited the Respondent to respond by May 6, but indicated he was still inclined to order a Zoom conference with an ENCOO senior representative to answer the Claimant's questions with the Sole Arbitrator present as well as a court reporter, for which the Claimant would bear the costs subject to costs awarded at the end of the case.

94. On May 6, the Claimant submitted Witness Statements from Mr. Umesh Amin, Mr. He Fang, Mr. Bogdan Ripa, and Ms. Anyi Wang, and Expert Reports from Mr. Jerry Barth and Ms. Pamela O'Neill, as well as accompanying exhibits as a supplement to the Amended Arbitration Demand.

95. Also on May 6, the Respondent submitted a response to the Claimant's May 4 email. The Respondent argued that the Claimant's objections to the audited financial information were due to a misunderstanding of auditing norms, that the answers given in the interrogatories were sufficient, and that a videoconference with one of ENCOO's senior managers was not necessary but provided proposals for dates for the meeting, should the Sole Arbitrator find such a meeting necessary.

96. On May 10, the Claimant renewed its application for sanctions seeking adverse inferences based on the responses submitted by the Respondent in its prior emails.

97. On May 11, the Sole Arbitrator asked the Respondent to confirm the availability of a senior officer to attend the videoconference by no later than May 13 and deferred any decision on the Claimant's application for sanctions until after the videoconference.

98. On May 13, regarding the videoconference, the Respondent confirmed that a senior officer would be available on one of three proposed dates but noted that the identity of the senior officer would not be confirmed until three days before the videoconference.

99. On May 16, the Claimant indicated its preferred date and asked that the Respondent confirm the identity of the senior officer no later than 7 days before the videoconference, as well as indicate whether an interpreter would be required.

100. On May 19, the Respondent confirmed that Mr. Chungang Liu, CEO of ENCOO, would attend the videoconference and that it would engage a third-party interpreter.

101. On May 25, the Claimant held a videoconference in which it asked Liu questions to clarify the financial documents received as a part of document production. Counsel for the Respondent and the Sole Arbitrator were also in attendance.

102. On the same day, the Claimant submitted a list of questions that it did not get to ask at the videoconference due to timing and two document requests stemming from information it believes should have been included in the Respondent's document submissions.

103. On June 2, Respondent submitted a reply to the Claimant's questions and document requests.

104. On June 3, the Sole Arbitrator denied the Claimant's request for answers to additional questions and the two document requests beyond what the Respondent agreed to provide in its June 2 submission.

105. On the same day, the Respondent confirmed that it would respond to the Claimant's follow-up questions, other than Nos. 10, 14, and 15 by June 5 and reiterated that the Claimant's questions were mostly due to a misunderstanding of PRC accounting norms.

106.    On June 4, the Claimant submitted Claimant's Response to Respondent's Reply to Claimant's Further Document Requests and Supplemental Questions.

107.    On the same day, the Sole Arbitrator denied the Claimant's request for reconsideration of the Sole Arbitrator's decision denying its application on June 3 but indicated that the denial was only "at this time," and emphasized that the Claimant may reapply for additional information if the Respondent's answers were unhelpful or insufficient.

108.    On June 6, the Respondent submitted its responses to the Claimant's follow-up questions and addressed the arguments raised by the Claimant in its June 3 submission.

109.    On June 10, the Claimant submitted Claimant's Further Response to Respondent's Reply to Claimant's Further Document Requests and Supplemental Questions. In its Further Response, the Claimant requested that the Tribunal compel the Respondent to produce four additional categories of documents since the Respondent's response to the Claimant's questions were allegedly incomplete, insufficient, and unhelpful. Namely, the Claimant requested that Respondent produce: i) corporate organizational charts; ii) transfers to and from Respondent; iii) audited financial statements for 2017, 2018, and 2021; and iv) financial reports of related companies.

110.    On June 13, the Respondent submitted an opposition to the Claimant's Further Response on the grounds that the Claimant was attempting to expand the scope of discovery and that rather than requesting more documents, the Claimant should instead raise questions via email for Respondent's response. The Claimant submitted a response to the Respondent's June 13 email in which it provided further support for its June 10 Further Response.

111.    On June 14, the Respondent submitted Respondent's First Set of Requests for Production of Documents, which sought each and every historical version of the source codes of the

Claimant's Studio products since January 1, 2019 to the present and audited financial statements of years 2019-2022 of the Claimant. On the same day, the Sole Arbitrator invited Claimant to respond by June 22.

112.    On June 15, the Sole Arbitrator issued Procedural Order No. 11, in which he ordered the Respondent to produce its 2017, 2018, and 2021 audited financial statements, documents sufficient to show financial transfers to and from the Respondent from 2019 to 2021, and documents sufficient to identify the corporate organization structure of the Respondent, related companies, and consolidated companies. The Sole Arbitrator also denied any additional requests for information and documents that were not in the categories listed.

113.    On June 21, the Sole Arbitrator invited the Parties to confer on the schedule for the hearings and revert no later than June 27.

114.    On June 22, the Respondent submitted the Respondent's Request for an Extension of the Time Limit for Statement of Defence, in which it requested that the Sole Arbitrator extend the deadline for the Statement of Defence, postpone the hearing accordingly, and consider allotting more days for the hearing.

115.    Also on June 22, the Claimant submitted the Claimant's Response to the Respondent's Request for Production of Documents. The Claimant raised a general objection to Respondent's Request as untimely, made without leave of the Tribunal, and retaliation for the Claimant's own document production requests.

116.    On June 28, the Claimant submitted Claimant's Opposition to Respondent's Request for an Extension of Time for Its Statement of Defence, in which it argued against postponing the hearings and raised an additional argument that the hearings scheduled for the week of September 12, 2022 must take place in-person in New York City and not virtually.

117. Also on June 28, the Sole Arbitrator wrote to the Parties to indicate that, having reviewed the submissions, he would maintain the original deadline of July 28, 2022 for the Statement of Defence and that his ruling would be embodied in a forthcoming procedural order. The Sole Arbitrator also asked that the Parties, pursuant to Procedural Order No. 9, arrange a time to meet with the Sole Arbitrator in July 2022 in order to discuss whether the hearings would take place in-person or virtually. In preparation for this call, the Sole Arbitrator invited the Parties to make submissions no later than July 11 on the anticipated quarantine requirements for travelers returning to China for the time period during the hearings in September 2022.

118. On June 29, the Respondent submitted a Letter to the Tribunal in which it asked the Sole Arbitrator to reconsider his decision to not postpone the hearings.

119. On July 1, the Respondent submitted the Respondent's Reply to the Claimant's Response to the Respondent's First Set of Request for Production of Documents.

120. On July 5, the Respondent filed an Application for Claimant's Identification of Trade Secrets.

121. On July 6, the Sole Arbitrator issued Procedural Order No. 12, in which he denied both of the Respondent's requests from the Respondent's First Set of Request for Production of Documents.

122. On July 11, the Claimant filed its Opposition to the Respondent's Application for Claimant's Identification of Trade Secrets.

123. On July 14, the Sole Arbitrator and the Parties held a call, in which the Respondent requested the addition of a witness.

124. On July 15, the Respondent indicated the witness requested was Mr. Shichao Hu.

125.    On July 16, the Claimant raised an objection to the inclusion of Hu as a witness on the grounds that the Claimant had entered into a settlement agreement with Hu ("Supplemental Settlement Agreement") that prohibited contact with the Respondent, and thus Hu's appearance as a witness would be in violation of the Supplemental Settlement Agreement.

126.    On July 17, the Respondent responded to the Claimant's objection, arguing that the Claimant never disclosed its settlement agreement with Hu and that the Settlement Agreement involving the Respondent does not prohibit Hu's participation as a witness.

127.    On July 18, the Claimant replied to the Respondent's response to its objection, arguing that the Supplemental Settlement Agreement with Hu stated he should refrain from further contact with the Respondent and indicated that if Hu were included as a witness, the Claimant would need an additional day for cross-examination.

128.    On July 19, the Respondent informed the Sole Arbitrator that it had added Mr. Anton Ware and Ms. Tereza Gao of Arnold & Porter to its counsel team.

129.    On July 20, both Parties sent comments on the Sole Arbitrator's proposed agenda for the videoconference to take place on July 21. The Claimant submitted Claimant's Reply in Further Support of its Opposition to Respondent's Application for Claimant's Identification of Trade Secrets. The Respondent submitted Respondent's written submission regarding the virtual/physical hearing issue. On the same day, the Claimant submitted a response to this submission.

130.    On July 21, the Sole Arbitrator and the Parties held a videoconference to discuss the time allocation for the hearings, whether the hearings would take place virtually or in-person, the Respondent's application with respect to source code review, the Respondent's application that Claimant identify its trade secrets, and an alleged improper communication by Claimant.

Vincent Filardo and Robert Whitman of King & Wood Mallesons appeared as primary

counsel on behalf of the Claimant and Anton Ware of Arnold & Porter appeared as primary

counsel on behalf of Respondent.

131.    On July 22, the Respondent submitted a clarification on the Protective Order.

132.    On July 25, the Sole Arbitrator issued Procedural Order No. 13, which addressed the

various issues related to the hearings that were the subject of the July 21 videoconference.

The Sole Arbitrator declined to grant any extension of the deadline to submit the Statement

of Defence that would require postponement of the hearings and determined that the hearings

would take place in person in New York during the week of September 12, 2022. The

Respondent submitted a request to extend the deadline for the Statement of Defence by one

week and to schedule another hearing in addition to the currently scheduled hearings to

address the expert report. The Respondent additionally informed the Sole Arbitrator that it

had sent written notice to the Claimant to initiate the expert-designation process under the

Protective Order and requested a time limit of 30 days for submission of its technical expert

report following the Claimant's confirmation of its approval of the participation of the expert.

133.    Also on July 25, the Sole Arbitrator granted the Respondent's request to extend the

deadline for the Statement of Defence.

134.    On July 27, the Claimant asked the Respondent to confirm the visa status of its witnesses

and asked that the Respondent's expert witness execute an addendum to his

acknowledgement in order to confirm that he is aware of the Protective Order's provisions.

135.    Also on July 27, the Respondent confirmed that Mr. Chungang Liu, Mr. Shichao Hu, Mr.

Qiufang Shi, and Mr. Kevin Duan would appear on behalf of the Respondent and that all

witnesses other than Duan held a visa within the validity period.

136.    On July 28, the Claimant submitted a response to the Respondent's July 25 email correspondence.

137.    On August 4, the Respondent submitted a request to extend the deadline for the submission of the Statement of Defence by three days, as well as the submission of its expert report, and reiterated concerns that a week would not be sufficient to complete the hearings. The Sole Arbitrator granted Respondent's request to extend the deadline for the Statement of Defence and invited the Parties to each submit a timetable for the hearings in the event that the experts are to be heard on a separate hearing date.

138.    On August 8, the Respondent submitted the Statement of Defence as well as witness statements from Mr. Chungang Liu, Mr. Shichao Hu, Mr. Qiufang Shi, and Mr. Zhichao Duan.

139.    On August 10, the Sole Arbitrator held a call with the Parties to determine final issues related to the hearings. The Sole Arbitrator also raised the possibility of appointing a tribunal secretary.

140.    On August 11, The Sole Arbitrator sent an email summarizing the points discussed during the call, including when Fry would present his testimony, Hu's contact information, the venue for the hearings, and documents appended to Respondent's witness statements.

141.    Also on August 11, the Respondent provided comments to the points listed by the Sole Arbitrator on the call.

142.    On August 12, the Claimant responded to the Respondent's comments. The same day, the Respondent raised objections to the Claimant's email.

143.    On August 14, the Claimant provided a list of outstanding issues that would potentially require the Sole Arbitrator's intervention to decide. The Respondent provided additional

comments on the issues raised by the Claimant. The Claimant responded to the Respondent's additional comments.

144.    On August 16, the Claimant asked that the Sole Arbitrator and the Parties hold a call the following day and identified four issues to discuss, which were the Respondent's correspondence with Mr. Hu, documentary evidence for $30 million in funding that ENCOO received, the date of the Respondent's expert witness report, and the dates of expert testimony. The same day, the Respondent provided its comments on the Claimant's proposed agenda and added the additional discussion item of the evidence bundles.

145.    On August 17, the Sole Arbitrator and the Parties held a conference call to discuss the outstanding issues. On the same day, the Sole Arbitrator provided a summary of the decisions made during the call.

146.    On August 19, the Respondent submitted the Second Witness Statement of Mr. Qiufang Shi and accompanying exhibits.

147.    On August 22, the Respondent submitted English translations of two of the exhibits used in Mr. Shi's Second Witness Statement. The Respondent submitted new document production requests based on Mr. Hu's review of the Witness Statements of Mr. Umesh Amin and Mr. Munil Shah.

148.    On August 24, the Claimant submitted its objections to the Respondent's new document production requests and asked that the Sole Arbitrator strike Shi's Second Witness Statement and bar any further supplemental witness statements because it was submitted without leave of the Sole Arbitrator. Also, following consultation between the International Centre for Dispute Resolution and the Parties, Ms. Camille Ramos-Klee was appointed Tribunal Secretary in this arbitration.

149.    On the same day, the Sole Arbitrator granted two of the Respondent's document
production requests and denied the other two requests on the grounds that production would
involve a heavy burden. He also denied the Claimant's application to strike Shi's Second
Witness Statements and indicated that unless expressly authorized, no further witness
statements or expert reports could be submitted by either Party. The Claimant brought to the
Sole Arbitrator's attention that the Respondent had not produced any of the documents it had
been ordered to produce during the call on August 17.

150.    On August 25, the Respondent requested that the Sole Arbitrator reconsider his decision
to deny two of the Respondent's requests for document production.

151.    On August 26, the Claimant responded to the Respondent's request that the Sole
Arbitrator reconsider his decision on document production.

152.    Also on August 26, the Claimant requested that the Sole Arbitrator strike portions of Shi
and Liu's witness statements, as well as accompanying exhibits, that reference the
Respondent's source code because the Respondent did not make the source code available to
the Claimant.

153.    On August 27, the Sole Arbitrator acknowledged that the Parties differed on the burden
of producing certain documents and asked that the Claimant produce any documents
responsive to Requests A and D that could be produced with little burden. He also indicated
that if Claimant produced no documents, then he would explore with counsel at the hearings
the burden involved with the production.

154.    On August 29, the Sole Arbitrator asked the Parties to clarify the schedule for the
hearings.

155.    On August 30, the Respondent produced documents it had been ordered to produce at the August 17 conference call.

156.    Also on August 30, the Respondent submitted the Respondent's Opposition to Claimant's Application to Strike Exhibits and Portions of Respondent's Witness Statements.

157.    On August 31, the Claimant proposed that the Parties' opening and closing statements and the Claimant's Renewed Motion for Sanctions be submitted and addressed separately from the hearing. The Claimant also confirmed that the Parties had agreed that the hearings would take place at the AAA facilities in New York. The Sole Arbitrator indicated he preferred opening statements to be delivered live on the first day of hearings and stated the Parties should aim to complete the hearings in the six days set aside, September 12-16 and September 21. The Claimant also submitted a response to the Respondent's Opposition to Claimant's Application to Strike Exhibits and Portions of Respondent's Witness Statements and renewed its request for an extension on the deadline for the Reply.

158.    On September 1, the Respondent confirmed certain procedural matters related to the hearings, raised concerns about the Claimant's request to extend its deadline for the Reply, and suggested the Parties dispense with the scheduled simultaneous pre-hearing briefs in order to reserve more time to prepare for the hearings. The Claimant raised objections to some of the Respondent's procedural requests, requested additional time allocation to the Claimant at the hearing, and agreed to dispense with the pre-hearing briefs.

159.    On September 2, the Sole Arbitrator ordered that opening statements would be allowed at the hearing, asked that the Parties confer about the timing allocation for each witness, and determined that the deadline for the Reply would be September 6.

160.    On September 5, the Claimant sent its proposed time allocation. On the same day, the Sole Arbitrator raised concerns that the allocations proposed by the Claimant was not a fair or acceptable proposal and asked that the Parties confer.

161.    On September 6, the Claimant submitted the Reply Statement of Claim and Reply Witness Statements from Mr. Dai Menghao, Mr. He Fang, Mr. Umesh Amin, and a Supplemental Expert Report from Ms. Pamela O'Neil. The Claimant also indicated that Amin's Witness Statement had been designated as Highly Confidential – Attorneys' Eyes only ("AEO") under the Protective Order. The Respondent submitted a response to the Claimant's Response to the Respondent's Opposition to Claimant's Application to Strike Exhibits and Portions of Respondent's Witness Statements, including new requests for production of documents. On the same day, the Sole Arbitrator denied Respondent's requests for document production but kept the possibility of addressing document-related issues open for the Hearing.

162.    On September 7, the Respondent raised an objection to Amin's Witness Statement being designated as AEO. On the same day, the Claimant clarified why it had marked Amin's Witness Statement as AEO and indicated that it had no objection to Hu seeing the AEO version. The Respondent also produced early object code versions in response to the Claimant's prior requests.

163.    On September 8, the Parties submitted a joint proposal on timing allocation for cross-examination of witnesses.

164.    Also on September 8, the Claimant submitted the Claimant's Reply Expert Report and Witness Statement of Mr. Jerry Barth

165.   On September 9, the Respondent argued that the Barth Reply Expert Report had identified a new set of alleged similarities between UiPath and ENCOO's source codes and requested that the newly-alleged similarities be excluded from the record or in the alternative, that Respondent be given opportunity after the hearing to present factual and expert evidence to address the new allegations.

166.   Also on September 9, the Claimant produced the native file of Exhibit D to the Witness Statement of Munil Shah.

167.   On September 10, the Sole Arbitrator directed the Parties to be prepared to discuss the Respondent's September 9 request at the hearings.

168.   On September 10, the Respondent alerted the Sole Arbitrator that it had not received a copy of the AEO version of Amin's Witness Statement. On the same day, the Claimant sent a copy.

169.   On September 11, the Claimant responded to the Respondent's September 9 submission. The Respondent submitted the Respondent's Hearing Bundles.

170.   By the agreement of the Parties and pursuant to Procedural Order No. 9, an oral hearing took place between September 12 and 16 and on September 21 (the "Hearing") at the AAA-ICDR's Midtown office in New York. Claimant UiPath was represented by King & Wood Mallesons and Respondent ENCOO was represented by Arnold & Porter and Han Kun Law Offices. The Sole Arbitrator and Tribunal Secretary, Camille Ramos-Klee, were in attendance as were a court reporter, three Chinese-English interpreters, and an IT specialist.

171.   At the Hearing, Mr. Bogdan Ripa, Mr. Munil Shah, Mr. Umesh Amin, and Mr. He Fang were called as fact witnesses and Ms. Pamela O'Neil and Mr. Jerry Barth were called as expert witnesses for UiPath, were examined by counsel for UiPath and cross-examined by

counsel for ENCOO. All Claimant's witnesses testified in-person with the exception of He Fang, who appeared virtually.

172.    Also at the Hearing, Mr. Chungang (Sean) Liu, Mr. Shichao Hu, and Mr. Quifang Shi were called as fact witnesses and Mr. Peter Fry was called as an expert witness for ENCOO. They were examined by counsel for ENCOO and cross-examined by counsel for UiPath. All Respondent's witnesses testified in-person with the exception of Shi, who appeared virtually.

173.    On September 13, the Claimant produced a document that was referenced at the Hearing and the Respondent provided a corrected witness statement of Mr. Chungang Liu, as well as five documents that had been referenced at the Hearing. Respondent also informed Claimant and the Sole Arbitrator that it had decided not call Mr. Dai Menghao for cross-examination. The Parties and the Sole Arbitrator agreed that Mr. Menghao's presence was not necessary.

174.    On September 14, the Claimant alerted the Respondent and the Sole Arbitrator that the object code received on September 7 only contained the code for Studio IDE and did not have the UI Automation Code. The Claimant requested that the Respondent produce the full code. The Claimant also indicated that Respondent confirmed it would not call Mr. Kevin Duan for additional direct examination and accordingly, Claimant would not cross-examine Mr. Duan. As approved by the Sole Arbitrator, the Parties agreed Mr. Duan's presence was not necessary.

175.    On September 15, the Respondent argued that the object code produced on September 7 did contain the UI Automation Code and provided instructions on where to locate it. The Respondent also produced the Respondent's business plans related to the fundings referenced in Mr. Chungang Liu's Witness Statement.

176.    On September 18, the Respondent provided a clarification on Han Kun Law Office's representation of Mr. Shichao Hu.

177.    On September 19, Claimant provided a response to Respondent's clarification on Han Kun Law Office's representation of Mr. Shichao Hu. The Respondent submitted the Third Witness Statement of Mr. Qiufang Shi as well as accompanying exhibits. The Respondent also offered to make Shi available to cross-examination during the September 21 Hearing to discuss his Third Witness Statement.

178.    On September 20, the Claimant made an application to either strike the September 19 submissions from Fry and Shi in their entirety because they rely on information never produced or alternatively that the Respondent be compelled to produce its source code and object code and not be allowed to rely on ENCOO design or development documents not produced prior to the August 6 Witness Statements. Claimant also submitted Claimant's Supplemental Reply Witness Statement for Mr. Umesh Amin, the Second Supplemental Expert Witness Statement of Mr. Jerry Barth, and a copy of Mr. Hu's 2019 Performance Review.

179.    On the same day, Claimant indicated it would not seek to further cross-examine Shi at the September 21 Hearing, but that it reserved the right to seek leave of the Sole Arbitrator to cross-examine him on a more reasonable timetable on the grounds that the submission of Shi's Third Witness Statement was unauthorized.

180.    On September 22, the Sole Arbitrator asked the Parties for submissions on whether additional hearing dates were needed and on the submission of post-hearing briefs. The Sole Arbitrator stated:

I write both to thank both parties for the high quality of their advocacy, as well as their civility, over the course of the hearings and to discuss next steps.

I am mindful that, over the course of the hearings, each Party made various applications for additional evidence that, if granted, may potentially require the recall of witnesses and I am conscious that each Party may be contemplating other applications. Since it is important that each Party has a fair opportunity to present its case, I would ask each Party to consider carefully at this time what further steps it might request prior to the issuance of a final award.  I know that travel schedules, especially for the Respondent's team, might make an immediate submission impractical, but I would like to set a date for submissions of October 3.  If this proves too difficult for the Respondent, I am, of course, happy to postpone that deadline.

The Parties should also discuss the submission of post-hearing briefs, including whether they should be simultaneous or sequential, and how many rounds.  However, it would make sense for the Parties to make their submissions on next steps (if any) before fixing a date for the submission of post hearing briefs.

181.    On September 26, the Claimant submitted its proposal on post-hearing submissions and outstanding discovery applications. The Claimant also indicated it had several pending sanctions motions still open and asked that the Sole Arbitrator consider and rule on the motions prior to or at the time of the Award. In response to the Sole Arbitrator's question on whether additional discovery or witness testimony would be necessary, Claimant wrote "Claimant will not make any further discovery applications and, if Respondent is of a similar mindset, will not seek to recall any additional witnesses. Claimant reserves its right to do so should Respondent seek additional testimony."

182.    On September 28, Respondent submitted Mr. Fry's Hearing presentation slides in response to a document production request made at the Hearing.

183.    On October 4, Respondent submitted its response to the Sole Arbitrator's email communication of September 22, quoted above, where he noted: "Since it is important that

33

each Party has a fair opportunity to present its case, I would ask each Party to consider carefully at this time what further steps it might request prior to the issuance of a final award."  In its response, the Respondent made a proposal on post-hearing schedules and produced five documents that had been requested by the Claimant during the Hearing. Regarding the Claimant's sanction motions, the Respondent requested to be heard, either through written submissions or a Zoom hearing, prior to the Sole Arbitrator making any decision. In response to the Sole Arbitrator's question on whether additional discovery or witness testimony would be necessary, the Respondent wrote "the Respondent will not seek to recall any additional witnesses, nor will the Respondent make additional discovery requests."  Other than these steps, the Respondent did not request that any other steps be taken in the arbitration in response to the Sole Arbitrator's specific invitation that it outline such steps to ensure it had "a fair opportunity to present its case."

184.    On October 5, the Sole Arbitrator sent an email indicating that he was not inclined to permit any further discovery, setting a deadline for post-hearing briefs, and asking Claimant to clarify which sanctions motions it sought to pursue.

185.    On October 12, the Claimant provided a summary of its outstanding sanctions motions and indicated that it planned to cover the sanctions in more detail in its post-hearing brief.

186.    On November 15, the Respondent requested a one-week extension on submission of the post-hearing briefs.

187.    On the same day, the Claimant objected to the Respondent's extension request on the grounds that the new deadline would fall directly after the Thanksgiving holiday in the US and would not benefit the Claimant.

188.    On November 16, the Respondent amended its extension request to four additional days, which was granted by the Sole Arbitrator.

189.    On November 18, the Claimant requested an increase of the page limits for the post-hearing briefs from 70 pages to 85 pages, which was granted by the Sole Arbitrator.

190.    On November 21, the Respondent asked that the deadline for the post-hearing briefs be extended from November 22 to December 1 based on the increase in allotted pages. The Claimant objected to the Respondent's extension request on the grounds that the Respondent had not shown additional work would be needed.

191.    On the same day, the Sole Arbitrator granted the Respondent's request for a deadline extension with the understanding that no further extensions would be granted.

192.    On December 1, both Parties submitted their post-hearing briefs, along with separate submissions on sanctions. The Respondent also submitted Compressed Proceedings Transcripts which were referenced in its brief.

193.    On December 2, the Claimant submitted the full suite of final transcripts from the Hearing.

## V.    Requests for Relief

### A.    Claimant

194.    The Claimant requests that the Sole Arbitrator:

a.   Issue a declaration that Respondent ENCOO has breached its obligations under the Settlement Agreement and violated New York and federal law as provided herein;

b.   Grant to the Claimant compensatory damages in an amount of $265 million and punitive damages in an amount not more than two times the amount of compensatory damages awarded;

c.  Grant to the Claimant injunctive relief enjoining the Respondent from further using, disclosing, or exploiting the Claimant's trade secrets.

d.  Grant to the Claimant pre- and post-judgment interest at the New York statutory rate of nine (9) percent;

e.  Grant to the Claimant attorneys' fees and costs incurring by UiPath in this Arbitration; and

f.  Grant to the Claimant all other and further relief to which UiPath may be entitled.

**B.    Respondent**

195.  The Respondent requests that the Sole Arbitrator:

a.  Deny all demands sought by the Claimant in the Amended Arbitration Demand.

b.  Order that the Claimant shall bear all the fees, expenses and costs in relation to the present arbitration proceedings, including without limitation to the fees of the Tribunal and the Respondent's attorney's fees.

**VI.    Analysis**

196.  The Sole Arbitrator has carefully reviewed the submissions and evidence submitted by the Parties and considers four main claims raised by Claimant: a) Misappropriation Claims; b) Breach of the Settlement Agreement and the Covenant of Good Faith and Fair Dealing; 3) a motion for sanctions; and 4) damages, if any are warranted.

197.  Each section will contain an outline of the relevant facts, a summary of each Party's position, and the Sole Arbitrator's analysis. The undisputed facts and Party position sections will summarize evidence and arguments submitted in the Amended Demand for Arbitration, the Statement of Defence, the Statement of Reply, the Hearings, each Party's post-hearing brief, and all accompanying witness statements, witness testimony, and exhibits. The Sole

Arbitrator emphasizes that he has reviewed and considered all the factual and legal arguments presented by the Parties in their submissions. The fact that this Award may not expressly reference all arguments does not mean that such arguments have not been considered; the Sole Arbitrator includes only those points which he considers most relevant for his decision.

198.    As an initial matter, under New York law, the Claimant is required only to prove its claims by a preponderance of the evidence, meaning that the facts asserted are more probably true than false. *Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983). The Respondent has not contested this burden of proof and thus the Sole Arbitrator will decide whether the Claimant has met this burden by reference to this standard.

### A.    Misappropriation Claims

199.    The analysis in this section relates to five of the Claimant's eight claims against the Respondent: 1) violation of the Defend Trade Secrets Act; 2) misappropriation of UiPath's trade secrets in violation of New York common law; 3) aiding and abetting breach of fiduciary duty; 4) unfair competition with UiPath in violation of New York common law; and 5) unjust enrichment.

### 1.    Statement of Facts

200.    The basis for the Claimant's Misappropriation Claims stem from what the Claimant alleges is a conspiracy between the Respondent, namely ENCOO's co-founders Mr. Chungang Liu ("Liu") and Mr. Qiufang Shi ("Shi"), and Mr. Shichao Hu ("Hu"), a former employee of the Claimant, to access and download the Claimant's confidential RPA Source Code for ENCOO's benefit.

### i.        The Parties

201.    UiPath, the Claimant, was founded in 2005 in Romania and has since grown to over

4,000 employees in 40 offices around the world, including in Bellevue, Washington (Umesh

Amin Statement, ¶4). UiPath has been a pioneer in the RPA field since its inception and

since 2018 has been the world's largest RPA company by market share (Bogan Ripa

Statement, ¶¶5-6, 8). UiPath released its first enterprise RPA Products in 2015, which

included Studio, Robot, and Orchestrator (*Id.*, ¶7-8).

202.    Liu established ENCOO, the Respondent, twelve years later, in July 2017 (Liu Statement,

¶11). ENCOO was initially a software consulting and testing outsourcing company but in

early 2018, Liu decided to change ENCOO's focus to RPA (*Id.*).

### ii.       Hu's Work History and Employment with the Claimant

203.    Hu worked at Microsoft, first in Shanghai starting in 2007 and then in Seattle from 2011

until December 2018 (Shichao Hu Statement, ¶¶5-6). During his time in Shanghai, Hu

worked in the same Shangai Zizhu Science Park building as Shi, but potentially on different

floors (9/15/22 Tr. (Hu) 96:3-8). Liu also worked at Microsoft, though he joined Microsoft

Shanghai after Hu had transferred to Microsoft's Seattle office (Chungang Liu Statement,

¶8). Liu and Shi knew each other at Microsoft because they worked on the same floor and

had the same manager (Chungang Liu Statement, ¶5; Qiufang Shi Statement, ¶4).

204.    In his time at Microsoft, Hu did not work on any RPA products or gain any other RPA

experience (9/15/22 Tr. (Hu) 27:17-19). Hu chose to leave Microsoft in December 2018

(Shichao Hu Statement, ¶¶6, 13, 21).

205.    On December 21, 2018, Hu was hired by UiPath as Director of Engineering ███████

████████████████████████████████ Munil Shah Statement, ¶9). As a term of

his employment, Hu signed the Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement"), executed on December 21, 2018, which covered, among other matters, the Claimant's trade secrets, software, and research and development (Exh. R-B-5). On January 28, 2019, Hu officially joined UiPath (Shichao Hu Statement, ¶21).

206.    Hu's job tasks as Director of Engineering involved ███████████████



(Munil Shah Statement, ¶14). Hu was not hired to work on RPA products and was not an expert on RPA products (9/15/22 Tr. (Hu) 227:12-13).

207.    A limited group of UiPath employees had access to the Source Code repositories in an effort to keep the Source Code protected and secure (Munil Shah Statement, ¶23). Hu was granted access to the Source Code repositories but did not have authorization to make changes to the Source Code.  Rather, he would have had to contact someone from the software development team to make any changes (Munil Shah Statement, ¶25). Hu accessed and continued to update his version of the Claimant's Source Code throughout his employment at UiPath (Munil Shah Statement, Exh. D).

208.    In March 2019, Hu traveled to UiPath's Romania office in order to work with the R&D teams of UiPath's Studio, Robot, and Orchestrator products (Shichao Hu Statement, ¶25).

### iii.      Respondent's Recruitment of Hu

209.   Shi began working at ENCOO in June 2019, following a series of conversations with Liu, one of which contemplated the hiring of RPA experts (9/16/22 Tr. (Shi) 80:16-81:22). On April 24, 2019, Liu sent Hu a LinkedIn message proposing they connect on WeChat since they had a mutual contact.  Liu followed up with a WeChat message on May 6, 2019 (Ex. R-B-7). Shi also contacted Hu via WeChat on May 6 to set up a dinner while Shi was in California (Ex. R-C-1). Shi and Hu met for dinner in Redmond Washington on May 17, 2019 (Shichao Hu Statement, ¶40).

210.   Hu stated that on July 20, 2019, he went to China on a two-week vacation to see his family in Wuhan (Shichao Hu Statement, ¶41). During that time, Hu stated that he was contacted by a headhunter about a position at Cyclone, a Chinese RPA company, which prompted Hu to research the RPA market in China. As a result of this research, Hu messaged Liu to request a meeting (Ex. R-A-10 at 1-2). On July 31, 2019, Hu met with Cyclone's CEO and received an offer to join Cyclone, which he eventually declined (Shichao Hu Statement, ¶47). On August 3, 2019, Hu met Liu for dinner in Shanghai, after which they went to ENCOO's offices for a product demonstration (Shichao Hu Statement, ¶49). Liu offered Hu a position at ENCOO during the dinner (*Id*., ¶48). Hu then met with investors in Cyclone and ENCOO, who suggested that he join ENCOO (9/15/22 Tr. (Hu) 172-179).

211.   Hu received a formal employment offer from ENCOO on August 5, 2019 (Shichao Hu Statement, ¶56). Hu negotiated his salary with Liu, who ultimately agreed to ▮▮▮▮▮▮ as a base salary with stock options valued at approximately ▮▮▮▮▮▮ (Ex. R-A-10 at 12). This salary was higher than those paid to Liu and Shi (Exh. R-A-10 at 5). Hu's title would be

Co-Founder and Chief Product Officer. Hu accepted the offer on August 14, 2019 and asked

Liu to not advertise his hiring (Ex. R-A-10 at 11, 13).

212.    Hu resigned from his position at UiPath on August 15, 2019 (Shichao Hu Statement,

¶58). As an explanation, Hu informed his supervisor, Munil Shah ("Shah"), that he would be

resigning from UiPath in order to return to China to take care of his parents and would be

unemployed (Munil Shah Statement, ¶27). Shah offered Hu the chance to either work for

UiPath remotely from China or to open a UiPath development facility in China (Munil Shah

Statement, ¶27). Hu declined both offers. Hu never mentioned to either Shah or to Umesh

Amin ("Amin"), UiPath's Senior Vice President and Global Head of Intellectual Property,

that he had secured a position in China nor that the position was RPA-related (Umesh Amin

Statement, ¶¶10, 20).

213.    On the same date he announced his resignation, Hu accessed Claimant's Source Code

(Munil Shah Statement, Exh. D). Hu's access of the Source Code was recorded on UiPath's

GitHub repository (*Id*.). At the time of his resignation, Hu wiped his UiPath devices prior to

returning them (Exh. R-B-5, §4; Umesh Amin Reply Statement, ¶¶9-10).

### iv.    Hu's Employment with Respondent

214.    On September 18, 2019, Hu began the position of Chief Product Officer at ENCOO

(Shichao Hu Statement, ¶64). Hu's new role was focused on future product strategy and

design-related work rather than writing code, which had been his main responsibility at

UiPath (*Id*.). Shi, as CTO, took on most code writing and programing work (*Id*., ¶65).

215.    ENCOO first began developing the code for its Studio product on November 25, 2018

(9/14/22 Tr. (Liu) 46:9-24). In August 2019, ENCOO released a commercial version of its

41

Studio Product (Barth Second Supplemental Report, ¶ 13). In March 2020, ENCOO released a new version of Studio that was significantly more polished (*Id*.).

216.    After several pitches by Liu, ENCOO received $5 million in investments from GSR ventures in April 2019 and $10 million from Sequoia and Future Capital in July 2019. After Hu joined ENCOO, he began to support Liu in developing business plans and pitches for investors (Shichao Hu Statement, ¶67), and ENCOO received a further $20 million in investments by early 2020 (9/15/22 Tr. (Hu) 217:6-25-220:3).

217.    Press releases from March and April 2020, which were used to attract investors, stated that Hu, Liu, and Shi knew each other from Microsoft, Hu had significant experience in RPA products, and Hu was an ENCOO founding member (Umesh Amin Statement, Exh. L).

218.    Hu decided to leave ENCOO in April 2020, stating that he had concerns about the sophistication of ENCOO's products and that Liu's product demonstration in August 2019 had fooled him into overestimating the maturity of ENCOO's RPA products (Shichao Hu Statement, ¶¶68, 72, 73). Hu began job searching in May 2020 and submitted his resignation from ENCOO as a term of the Settlement Agreement in July 2020 (*Id*. at ¶80). The process of Hu's resignation was finalized under Chinese labor law on September 7, 2020 (*Id*.). Immediately upon resigning from ENCOO, Hu returned to the US to look for work (*Id*.).

### 2.    Claimant's Position

#### i.    Factual Arguments

219.    The Claimant asserts that a conspiracy existed between Liu, Shi, and Hu to use Hu's employment with UiPath as a means to misappropriate UiPath's Source Code.

220.    To begin, the Claimant argues that, despite their denials, Hu, Liu, and Shi knew each other prior to working together at ENCOO. The Claimant suggests that all three men had met each other while working at Microsoft and highlights that they each knew the same

supervisor, Yang Cao. The Claimant supports these assertions through a press release from

the Respondent's website stating that Hu previously met Liu and Shi while working at

Microsoft (Umesh Amin Statement, Exh. J). The Claimant does not accept the Respondent's

argument that the press release contained invented facts as a marketing material. The

Claimant also emphasizes that while Liu and Hu never overlapped at Microsoft Shanghai,

Shi and Hu worked in the same building for four years and could have conceivably crossed

paths in that time.

221.    The Claimant raises questions about Hu's reasons for joining UiPath. Shah, whom the

Sole Arbitrator found to be a highly credible and professional individual, was Hu's

supervisor while working at UiPath. He noted that Hu took significantly less convincing to

accept a job at UiPath than other recruits, which Shah found unusual (Munil Shah Statement,

¶12). Hu's decision further surprised Shah because Hu joined UiPath from Microsoft. At the

time, UiPath only had 5-10 employees at its Bellevue, Washington office, which meant it

could not offer the same level of prestige, pay or benefits as Microsoft (Munil Shah

Statement, ¶9; 9/12/22 Tr. (Shah) at 282:12-284:16). The Claimant casts further doubt on

Hu's stated motivations for joining UiPath by pointing to a statement from Hu that he left

Microsoft in the hopes of obtaining a higher salary from a large company such as Google or

Facebook (Shichao Hu Statement, ¶¶6, 13, 21). Hu did not get a higher salary from UiPath.

222.    A point of dispute between the Parties is whether Hu was required to access the Studio

Source Code to fulfill his job responsibilities. Claimant argues that though Hu's status as

Director of Engineering allowed him to access UiPath's Source Code, none of his work

responsibilities related to Studio or required him to access Studio's Source Code (Munil Shah

Statement, ¶15). The Claimant questioned Hu's assertion that he accessed the Studio Source

Code for innocuous reasons (e.g. as a part of his work connecting AI Fabric to Orchestrator or in preparation for a training trip to Romania). Hu at one point made a comment about needing to access the Source Code in order to debug it (9/15/22 Tr. (Hu) at 247:5-15, 248: 5-15) but under further questioning from the Claimant, he could not identify a time or single function that he debugged (*Id*. 248:16-249:8, 251:15-25). The Claimant also emphasizes that Hu continued to update his local copy of UiPath's Source Code, including the day after he accepted ENCOO's offer and the day he announced his resignation from UiPath.

223.    The Claimant questions the extent of Liu and Shi's initial contact with Hu. The Claimant points to the timing of Liu and Shi's independent outreach to Hu, which occurred within 8 minutes of each other on the same day via WeChat following an initial LinkedIn message sent the week before (Exh. R-B-8 at 1). The Claimant suggests that that there must be messages missing from those produced by ENCOO.  Specifically, the Claimant highlights a message sent by Shi on May 14, 2019, in which he informed Hu that he was in the US and asked for a convenient time to meet for dinner. Both Hu and Shi confirmed that they met for dinner on May 17, 2019 but there were no written communications between the two arranging a time or a location for their dinner.  The only reasonable inference, according to the Claimant, is that there must have been other communications between the two.

224.    The Claimant also casts doubt on Hu and Shi's claims that, during this dinner, they only discussed the RPA market in general and did not mention ENCOO or UiPath. The Claimant additionally finds Shi's trip to the US suspect given that "he does not speak English well, had never in his 14-year tenure at Microsoft worked in the U.S., and never mentioned Washington or Microsoft in his communications to Hu." (Claimant's Post-Hearing Brief, pg 53). Adding to this suspicion, the press release that mentioned all three men knew each other

while working at Microsoft also mentioned that Shi went to the US specifically to find Hu and persuade him to join ENCOO. In general, the Claimant suggests there may have been more to these conversations, as well as Hu's July 2019 trip to China during which he visited ENCOO's facilities.

225.    The Claimant also contests Hu's testimony that he chose to leave UiPath because he was disliked the late work hours with the Romanian team, had difficulty recruiting engineers, and found many engineers were not familiar with RPA products. The Claimant alleges that UiPath has no set hours, which means employees could work whenever they wanted, and that Hu was able to recruit many engineers from some of the biggest tech companies.

226.    The Claimant notes that Hu did not disclose to the Claimant that he intended to build a world-class RPA platform in China or even that he planned to continue to work in the RPA space. Rather, Hu told Shah and Amin that he was moving to China to take care of his parents and would be unemployed. The Claimant also emphasizes that Hu asked Liu to keep a low profile on him joining ENCOO.

227.    The Claimant raises questions about whether Hu's role was in fact separate from the process of writing code, pointing out that ENCOO's engineering headcount included Hu and that the engineering team only had ten engineers, none of whom had RPA experience (R-C-13).

228.    Following Mr. Hu's hiring, ENCOO released an RPA product called "Studio," which the Claimant alleges could not have been created without intimate knowledge of UiPath's proprietary and confidential information. The Claimant emphasizes that it took UiPath fifteen years to develop its Studio product and other RPA products, whereas ENCOO alleges to have created a comparable product in less than one year with far fewer engineers, resources, or

experience. The Respondent has argued that it was able to develop its product so quickly due to Microsoft's WWF and .Net technology providing a "mature RPA development framework."  The Claimant responds that this cannot account for the Respondent's speed on the ground that these are software development tools that can be used to develop any software product, including those that do not have RPA functions. The Claimant further asserts that Microsoft itself, the creator of these tools, does not have an equivalent product that can compete with UiPath's Studio product, even after acquiring an RPA company in 2019 in an attempt to further develop its RPA offerings (9/13/22 Tr. (Amin) at 6:24-8:6).

229.    The Claimant's technical expert, Mr. Jeremy Barth ("Barth"), analysed the Claimant's Source Code for its Studio product compared with an obfuscated executable object code of ENCOO's Studio product and offered the opinion that the many similarities could be explained only by the fact that the Respondent had misappropriated the Claimant's Source Code. Namely, Barth found that ENCOO's source code from both its April 2020 product and its November 2021 product were so similar to UiPath's Source Code that they had to have been derived from the same technology. Barth found that some superficial changes had been made to make the source codes appear different upon a cursory review, but no meaningful changes had been made to the product.

230.    Barth responded to the Respondent's technology expert, Mr. Peter Fry, who attributed the similarities to using the same public domain software development tools, that the similarities between the products are deeper than just using the same tools.

231.    The Claimant also emphasizes that Barth was forced to conduct his analysis with obfuscated object code because the Respondent refused to provide unobfuscated object code

or source code. Barth reported that he would likely have found even more copying had he had access to unobfuscated object code or source code.

232.    Barth opined in all his reports that the Respondent's misappropriation of UiPath's Studio Source Code is continuing and ongoing.

233.    The Respondent provided to the Claimant its Studio executable code from May 2019 and August 2019 in September 2022, but as the Claimant reiterates, this code was also obfuscated. Barth prepared a Second Supplemental Report based on analysis of this code. Barth found that these older versions of code, which pre-date Hu's employment with ENCOO, contained no similarities with UiPath's Source Code and were "extremely rudimentary." Barth finds the period between August 2019 and the next iteration of ENCOO's Studio product, which came in March 2020, was developed in a "remarkably short period of time" and moved from rudimentary to an operational, enterprise, commercial product within that period. Due to the similarities that arose in that period, Barth concludes that ENCOO's Studio source code had to have been copied from UiPath's Source Code.

234.    The Claimant argues that the Respondent has not provided any evidence as to how it developed Studio so quickly or why there are so many similarities with UiPath's Source Code. The Respondent has raised the argument that any similarities in the source codes are due to ENCOO's employees reverse-engineering UiPath products. In response, the Claimant argues that the Respondent has not provided any evidence of reverse-engineering and even if it had, such reverse-engineering would be in violation of UiPath's end-user license agreements that prohibit commercial use and reverse engineering of the products. The Claimant also notes that ENCOO's audited financial reports do not show any elevated costs that would justify accelerated development of the Studio product.

235.    Finally, the Claimant raises suspicions about Hu's decision to leave ENCOO. The

Claimant argues that Hu did not provide a reasonable explanation for how a 15+ year

software veteran could have been duped into thinking ENCOO's products were more

advanced than they were and that Hu's claim that there were too many RPA competitors who

recently received investments was not reasonable because ENCOO received a $20 million

investment just prior to Hu leaving. The Claimant also emphasizes that despite Hu stating

that his desire to move to China was to care for his elderly parents and sick cousin, he

immediately returned to the US upon leaving ENCOO.

### ii.    Legal Arguments

236.    Of the seven claims the Claimant raises against the Respondent, five relate to the alleged

misappropriation of UiPath's Source Code: 1) violation of the Defend Trade Secrets Act; 2)

misappropriation of UiPath's trade secrets in violation of New York common law; 3) aiding

and abetting breach of fiduciary duty; 4) unfair competition with UiPath in violation of New

York common law; and 5) unjust enrichment.

### a.    Violation of the Defend Trade Secrets Act and Misappropriation under New York Common Law

237.    Since the legal analysis and evidence for the claims of violation of the Defend Trade

Secrets Act ("DTSA") and the claims of misappropriation under New York law are identical,

the Claimant has presented them jointly.

238.    The Parties do not dispute the baseline definition for misappropriation of a trade secret

under the DTSA or New York law, which is that a plaintiff must 1) possess a trade secret that

was 2) misappropriated by the defendant. 18 U.S.C. §1839(3), *See e.g. ExpertConnect,*

*L.L.C. v. Fowler*, 18-CIV-4828, 2019 WL 3004161 at *6 (S.D.N.Y. July 10, 2019). However,

each Party takes a different view on whether UiPath's Source Code constitutes a trade secret and whether ENCOO used improper means to access the Source Code.

239.    For the first prong, the Claimant argues that its Studio Source Code fits into the definition of a trade secret under both the DTSA and New York law. Before beginning its analysis, the Claimant highlights that the Sole Arbitrator already accepted that UiPath's Studio Source Code was a trade secret in Procedural Order No. 13, ¶28, which was issued in response to the Respondent's application for the identification of trade secrets made during a July 21, 2022 videoconference between the Parties.

240.    The Claimant argues that New York case law supports a finding that the whole of UiPath's Studio Source Code constitutes a trade secret. Not only are the independent lines of code and source code modules a trade secret themselves but also the sum of the code combined with publicly available code and software to create Studio's design, look, and operation would qualify as a trade secret. *Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.,* 297 F.Supp. 2d 463, 483 (N.D.N.Y. 2003), *aff'd*, 126 F.App'x 507 (2d Cir. 2005) & *Monovis, Inc. v. Aquino*, 905 F.Supp. 1205, 1231 (W.D.N.Y.). The Claimant emphasizes that UiPath has taken strict measures to protect its Source Code, including storing the code in a secure encrypted industry-standard software repository, limiting employee access to the code to senior engineers and editing abilities to only one team, and requiring all employees with access to the code to sign confidentiality agreements. The Claimant also asserts that the main economic value for Studio Source Code derives from not being known. Considering these factors in combination, the Claimant argues its Source Code must be considered a trade secret.

49

241.   For the second prong, The Claimant identifies six grounds supporting a finding that ENCOO acquired UiPath's Source Code by improper means.

242.   First, the Claimant asserts that ENCOO recruited Hu and offered him an extraordinary compensation package.  The only plausible explanation for this, according to the Claimant, is that Hu misappropriated UiPath's Source Code. To support this assertion, the Claimant argues that Liu, Shi, and Hu all knew each other before their alleged first outreach, and that Liu and Shi's account of their recruitment of Hu is incomplete. The Claimant also asserts that Hu's and Liu's account of their meeting in China is not credible, finding it hard to believe that Liu, having only communicated with Hu two times previously, would offer him for a job on the spot after meeting him for the first time. Furthermore, the Claimant reiterates that Hu lacked the RPA experience that would justify the high salary he was offered if he had been recruited for his expertise.

243.   Second, the Claimant argues that Hu's accessing of UiPath's Source Code coincides with his meetings with ENCOO's officers. Hu accessed UiPath's Source Code on May 29, 2019, which was a few days after his meeting with Shi. Prior to his trip to China in July 2019, Hu accessed and updated his local copy of UiPath's Studio Source Code 27 times, whereas, prior to that May meeting, he had only accessed the Source Code once since March 19, 2019. After meeting with Liu in China, Hu accessed and updated his local copy of the Source Code one more time, on the day he accepted ENCOO's offer and announced his resignation to UiPath. The Claimant alleges that Hu had no work-related reason to repeatedly view and update his versions of UiPath's Source Code.

244.   The Claimant addresses some of the arguments made by the Respondent designed to rebut the Claimant's assertion that Hu has no work related reason to access to the Source

Code. Hu has alleged that he needed to view the Source Code to tie-in to AI Fabric. The Claimant argues that AI Fabric was never tied in to Studio, only its Orchestrator product, and Hu had completed his work on AI Fabric at the time of his access. Hu has also alleged that he needed to access the Source Code to prepare for a training with UiPath's Romania team, which was in charge of managing the Studio product. The Claimant asserts that UiPath has its own training materials to teach its engineers about Studio and that it is not possible to learn about a product just from looking at its source code. Also, Hu's access came after his trip to Romania, which would not explain why he continued to access and update his local version of the Source Code.

245.    The Claimant argues that Hu's accessing and updating his local copy of UiPath's Source Code with the intention to share it with ENCOO constituted a violation of his Confidentiality Agreement, thus establishing a misappropriation of UiPath's trade secret. The Claimant points to extensive case law that supports a finding an ex-employee improperly acquired a plaintiff's trade secrets even if the ex-employee had access to the trade secrets due to their job.

246.    Third, the Claimant alleges that Hu tried to conceal his misappropriation. Hu's position at ENCOO was not announced until he had worked there for six months, and his LinkedIn account listed at least through May 9, 2020 that he was still working at UiPath. Furthermore, the Claimant highlights Hu telling Shah and Amin that he was leaving UiPath to care for his parents with no job lined up, and his rejection of Amin's offers to speak with his contacts at RPA companies in China. Finally, the Claimant argues that Hu's wiping of his UiPath laptop prior to returning it suggests he attempted to conceal his misappropriation.

247.   Fourth, the Claimant argues that ENCOO's development period for its RPA software was suspiciously short. UiPath's RPA products took over a decade to develop, and Microsoft, which has also worked on developing RPA products for many years, still has not achieved a product as developed as UiPath's Studio product. ENCOO had a team of engineers from Blue Bridge with no RPA experience led by Shi, who also had no RPA experience. ENCOO's initial release of its Studio product was extremely rudimentary, but within eight months it had a product that was competitive with UiPath's Studio product. Further, ENCOO's financials contain almost no extraordinary or unusual development or employee expenses in those eight months that might justify an expedited development window.

248.   Fifth, the Claimant reiterates the findings in Barth's report that ENCOO could not have created its Studio product without misappropriating UiPath's Source Code.

249.   Sixth and finally, the Claimant argues that ENCOO knew or should have known that obtaining UiPath's Source Code from Hu was improper. Since Liu and Shi were not only aware that Hu was a UiPath employee but also specifically recruited him due to his employment, the Claimant asserts that they should have been aware that he had executed a Confidentiality Agreement since this is common practice in the software industry. Furthermore, the Claimant raises suspicions about ENCOO's choice to have Hu lead the internal investigation following receipt of UiPath's draft SDNY Complaint since it would have made more sense to have their CTO, Shi, lead the investigation rather than the only person who had previously worked at UiPath. The Claimant also flags that Respondent never mentioned the investigation, its findings, or the alleged removal of similarities with UiPath Source Code during the Settlement Agreement negotiations, which the Claimant argues suggests that Respondent knew it had copied UiPath's Source Code.

250.    The Claimant argues that these six factors together must be considered more than enough evidence to establish that it is more probable than not that ENCOO misappropriated UiPath's Source Code. The Claimant points to substantial case law that supports finding misappropriation based on a combination of suspicious actions by a former employee but lacking specific evidence of misappropriation. *See e.g. Paz Sys., Inc. v. Dakota Grp.*, 514 F.Supp 2d (E.D.N.Y. 2007); *KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533, 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020); *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CIV-4819, 2020 WL 3429775 (S.D.N.Y. June 23, 2020). In sum, because UiPath's Source Code was a trade secret and because ENCOO's actions make it more likely than not that they misappropriated that Source Code, the Claimant argues the Sole Arbitrator should find that Respondent violated both the DTSA and New York common law on misappropriation.

### b.  Aiding and Abetting Breach of Fiduciary Duty

251.    As the Claimant set forth in its submissions, the elements for finding a breach are "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (1st Dep't 2003). A former employee still owes a fiduciary duty to a former employer to not misappropriate confidential information they had access to in the course of employment. *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998). Respondent does not dispute this account of the law.

252.    The Claimant argues that Hu owed a fiduciary duty to UiPath because as Director of Engineering, he had access to confidential information, specifically the Claimant's Source Code. The Claimant asserts that Hu breached this duty by viewing and downloading the Source Code multiple times without a business reason or authorization, by meeting with Liu

and Shi to discuss the RPA market and software while still employed at UiPath, and by providing UiPath's Source Code to ENCOO.

253.    As discussed above, the Claimant contends that Liu and Shi knew or should have been aware of Hu's Confidentiality Agreement. The Claimant maintains that Liu and Shi's communications and meetings with Hu were to facilitate his misappropriating of UiPath's Source Code. Finally, the Claimant points to Hu's large salary as an added incentive from ENCOO to misappropriate UiPath's Source Code.

### c.  Unfair Competition and Unjust Enrichment

254.    The Claimant has raised these two equitable theories as an alternative to the trade secret misappropriation claims and discusses them jointly because the evidence used to support these claims is identical and similar to that used to support the misappropriation claims.

255.    As the Claimant states in its submissions, an unfair competition claim is established where a defendant misappropriates "the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Bytemark, Inc. v. Xerox Corp.*, 342 F.Supp 3d 496, 515 (S.D.N.Y. 2018).  Unjust enrichment exists where a plaintiff can show that the defendant was enriched at the plaintiff's expense and allowing the defendant to retain that enrichment would go against equity and good conscience. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012). The Respondent has not raised any objections to the applicable law.

256.    The Claimant argues that, based on the facts presented in the section on misappropriation, ENCOO stole UiPath's Source Code, which would constitute unfair competition, and used the Source Code to develop and sell its own Studio product for its own enrichment, which would qualify as unjust enrichment.

### d. Response to Respondent's Argument that Claimant Cannot Bring its Misappropriation Claims

257.    The Respondent has raised a threshold argument that the Claimant cannot bring its Misappropriation Claims because it has not shown that it is no longer bound by the Settlement Agreement, and a finding that the Settlement Agreement is no longer valid is a precondition the Claimant's assertion of its Misappropriation Claims. In making this argument the Respondent asserts that while the Claimant alleged that the Respondent breached the Settlement Agreement, it never explicitly stated that this alleged breach was material. The Respondent also argued that the Claimant's raising of the Misappropriation Claims in this arbitration would constitute a breach of the Settlement Agreement because, as part of that Agreement, the Claimant had agreed to not assert the Misappropriation Claims. This argument will be described in greater detail in the section describing the Respondent's position.

258.    In response, the Claimant asserts that the Settlement Agreement stipulated it would forgo commencing litigation in the District Court for the Southern District of New York, which would have made its allegations of ENCOO's misappropriation public and would have likely caused ENCOO's financial ruin. The Claimant further states that its claims related to breach of the Settlement Agreement were obviously alleging material breaches because they relate to every obligation ENCOO had under the Settlement Agreement and go to the essence of the agreement itself. Finally, the Claimant asserts that, under New York law's on election of remedies, a party can raise both a claim for breach of a settlement agreement and a claim on the settled issue, and, in the event it succeeds on both, it must choose only one claim from which to recover damages. *Plant City Steel Corp. v. Nat'l Mach. Exch. Inc.*, 23 N.Y.2d 472, 477 (1969). The Claimant clarifies that it has elected to receive damages from the

Misappropriation Claims, should the Sole Arbitrator find in its favor. Since the Claimant is not seeking double recovery on both claims, the Claimant asserts that it is entitled to raise both the breach and Misappropriation Claims at the same time.

### 3. Respondent's Position

#### i. Factual Arguments

259.    To begin, the Respondent emphasizes that ENCOO's shift to produce RPA products was due to Liu's observation that the RPA market would likely grow tremendously due to the development of the Chinese economy and rising labor costs. As a result, ENCOO started to invest significant resources and efforts into RPA products. The Respondent asserts that it used the public Microsoft Windows Workflow Foundation framework to research and develop its RPA products.

260.    The Respondent alleges that Hu never contacted or met Liu and Shi during his employment with Microsoft and that their first contact with Hu was well after he had begun his employment with UiPath. While the Respondent does acknowledge that Shi and Hu both worked for Microsoft in Shanghai between 2007 and 2011, the Respondent emphasizes that the two men did not know each other and points out that Microsoft Shanghai had more than 1,000 employees spread out in a large building over five floors. The Respondent further maintains that the April 3, 2020 press release referenced by the Claimant was made up by third-party media for marketing purposes, with details exaggerated or made up to make the story more interesting and impressive for potential readers.

261.    The Respondent points out that a head-hunter reached out to Hu about the position at UiPath, emphasizing that he did not specifically seek out the position. The Respondent argues that his decision to join UiPath was due to seeing more career opportunities at a small

start-up and because many senior leaders, including Shah, who would become Hu's supervisor at UiPath, had moved from Microsoft to UiPath.

262.    The Respondent contends that Hu was required to learn about Studio and its Source Code as a part of his job responsibilities at UiPath and argues that Hu being given access to the Source Code strongly supports Hu's work responsibilities relating to the Studio products. The Respondent refers to Hu's trip to Romania in March 2019 and the subsequent presentation he prepared as reasonable explanations for his access to the Source Code. The Respondent further alleges that Hu's level of access to the Source Code was on par with most of the Studio team. Moreover, Respondent emphasizes that part of Hu's role was focused on overall design and driving cross-team collaboration, which meant he had to have an understanding of how all UiPath products integrated. The Respondent highlights that Hu only ever accessed UiPath's Source Code on his work computer, which was returned to Claimant following Hu's resignation. Finally, the Respondent maintains that Hu accessed the Studio Source Code one last time on the date of his resignation in connection with handing over job duties.

263.    The Respondent asserts that Liu's motives for reaching out to Hu were to build a relationship with a former Microsoft colleague working in the RPA areas, and that until the August 3, 2019 meeting with Hu, Liu did not think Hu would be willing to leave UiPath. The Respondent emphasized that Liu was not even aware that Hu would be moving back to China until the August meeting. Similarly, the Respondent attributes Shi's outreach to Hu to be due to Shi's desire to learn more about the RPA industry following his hiring at ENCOO.

264.    The Respondent argues that ENCOO did not contribute to Hu's decision to leave UiPath. Rather, Hu left because he thought UiPath's internal collaboration between teams caused

long working hours, and because he wanted to take care of his aging parents in China. The Respondent reiterates that ENCOO was not even a possibility for Hu when he began his search in China. Instead, he had interviewed with Cyclone, a rival RPA company, and did not consider joining ENCOO until his dinner with Liu in August 2019. The Respondent also clarifies that Hu did not specifically go to Shanghai to meet with Liu during his trip to China; Hu was in Shanghai to take a direct flight back to Seattle.

265.    The Respondent alleges that Hu wiped his laptop prior to returning it to UiPath because he had stored personal information on it. The Respondent also emphasizes that prior to wiping the laptop, Hu uploaded all work documents to the cloud. Further, the Respondent maintains that reformatting a laptop before returning it following a resignation is normal practice.

266.    The Respondent emphasizes repeatedly that Hu's position at ENCOO, which he began in September 2020, did not involve code-writing but instead focused on future product strategy and design-related work. The Respondent highlights that Shi was already acting as CTO when Hu joined, and Shi had over 15 years of experience, as well as a strong engineering team working under him, meaning Hu's code-writing background was not needed at ENCOO.

267.    The Respondent argues that it developed its source code independently without misappropriating Claimant's Source Code. The Respondent attributes the fast development of ENCOO's Studio product to the availability of Windows Workflow Foundation and other public resources. Furthermore, the Respondent has identified two other RPA companies, ShadowBot and Open RPA, that developed their own successful RPA products even faster than ENCOO did.

268.    The Respondent maintains that even if there are some similarities in the code, this does

not mean that there has been misappropriation. The Respondent attributes similarities to

companies making use of the same public resources, such as open-source code, conduct

reverse engineering of publicly available products, or use of the same platform or tool to

develop code. The Respondent emphasizes that ENCOO's independent investigation found

that only 0.6% of the source code inspected has similarities.

269.    The Respondent alleges that as Hu became more familiar with ENCOO's products, he

became disillusioned with their quality and found that though the functions were similar to

UiPath's products, the maturity and stability of the products was not at the same level. The

Respondent argues that because of this disillusionment with ENCOO, it is unlikely that Hu

misappropriated UiPath's Source Code because otherwise he would have just solved the

problems by copying the Source Code.

### ii.    Legal Arguments

270.    The Respondent provided direct responses to the Claimant's arguments related to

violation of the DTSA and misappropriation of trade secrets under New York law, but did

not directly address the arguments of aiding and abetting breach of a fiduciary duty, unfair

competition, or unjust enrichment. The Respondent seems to reject these claims based on

factual grounds, namely arguing that ENCOO did not misappropriate UiPath's Source Code

and thus could not have aided and abetted Hu in breaching his fiduciary duty nor profited

from unfair competition or unjust enrichment. This summary will focus on the two legal

arguments raised by the Respondent, which are that the Claimant has not met the

requirements for misappropriation of trade secrets under the DTSA and New York law and

that the Claimant has not met the preconditions required to raise its Misappropriation Claims.

a.  **DTSA and Misappropriation Claims under New York Law**

271.   The Respondent agrees with the Claimant that the analysis of the DTSA and New York

law for a finding of misappropriation are similar enough to be discussed jointly. The

Respondent also agrees that under both analyses a plaintiff must show that it possesses a

trade secret that has either been acquired through improper means by the defendant or the

defendant knew or had reason to know that the trade secret was acquired through improper

means.

272.   The Respondent alleges that the Claimant cannot meet either prong of the requirements

under the DTSA and New York law. First, the Respondent argues that the Claimant has not

demonstrated that it has a trade secret that has been identified with "reasonable particularity,"

as required under *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161 (S.D.N.Y. July 10,

2019). The Respondent contends that the Claimant cannot merely claim the entirety of its

Source Code as a trade secret, nor can it claim all of its Source Code minus the portions

subject to public domain or open license, which it supports through New York case law.

*Paysys Int'l, Inc. v. Atos Se*, 2016 WL 7116132 at *11 (S.D.N.Y. Dec. 5, 2016); *MSCI Inc. v.

Jacob*, 945 N.Y.S.2d 863, 865.

273.   The Respondent sets forth six factors that must be considered to determine if information

constitutes a trade secret, which are "(1) the extent to which the information is known outside

of the business; (2) the extent to which it is known by employees and others involved in the

business; (3) the extent of measures taken by the business to guard the secrecy of the

information; (4) the value of the information to the business and its competitors; (5) the

amount of effort or money expended by the business in developing the information; [and] (6)

the ease or difficulty with which the information could be properly acquired or duplicated by

others." (Respondent's Post-Hearing Brief, ¶19, *quoting Ashland Mgmt. Inc. v. Jamien*, 624

N.E.2d 1007, 1012-1013 (N.Y. 1993).) The Respondent emphasizes that the Claimant must

make a distinction between, on the one hand, general knowledge in the field and trade secrets

and, on the other hand, that certain types of information, such as publicly available

information, commonly used algorithms, and third-party licensing, must be excluded.

274.     The Respondent argues that the Claimant has not adequately identified its trade secrets.

The Respondent contends that the Claimant initially identified its entire Source Code as a

trade secret but changed its position in response to Respondent's initial Application for

Claimant's Identification of Trade Secrets on July 5, 2022, stating instead that the Claimant's

trade secrets had been identified in Barth's First Expert Report. The Respondent then alleges

that Fry's Expert Report as well as Shi's Second Witness Statement found that the

similarities identified by Barth were all publicly available and not secrets. The Respondent

further argues that Barth's Second and Third Expert Reports identified a list of new

similarities which had not been addressed in his initial Expert Report. The Respondent

asserts that these new alleged similarities should not be considered because they were not

originally pleaded, which meant the Respondent did not have adequate opportunity to fully

examine or respond. Finally, the Respondent contends that the Claimant must specifically list

component parts or sequencing of their source code in order to meet the trade secrets

requirement, which it has not done.

275.     The Respondent then provides a breakdown of each of the similarities identified by Barth

in both his First Expert Report and his Second Expert Report. The Respondent argues that

each of these similarities can be explained through usage of the same third-party sources and

reverse engineering publicly available code. The Respondent argues that because none of the

similarities identified by the Claimant relate to trade secrets, the Claimant has not established that it had a trade secret for purposes of the DTSA and misappropriation under New York law.

276.    The Respondent argues that the Claimant also fails on the improper means prong, raising six points in its defense. First, the Respondent contends that it has established that its Studio source code was independently developed without copying the Claimant's Source Code. The Respondent points to testimony from Liu, Shi, and Hu supporting that they independently created ENCOO's Studio product, as well as the code commit history for ENCOO's Studio supporting that there was never a time that a large portion of code was copied into the server, which the Respondent alleges would have been readily apparent had it happened. The Respondent also argues that the ENCOO planning documents and the Studio Product Backlog Item List, which recorded the particular assignments allocated to each engineer, support independent development because otherwise there would be no need to make and trace designing plans so regularly, nor would there be a need to assign specific tasks to the engineers.

277.    Second, the Respondent states that it conducted a thorough self-examination following receipt of the Draft Complaint and concluded there was no source code copied from the Claimant. The investigation found a few similarities, totaling 0.64% of the total code, but attributed them to three causes: use of Workflow Foundation, a common source framework, developers potentially referencing public code from UiPath or other public sources, and developers potentially reverse engineering UiPath's product. The Respondent contends that the DTSA excludes reverse engineering and independent derivation from improper means and that New York law excludes reverse engineering if there is no privileged relationship

between the parties and if the information used is through publicly available means. *Cf.*
*Monovis, Inc. v. Aquino*, 905 F.Supp. 105, 1228 (W.D.N.Y. 1994). The Respondent also
emphasizes that all code similarities that could have been related to the Claimant were
removed by the Respondent following the self-examination.

278.    Third, the Respondent alleges that the similarities identified by Barth are not from
copying UiPath's Source Code but from ENCOO's use of public resources. Much of these
arguments echo the Respondent's position on the Barth Report for the trade secrets prong.
The Respondent adds the additional point that the source code of another Chinese RPA
brand, Laiye, resembles UiPath's more closely than ENCOO's source code does. The
Respondent also argues that the similarities Barth points out in his Report were from August
2020, when the Parties had begun negotiations of the Settlement Agreement, and contends
that it would be unreasonable for ENCOO to continue to misappropriate UiPath's Source
Code, if it had in the first place, since it knew the source code would be subject to review.

279.    Fourth, the Respondent asserts that there was no conspiracy to misappropriate the
Claimant's trade secrets, as was described in the Respondent's factual arguments. The
Respondent alleges that the Claimant has invented the conspiracy between Liu, Shi, and Hu
and has not provided solid evidence to support such a conspiracy, just speculation and
testimony from its own employees.

280.    Fifth, the Respondent argues that Hu's access to UiPath's Source Code was for legitimate
purposes within his work responsibilities, as described above.

281.    Sixth and finally, the Respondent contends that there is no solid evidence to support the
Claimant's theory of a conspiracy between Liu, Hu, and Shi and that its three main pieces of
evidence, namely the press release, the allegation ENCOO could not have developed its

product so quickly, and Hu's wiping of his computer at his resignation from UiPath, are all explainable through non-nefarious means. The Respondent asserts that the press release was invented for marketing purposes and was not intended to be a reflection of fact. The Respondent argues that it has shown it is possible to develop an RPA product in a short timeframe by identifying two other RPA companies that were able to produce successful produces in an even shorter period of time and that public resources have made development of RPA products significantly faster. Finally, the Respondent alleges that Hu was merely following industry standard practice when he wiped his computer before returning it to UiPath.

282.    In sum, the Respondent argues that the Claimant has not met either prong to establish a claim under the DTSA or misappropriation under New York law.

### b. Precondition to Raising Misappropriation Claims

283.    As previewed above, in its Statement of Defence, the Respondent argues that the Misappropriation Claims should be dismissed because the Claimant has not satisfied the preconditions to pursuing such claims.

284.    The Respondent argues that the Claimant has not established that it is no longer bound by the Settlement Agreement. Namely, the Respondent maintains that the Claimant has never claimed a termination or cancellation of the Settlement Agreement that would relieve it from its duties under the Settlement Agreement, specifically the forbearance of pursing the Misappropriation Claims. The Respondent points out that none of the Claimant's pleadings list the breach of the Settlement Agreement as a material breach.

285.    Along this line of reasoning, the Respondent argues that under the Settlement Agreement, the Claimant can only pursue claims if it goes through two rounds of source code review,

first with a third-party reviewer, second with another third-party reviewer if the first reviewer

finds misappropriation, and then goes through good faith negotiation that does not resolve the

dispute. Since the first review was not conducted, the Respondent alleges that the

Misappropriation Claims cannot be heard.

### 4.    Sole Arbitrator's Analysis

286.    The Sole Arbitrator turns to consider UiPath claim for misappropriation.

287.    The Sole Arbitrator begins with a number of preliminary observations.

288.    First, in a case involving the misappropriation of intellectual property, by its nature, the

misappropriation will not be done openly.  It will be concealed.  Realistically, if a party is

going to engage in the misappropriation of another's intellectual property, it will do so

secretly and try to cover its tracks. The Sole Arbitrator finds that this is precisely what

happened in this case.

289.    Second, while the Claimant takes the position that there was a long-standing plan among

Hu, Shi, and Liu to misappropriate UiPath's Source Code based on its assertion — denied by

the Respondent — that they had only all known each other for a long time from working at

Microsoft, it is not necessary for the Sole Arbitrator to resolve this dispute.  Whether Hu, Shi

and Liu had a long-standing plan based on a long acquaintance or whether they had only

recently met each other and acted opportunistically, the evidence is overwhelming and

supports only one inescapable conclusion — working with Hu, ENCOO misappropriated

UiPath's intellectual property and used it to develop a competing RPA product.

290.    Third, this case is characterized by admitted deception on the part of ENCOO and Hu and

by events and implausible coincidences from which — in some cases individually, but in all

cases collectively — the only inference that can be drawn is that ENCOO, working with Hu, misappropriated UiPath Source Code.

291.    Indeed, ENCOO and Hu engaged in admitted deception and concealment:

- ENCOO issued press releases in March and April 2020 stating that Hu, Liu, and Shi knew each other from Microsoft, Hu had significant experience in RPA products, and Hu was an ENCOO founding member.  While UiPath asserts that this demonstrates that Hu, Liu and Shi had known each other for a long time, ENCOO now asserts that the claims in these press releases are false.  Either way, however, ENCOO is deceptive.  Either the press releases are in fact false, which shows that ENCOO is willing to lie to the public at large. Or the press releases are in fact true, in which case ENCOO is lying by claiming in this arbitration that it is false.

- For his part, having agreed to leave UiPath to join ENCOO, Hu lied to UiPath and falsely stated he would be resigning from UiPath without having alternative employment.

- On leaving UiPath, Hu wiped the laptop on which he downloaded UiPath's Source Code, before returning it to UiPath.

- When Hu accepted the offer to join ENCOO on August 14, 2019, he asked Liu to not advertise his hiring (Ex. R-A-10 at 11, 13).

- In this arbitration, ENCOO repeatedly refused to produce its source code or object code for review by UiPath, or did so in obfuscated form, or failed to recompile historical versions of its Source Code, and let the appeal deadline pass with respect to an application for an export license without submitting an appeal.

292.    This case is also characterized by implausible coincidences and events that would be otherwise inexplicable, but are easily explained by the fact that Hu misappropriated UiPath's Source Code and gave it to ENCOO.  Take one apparent coincidence — Hu accessed and updated his local copy of the Source Code on the same day that he accepted employment at ENCOO and announced his resignation to UiPath.  Given that Hu was resigning from UiPath and going to ENCOO, this action obviously could not be explained by any of Hu's job

responsibilities.  Rather it can only be explained by one thing:  Hu wanted to ensure that he

had the latest version of UiPath's Source Code before he left UiPath and moved to ENCOO.

There is simply no other plausible explanation. There are other similar inexplicable events:

- Hu's accessed UiPath's Source Code at a time close to his meetings with ENCOO's officers. Thus, Hu accessed UiPath's Source Code on May 29, 2019, which was a few days after his meeting with Shi. Prior to his trip to China in July 2019, Hu accessed and updated his local copy of UiPath's Studio Source Code 27 times, when prior to the May meeting, he had only accessed the Source Code once since March 19.

- Liu and Shi supposedly independently reached out to Hu, coincidentally, within 8 minutes of each other on the same day via WeChat following an initial LinkedIn message sent the week before (Exh. R-B-8 at 1).

- Hu and Shi met for dinner on May 17, 2019 even though ENCOO has produced no written communication between the two arranging a time or a location for their dinner.

- Hu had no legitimate work-related reasons to repeatedly access UiPath's Source Code, and his explanations, for example, he did so for a trip to meet UiPath's engineers in Romania, does not explain why he continued to access the Source Code after he returned from his trip.

293.    It is moreover noteworthy that upon joining ENCOO, Hu was the highest paid individual:

he had a base salary of ▮▮▮▮▮ and stock options valued at approximately ▮▮▮▮▮ (Ex.

R-A-10 at 12), which was more than the salary paid to Liu and Shi (Exh. R-A-10 at 5).   Liu

testified as follows:

> Q     Did you offer Mr. Hu a salary that was higher than yours?
>
> A     Yes.
>
> 9/14/2022 Tr. (Liu) 164: 6-8

294.    This suggests that Liu was not paying Hu for his qualifications as an employee but for the

fact that he was bringing with him something in addition to those qualifications, namely, the

Source Code he stole from UiPath.  Moreover, even though Hu's position at ENCOO supposedly did not involve writing code, ENCOO's engineering headcount included Hu and the engineering team only had ten engineers, none of whom had RPA experience (R-C-13).

295.    In addition, it is noteworthy that it took UiPath fifteen years to develop its Studio product and other RPA products, whereas ENCOO alleges to have created a comparable product in less than one year with far fewer engineers and resources.  Following Hu's hiring, ENCOO released an RPA product called "Studio," which the Claimant alleges could not have been created without intimate knowledge of UiPath's proprietary and confidential information. ENCOO's attempts to explain how it was able to do this are simply implausible and not credible:

- ENCOO claims that it was able to develop its competitive RPA product by using Microsoft's WWF and .Net technology.  But this claim is undermined by the fact that Microsoft itself, the creator of these tools, does not have a product that can compete with UiPath's Studio product, even after acquiring an RPA company in 2019 (9/13/22 Tr. (Amin) at 6:24-8:6).

- Similarly ENCOO claims that its employees reverse-engineered UiPath products, but it has not provided any evidence of reverse-engineering and even if it had, such reverse-engineering would be in violation of UiPath's end-user license agreements that prohibit commercial use and reverse engineering of the products.

296.    Furthermore, having observed the Claimant's technical expert, Mr. Jeremy Barth ("Barth") the Sole Arbitrator found him to be highly credible and highly qualified.  The Sole Arbitrator notes that he found in an analysis of the Claimant's Source Code for its Studio product compared with an obfuscated executable object code of ENCOO's Studio product that the many similarities could only be explained through misappropriation of the Claimant's Source Code. Namely, Barth found that ENCOO's source code from both its

68

April 2020 product and its November 2021 product were so similar to UiPath's Source Code that they had to have been derived from the same technology. Barth found that some superficial changes had been made to make the source codes appear different upon a cursory review, but no meaningful changes had been made to the product. The Sole Arbitrator, who observed both Barth and ENCOO's expert Mr. Peter Fry found Barth's testimony to be preferred.

297.    Finally, the Sole Arbitrator notes that Hu is clearly a talented engineer who, regrettably, got caught up in ENCOO's scheme to misappropriate UiPath's software.  It is unfortunate that Hu got caught up that scheme, and it is understandable that eventually he wanted to have nothing to do with ENCOO.

298.    With that background, the Sole Arbitrator turns to an analysis of UiPath's Misappropriation Claims.

### i.    Preconditions to Hearing the Misappropriation Claims

299.    The Sole Arbitrator begins with threshold argument advanced by the Respondent, namely, that the Claimant is precluded from bringing its Misappropriation Claims.  The Respondent asserts that, even though UiPath claims that the Respondent breached the Settlement Agreement, it never explicitly asserted that it was in material breach.  It asserts that this is significant, because only a material breach by ENCOO could relieve UiPath of its obligation under the Settlement Agreement not to bring a claim for misappropriation, and as such that UiPath cannot bring its five claims for misappropriation.

300.    ENCOO's argument rests on a fundamental misunderstanding of New York law on the election of remedies.

301.    As an initial matter, as the Respondent accepts, UiPath alleged a breach of the Settlement Agreement.  An allegation of breach, by definition, includes an allegation of material breach.

69

The Respondent points to no authority to the effect that an arbitration under the Commercial Rules needs to satisfy any specificity requirements when it comes to allegations of breach of contract.  In fact, the authority is to the contrary.  Rule 4(e)(iv) of the Commercial Rules of the AAA requires merely that a claimant set forth "a statement setting forth the nature of the claim."  There can be no doubt that UiPath did so. It alleges a breach of the Settlement Agreement, which by definition includes an allegation of material breach.

302.    Moreover, the breach asserted by the Claimant was obviously one of material breach, whether the Claimant used the term "material" or not in asserting its claim.  This is because the breaches alleged by the Claimant went to the essence of the Settlement Agreement.  Thus, on any view UiPath was alleging a material breach of the Settlement Agreement because its claims related to every obligation ENCOO had under the Settlement Agreement and, thus, go to the essence of the agreement itself.

303.    To the extent the Respondent argues that the Claimant is proceeding under inconsistent theories, and therefore is barred from bringing its Misappropriation Claims, that argument fails because it fundamentally misunderstands New York law on election of remedies.  Under New York law, a party can raise both a claim for breach of a settlement agreement and a claim on the settled issue, which if it succeeds on both, requires it to choose one claim as the basis to seek damages. *Plant City Steel Corp. v. Nat'l Mach. Exch. Inc.*, 23 N.Y.2d 472, 477 (1969).  As the Court stated in that case:  "Therefore, even though the plaintiff is seeking entirely different forms of relief, the two claims are interdependent. Success in the contract cause of action depends upon the breach of the accord. The proper procedure in respect to a trial of these issues requires the court to determine the accord issue. If the accord has been breached the plaintiff can make his election." *Id.*

304.     Here, the Claimant states that it has elected to receive damages only with respect to the

Misappropriation Claims, should the Sole Arbitrator find in its favor. Since the Claimant is

not seeking double recovery on both claims, the Claimant is entitled to proceed with both the

claim of breach and the Misappropriation Claims at the same time.

305.     We turn to consider the Misappropriation Claims.

### ii.     DTSA and Misappropriation under New York Law

306.     Since the Parties have treated the DTSA and misappropriation under New York law

jointly, the Sole Arbitrator's analysis will take the same approach.

307.     As agreed by the Parties, under the Defend Trade Secrets Act ("DTSA"), a plaintiff must

show 1) it possessed a trade secret and 2) the defendant misappropriated that trade secret.

Similarly, under New York common law, a claim for misappropriation must show 1)

plaintiff's possession of a trade secret and 2) defendant's use of that trade secret in breach of

an agreement, confidential relationship or duty, or as a result of discovery by improper

means. *ExpertConnect, L.L.C. v. Fowler*, 18-CIV-4828, 2019 WL 3004161 at *6 (S.D.N.Y.

July 10, 2019).

308.     This analysis will thus consider each prong in turn.

### a.  Trade Secrets Prong

309.     Both Parties agree that a trade secret must be identified with reasonable specificity such

that respondents are aware of what they are alleged to have misappropriated (Claimant's

Opposition to Respondent's Application for Identification of Claimant's Trade Secrets, pg. 6;

Respondent's Post-Hearing Brief, ¶16). Where the Parties disagree is on the degree of that

specificity.

310.     The DTSA defines a trade secret as:

> [a]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing [qualify as a trade secret if (i) the owner] has taken reasonable measures of keep such information secret [and (ii) such information] derives independent economic value, actual or potential, from not being generally known to, and no being readily ascertainable through proper means. . . 18 U.S.C. §1839(3).

311.    The definition of trade secret under New York law is similar, being "any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it" *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 453 (2018).

312.    New York law provides additional guidance on trade secret identification, identifying the following factors for determination of a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)

313.    The Respondent has argued that the Claimant cannot claim that the entirety of its Source Code constitutes a trade secret because portions of that Source Code contain elements in the public domain or subject to open license. The Respondent also asserts that portions of UiPath's Source Code could be easily reverse engineered from software UiPath makes available to users.

72

314.    The Sole Arbitrator finds that, on these issues, the Respondent misstates New York law

and overlooks the fact that UiPath protects its Source Code from reverse engineering through

strict end-user license agreements that prohibit commercial use and reverse engineering.

315.    As note above, the purpose of requiring the identification of a trade secret is for a

respondent to be on notice of what exactly they have been accused of misappropriating. Here,

the Claimant has alleged Hu copied the entirety of its Studio Source Code for ENCOO's

benefit, not just small portions. Therefore, the suggestion that the trade secret is limited to

just certain lines of code and certain source code modules ignores that the configuration of

publicly available code and software within a company's source code is customizable and in

turn is a protectable trade secret.  New York law makes clear that source code is not

something that can be broken down into public domain and trade secrets because it is the sum

of its parts. Thus, a "trade secret can exist in a combination of characteristics and

components, each of which, by itself, is in the public domain but the unified process, design

and operation of which, in unique combination, affords a competitive advantage and is a

protectable secret." *Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.,* 297 F. Supp. 2d 463,

483 (N.D.N.Y. 2003), aff'd, 126 F. App'x 507 (2d Cir. 2005) *See also Monovis, Inc. v.*

*Aquino,* 905 F.Supp.1205, 1231 (W.D.N.Y. 1994).

316.    Looking at the six factors identified under New York law for the determination of a trade

secret, the Sole Arbitrator has no difficulty finding that UiPath's Source Code fits within this

definition.

317.    UiPath's Source Code was not only not publicly known outside of the business but was

also stored in a secure encrypted industry-standard software repository. Even within the

company, only senior engineers were given access to view the Source Code and only one

73

team, located in Bucharest, was able to make changes. All employees with access to the

Source Code had to sign confidentiality agreements. These factors clearly meet the first three

factors under New York law in that the information was not publicly available, not all

employees had access, those who did had contractual obligations not to disclose the source

code, and UiPath took strong measures to protect its Source Code.

318.   The Source Code allows UiPath to sell a full product line of unique, market-leading RPA

products, which demonstrates the value of the information to UiPath and its competitors.

UiPath spent over a decade researching, developing, and testing its Source Code, showing a

considerable amount of investment, and meeting the fifth factor.

319.   Finally, as mentioned above, UiPath took considerable efforts to protect its Source Code.

Even the portions that were publicly available and, as the Respondent claims, could have

easily been reverse engineered were subject to stringent end-user agreements. The

Respondent has not shown the Source Code could be easily and <u>properly</u> acquired.

320.   Since UiPath's Source Code has met the six factors under New York law and the Source

Code as a whole can be considered within the definition, UiPath's Source Code was a trade

secret.

321.   Thus the Claimant has met the first prong of the test under the DTSA and

misappropriation under New York law.

### b.   Misappropriation/Improper Means Prong

322.   Having established that the Claimant's Source Code did constitute a trade secret, the Sole

Arbitrator now turns to whether the Respondent misappropriated that trade secret.

323.   Under the DTSA, a defendant misappropriates a trade secret if:

> (1)[the defendant] acquires a trade secret of another knowing or
> having reason to know that the trade secret was acquired through

> improper means; or (2) discloses or uses a trade secret of another
> without express or implied consent, and either (i) used improper
> means to acquire knowledges of the trade secret or (ii) knew or had
> reason to know the knowledge of the trade secret was derived from
> or through a person who had used improper means to acquire the
> trade secret or who had a duty to maintain the secrecy of or limit
> the use of the trade secret. 18 U.S.C. §1839(5).

324.    The statute defines improper means as acquiring the trade secret through "theft, bribery,

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or

espionage through electronic or other means." 18 U.S.C. ¶1839(6)(A).

325.    Case law from New York has consistently found that the definition for misappropriation

under New York law and under the DTSA are "fundamentally the same." *Iacovacci v. Brevet

Holdings, LLC*, 437 F.Supp. 3d 367, 380 (S.D.N.Y. 2020).

326.    As discussed above, rarely is there a "smoking gun" in cases involving misappropriation.

A party that has misappropriated another's intellectual property will not generally openly

confess to such a misappropriation and will often make it difficult for a party alleging

misappropriation to find direct evidence of that misappropriation.

327.    Following this reasoning, the Claimant has highlighted New York case law that supports

a finding of misappropriation based on circumstantial evidence in the event that convincing

direct evidence cannot be obtained. Specifically, the Claimant cites the language of

*Stanacard, LLC v. Rubard, LLC,* "the trier of fact may draw inferences which convince him

that [misappropriation] is more probable than not." No. 12 CIV. 5176, 2016 WL 462508, at

*19 (S.D.N.Y. Feb. 3, 2016) *see also Monovis Inc.*, 905 F.Supp. at 1231. The Respondent

does not contest that the Claimant may make its case based on circumstantial evidence. Thus,

the Sole Arbitrator turns to evaluate whether the six circumstantial grounds raised by the

Claimant adequately establish that Respondent more likely than not misappropriated the Claimant's Source Code.

328.    First, the Claimant has argued that the Respondent specifically recruited Hu and gave him a large compensation package in exchange for the Claimant's Source Code.

329.    Much of the Claimant's argument relies on the idea that Hu, Liu, and Shi had some sort of long-standing plan to misappropriate UiPath's Source Code.

330.    As mentioned above, the Sole Arbitrator does not view it as necessary to determine whether such a long-standing plan existed. Rather, the more significant evidence of misappropriation lies in the inexplicable coincidences highlighted above as well as Hu's large compensation package.

331.    Hu worked at UiPath from January 28, 2019 until September 15, 2019 (Shichao Hu Statement, ¶¶21, 63), less than eight months. Prior to joining UiPath, Hu had no RPA experience and no product management experience (9/15/22 Tr. (Hu) at 28:17-22 (acknowledging he is "not an expert in RPA products"); 32:2-3 ("I didn't develop any RPA specific expertise."); 209:2-18; 227:9-23; Shichao Hu Statement, ¶ 71). ENCOO hired Hu at the director and co-founder level, gave him the title of Chief Product Officer, and paid him the highest salary at the company of ███████, along with ███████ in stock options (Exh. R-A-10). Considering Hu's relevant experience to the role added with the fact that Liu gave Hu such a high salary (Exh. R-A-10), the only plausible reason that ENCOO was paying Hu so much is that he was bringing something else with him, namely UiPath's Source Code. The Respondent has not shown any evidence to justify such a large salary, nor any other justification for why Hu was compensated so handsomely.

332.    Second, the Claimant highlights Hu's review and download of UiPath's Source Code often coincided with his meetings with Liu and Shi.

333.    Hu met Shi for dinner in Washington on May 17, 2019 (Shichao Hu Statement, ¶40). On May 29, Hu began accessing and updating his local copy of UiPath's Studio Source Code and continued to access the Source Code 27 more times between May 29 and June 18 (Munil Shah Statement, Exh. D). This included using the "fetch" function on June 3, which would have downloaded all new changes (*Id.*). Following his meeting with Liu on August 3, Hu accessed the Source Code one more time on August 15, the same day that he tendered his resignation to UiPath (*Id.*, Shichao Hu Statement, ¶63). Prior to May 29, Hu had only accessed the Source Code once during the month of April and, though he did access the Source Code around 20 times in March, it is clear from the GitHub record that he did so in connection with a training on Studio in Romania (*Id.*).

334.    The Respondent has argued that Hu required access to UiPath's Source Code for both the training in Romania and for working on a tie-in between AI Fabric, the product Hu worked on during his time at UiPath, and Orchestrator, another one of UiPath's products. Even on the most charitable view of Hu's access, there is no apparent justification for why he suddenly needed to access the Source Code so many times. The training in Romania took place in March 2019 and would not explain why Hu would need to access the Source Code so many times several months later. For the AI Fabric and Orchestrator tie-in, even if Hu required access to facilitate this process, Hu's performance review indicates that the project was completed on June 14, 2019 (Hu Performance Review, pg. 1). However, Hu continued to access and update his copy of the Source Code through June 18 and then again on August 15 (Munil Shah Statement, Exh. D). The absence of any justification for the number of times

and the timing of Hu's accessing of the Source Code, combined with the meeting with Shi in May and Hu's resignation from UiPath on the day of his last access leads to only one reasonable inference: Hu's access to the Source Code was not for work related reasons but for downloading and transferring the Source Code to ENCOO.

335.    Third, the Claimant alleges that Hu took clear efforts to conceal his misappropriation of UiPath's Source Code by asking Liu to not advertise his hiring (Exh. R-A-10), misrepresenting to Shah and Amin that he was returning to China without a job in order to take care of his parents (Munil Shah Statement, ¶¶27-29), wiping his laptop when he left UiPath (9/15/22 Tr. (Hu) at 85:15-25; 86-94), and continuing to represent on his LinkedIn account that he was employed at UiPath until at least May 9, 2020 (9/15/22 Tr. (Hu) 209:19-210:9). While it may be a stretch to draw any inference from the fact, considered in isolation, that Hu did not update his LinkedIn profile, the other three actions collectively give rise to great concerns.

336.    The Respondent and Hu himself have provided no justification for why Hu asked Liu to "keep a low profile" on his joining ENCOO or why Hu represented to Shah and Amin that he would be unemployed. Both Shah and Amin offered Hu resources in preparation for his move to China, which Hu rejected and even mocked (9/15/22 Tr. (Hu) 209:19-210:9).

337.    Hu's wiping of his laptop is even more concerning because doing so was not only in violation of his Confidentiality Agreement but would have deleted any trace of his activities, such as transferring the Source Code to another device. The Respondent argues that Hu wiped his laptop because he kept personal information on the device (9/15/22 Tr. (Hu) 89:13-25 to 90:2), but this does not preclude the possibility that Hu additionally chose to wipe the device to conceal misappropriation.

338.    Fourth, the Claimant relies on the fact that ENCOO's supposedly developed its own
Studio product in record time only after Hu joined the company.

339.    UiPath spent over fifteen years developing its Studio product and invested considerable
money, time, and energy into developing one of the most advanced RPA products on the
market. Even Microsoft has not been able to create an RPA product as developed as UiPath's
Studio.

340.    While it is certainly possible that a company may create an RPA product in a shorter time
frame, as the Respondent has argued, that misses the point.  The question here is whether a
company could create a sophisticated RPA product in less than a year. ENCOO's source
code in August 2019 was extremely rudimentary and not anywhere near being a market-
leader in China's RPA market (Barth Second Expert Report, Exh. A ¶¶13, 18-20). A mere six
months after Hu joined ENCOO, ENCOO became a market-leading RPA software company
in China based on the success of its sophisticated Studio product that bore no resemblance to
the product released in August 2019 (Chungang Liu Statement, ¶¶22-23; Pamela O'Neill
Supp. Report, Exh. B-7).

341.    ENCOO perhaps could have justified its speedy development of its Studio product if
there had been evidence showing major investment in RPA technology or the hiring of
multiple RPA experts. However, ENCOO's financials show almost no development or
employee expenses during this six-month period (Pamela O'Neill Supp. Report, ¶ 21).
Furthermore, ENCOO's engineering team was hired from Blue Bridge, which had no RPA
experience, and was led by Shi who likewise had no RPA experience (Liu Statement, ¶¶9,
13). In fact, the only member of ENCOO with any RPA experience, albeit limited
experience, was Hu, who supposedly did not work on the RPA product.

342.    Thus, ENCOO would have the Sole Arbitrator believe that it developed a cutting edge

RPA product using employees with no RPA experience and without making any major

investment in possibly as short as six months but at most in no more than three years.  Based

on the record, the Sole Arbitrator finds this so far-fetched as to not be credible.

343.    The Respondent has tried to argue that its access to the Windows Workflow Foundation

and other public resources sped up the development process, but these tools are also available

to far larger and better-resourced companies. If Microsoft, with all of its resources, cannot

create a product comparable to UiPath's Studio, how can it be believed that a start-up with

one employee who worked for eight months at an RPA company plus a few engineers with

no RPA experience and limited investment would make a product that could compete with a

top-of-the-line product in less than a year?

344.    New York case law also supports a finding of misappropriation where a party accused of

misappropriation developed a product in an inexplicably short time frame. *See e.g. Monovis,*

905 F. Supp. at 1231; *Paz,* 514 F. Supp. 2d at 408; *Tradescape.com v. Shivaram,* 77 F. Supp.

2d 408, 419 (S.D.N.Y. 1999).

345.    Fifth, Claimant argues that the Barth Report establishes that there is direct evidence of

extensive similarities between Claimant's Source Code and Respondent's source code.

346.    Barth opined that there was clear evidence that ENCOO copied UiPath's Source Code

because ENCOO's source code contained ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

██████

347.   The Respondent has argued that the similarities are due to the Parties using similar development tools, but as the Claimant aptly states, these arguments are "akin to stating that a party can recreate Michelangelo's David because it used Michelangelo's chisels" (Claimant's Post-Hearing Brief, pg. 62). What is clear from the Barth Report is that though UiPath may have used standard software that was publicly available for some of its Source Code, it made significant modifications to the extent that the result was a "customized, unique, proprietary code" (Barth Supplemental Report, ¶6). The similarities identified are not just because the Parties used the same standard software as a starting point but rather that ENCOO copied UiPath's modifications.

348.   New York courts have consistently found misappropriation in cases where there is evidence of substantial similarity between or copying of source codes. *See e.g. Fabkom, Inc. v. R.W. Smith & Assocs., Inc.,* No. 95 CIV 4552, 1996 WL 531873, at *9 (S.D.N.Y. Sept. 19, 1996); *Vermont Microsystems, Inc. v. Autodesk, Inc.,* 88 F.3d 142, 148-49 (2d Cir. 1996); *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 732 F. Supp. 370, 372–73 (S.D.N.Y. 1989), *aff'd,* 920 F.2d 171 (2d Cir. 1990).

349.   Sixth and finally, Claimant argued that ENCOO knew or should have known that obtaining UiPath's Source Code from Hu was improper. ENCOO knew or should have known Hu was subject to a confidentiality agreement through his employment at UiPath because ENCOO requires its employees to execute similar agreements and even if they did not, both Liu and Shi are veterans in the software industry, where these types of confidentiality agreements are commonplace (Chungang Liu Statement, ¶41). ENCOO

should have known that such an agreement would prohibit Hu from sharing source code or

any other trade secrets from UiPath.

350.    Furthermore, even if the Respondent were to maintain that ENCOO had no idea Hu had

stolen UiPath's Source Code, it certainly was put on notice of potential misappropriation on

May 22, 2020 when UiPath sent its Complaint.

351.    The Claimant has provided an abundance of evidence in this case that inescapably points

to a finding that Hu and ENCOO misappropriated UiPath's Source Code. While coincidences

certainly exist, Hu receiving a huge compensation package combined with Hu accessing

UiPath's Source Code multiple times following his meetings with Liu and Shi combined with

Hu asking ENCOO to not advertise his employment and wiping his laptop, combined with

ENCOO's software drastically improving in less than six months, combined with ENCOO's

lack of investment into research or hiring RPA-experienced engineers, combined with Barth

finding substantial similarities in the codes are too many coincidences. Any one of these

factors would raise eyebrows, but all six in combination point to only one conclusion:

ENCOO misappropriated UiPath's Studio Source Code.

352.    As the Claimant pointed out, the facts of this case almost entirely mirror those found in

*Paz Sys., Inc. v. Dakota Grp.*, in which a former employee downloaded the plaintiff's trade

secret architectural drawings in violation of his fiduciary duties and immediately after started

a company with a competitor in which he received a 49% equity ownership. 514 F. Supp. 2d

at 405. The new company was able to start business immediately, while the plaintiff had

taken many years to launch due to the time required to create the architectural drawings (*Id*.

at 408). The former employee also tried to hide his misappropriation by destroying data (*Id*.

at 409). The court in *Paz* found that the plaintiff had established his trade secret

misappropriation claims (*Id.*). The fact pattern in this arbitration is very close to the fact

pattern in *Paz*, supporting a finding of trade secret misappropriation.

353.    As such, the second prong of the DTSA and New York law on misappropriation is met.

354.    Thus, the Sole Arbitrator finds that Respondent violated the DTSA and engaged in

misappropriation under New York law.

355.    The Sole Arbitrator notes that the measure of damages for trade secret misappropriation

under both the DTSA and New York law is a claimant's actual losses from the

misappropriation, including lost profits, and profits unjustly received by the respondent,

though if the foregoing measure are inapplicable or inadequate, a claimant can receive a

reasonable royalty. *In re Cross Media Mktg. Corp.,* 06-CIV-4228, 2006 WL 2337177, at *5

(S.D.N.Y. Aug. 11, 2006). Additionally, both the DTSA and New York law allow for

punitive damages 18 U.S.C. § 1836(b)(3)(C); *Paz Sys., Inc. v. Dakota Grp. Corp.,* 514 F.

Supp. 2d 402, 409 (E.D.N.Y. 2007).

356.    The Sole Arbitrator will address the issue of damages in Section C.

### iii.    Aiding and Abetting Breach of Fiduciary Duty

357.    UiPath outlined its case that ENCOO is liable for aiding and abetting breach of fiduciary

duty in four basic steps.

358.    First, Hu owed a fiduciary duty to UiPath to act with good faith and loyalty and to refrain

from using, misappropriating, or exploiting UiPath's confidential information — which as a

Director of Engineering, he had access to, including its Studio Source Code. (5/6/22 Shah

W.S. ¶ 25) —  for Hu's or ENCOO's benefit, or to UiPath's detriment.

359.    Second, UiPath Hu breached this fiduciary duty by: (i) viewing and downloading the

Source Code multiple times without business reason or authorization; (ii) meeting with

ENCOO and discussing the RPA market and RPA software while still employed at UiPath in violation of his Confidentiality Agreement; and (iii) providing UiPath's Source Code to ENCOO for Hu's and ENCOO's profit.

360.     Third, UiPath asserts that Liu of ENCOO knew that Hu was employed by UiPath as early as April 2019, and knew or should have known that Hu owed UiPath a fiduciary duty not to misappropriate its trade secrets because ENCOO required its employees to sign similar agreements, and as former Microsoft employees, Liu and Shi were "deeply aware of the importance of the protection of IP rights and trade secrets." (8/7/22 Chungang Liu Statement, ¶ 41).

361.     Finally, it asserts that ENCOO induced and substantially assisted Hu in the breach of his fiduciary duty based on the following: In April and May 2019, Shi and Liu began recruiting Hu by messaging him and reminiscing about their previous Microsoft connections. (Ex. R-A-10; EX. R-C-1; 9/14/22 Tr. (Liu) at 98:6-99:14-100:2-12). Shi invited Hu to dinner in May 2019 in "the United States," and days later, Hu updated his copy of UiPath's Studio Source Code. (Munil Shah Statement, Exh. D). Liu invited Hu to dinner in Shanghai on August 3, 2019, where the two discussed the RPA market and Hu had substantial discussions about ENCOO's RPA technology. (9/15/22 Tr. (Hu) at 133:16-25; 138:11-24; 147:21-25).  It further asserts that Liu also enticed Hu to join ENCOO with discussions of tripling profits, millions in recent investments, and product demos. (9/15/22 Tr. (Hu) at 147:21-25; 148-154). Hu then accessed UiPath's Source Code for the final time on August 15, 2019, the same day he announced his resignation from UiPath. (Munil Shah Statement, Exh. D). Finally, ENCOO offered Hu significant incentives to join ENCOO with UiPath's Source Code in hand, including the largest salary at ENCOO, stock options worth over ████████, and a

CPO and Co-Founder position. ENCOO even agreed to assist Hu in concealing his ENCOO

employment. (Ex. R-A-10 at 12, 8/14/19 messages).

362.    The Sole Arbitrator turns to consider whether ENCOO is also liable for aiding and

abetting a breach of fiduciary.  This requires the Sole Arbitrator to consider: (i) whether Hu

owed a fiduciary duty to UiPath; (ii) whether he breached that duty; and (iii) whether UiPath

has met its burden to show that the elements of aiding and abetting breach of fiduciary were

satisfied.

363.    In considering the first issue, the Sole Arbitrator notes that, under New York law, an

employee owes fiduciary duty to the employer and such duty "may continue after termination

of the employment relationship." *Am. Fed. Grp., Ltd. v. Rothenberg,* 136 F.3d 897, 914 (2d

Cir. 1998). Here, as employee of UiPath, Hu owed a fiduciary duty to UiPath.

364.    In terms of the second issue, New York provides that an employee breaches his fiduciary

duties to his employer by "misappropriat[ing] and utiliz[ing] confidential information . . . not

generally known to the public, but available only to employees in their endeavors for the

company." *Rothenberg*, 136 F.3d at 906.  *See also Paz Sys., Inc. v. Dakota Grp. Corp.,* 514

F. Supp. 2d 402, 405 (E.D.N.Y. 2007) (holding former director of engineering breached

fiduciary duty to plaintiff by copying confidential information from plaintiff's server onto his

computer prior to resignation and using the information to divert business to competitor-

defendant); *Capstone Logistics Holdings, Inc. v. Navarrete,* No. 17- CIV-4819, 2020 WL

3429775, at *6 (S.D.N.Y. June 23, 2020), *aff'd in part and remanded,* 838 F. App'x 588 (2d

Cir. 2020) ("[a]n employee owing a fiduciary duty to his…employer may not make

arrangements to work for a competitor at the employer's expense, and may not use the

employer's resources, time, facilities, or confidential information, nor may the employee …

actively divert the employer's business for his own personal benefit or the benefit of others.").

365.    Here, the same findings made by the Sole Arbitrator as a basis for his determination that ENCOO was liable for misappropriation also support a finding that Hu breached his fiduciary duty to UiPath. Thus, Hu viewed and downloaded UiPath's Source Code multiple times solely for the purpose of misappropriating it.  He met with ENCOO and discussed the RPA market and RPA software while still employed at UiPath in violation of his Confidentiality Agreement.  And, as discussed, the Sole Arbitrator has found that Hu misappropriated UiPath's Source Code and gave it to ENCOO.

366.    Finally, the elements for aiding and abetting a breach of fiduciary duty under New York law are: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen,* 760 N.Y.S.2d 157, 169 (1st Dep't 2003). A person knowingly participates in a breach of fiduciary duty when he or she "provides substantial assistance to the primary violator." *Kaufman,* 307 A.D.2d at 126. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.*

367.    Here UiPath has satisfied the first element in that, as the Tribunal has noted, Hu breached his fiduciary duty to UiPath.

368.    The Sole Arbitrator also finds that the second element to be satisfied because Liu knew that Hu was employed by UiPath as early as April 2019, and it is reasonable to infer that he knew that Hu owed UiPath a fiduciary duty not to misappropriate its trade secrets because ENCOO required its employees to sign similar confidentiality agreements to those signed by

Hu while employed at UiPath, and, as former Microsoft employees, Liu and Shi were

"deeply aware of the importance of the protection of IP rights and trade secrets." (8/7/22 Liu

Statement ¶ 41).

369.    Finally, the Sole Arbitrator finds that ENCOO induced and substantially assisted Hu in

the breach of his fiduciary duty.  The record is clear that Hu accessed and downloaded the

Source Code immediately after communicating with Liu and/or Shi.

370.    For example, Shi invited Hu to dinner in May 2019 in "the United States," and days later,

Hu updated his copy of UiPath's Studio Source Code. (Munil Shah Statement, Exh. D).  Liu

invited Hu to dinner in Shanghai on August 3, 2019, where the two discussed the RPA

market and Hu had substantial discussions about ENCOO's RPA technology. (9/15/22 Tr.

(Hu) at 133:16-25; 138:11-24; 147:21-25).  Hu then accessed UiPath's Source Code for the

final time on August 15, 2019, the same day he announced his resignation from UiPath.

(Munil Shah Statement, Exh. D).

371.    Finally, ENCOO offered Hu significant incentives to join ENCOO with UiPath's Source

Code, including the largest salary at ENCOO, stock options worth over ▮▮▮▮▮▮, and a

CPO and Co-Founder position. ENCOO even agreed to assist Hu in concealing his ENCOO

employment. (Ex. R-A-10 at 12, 8/14/19 messages).   And, as the Sole Arbitrator has found,

ENCOO used UiPath's Source Code.  *See Pure Power Boot Camp, Inc. v. Warrior Fitness

Boot Camp, LLC,* 813 F. Supp. 2d 489, 529–32 (S.D.N.Y. 2011) (defendant liable for aiding

and abetting breach of fiduciary duty by using plaintiff's confidential information stolen by

former employees to establish a rival company).

372.    Thus, the Sole Arbitrator finds that ENCOO is liable for aiding and abetting breach of

fiduciary duty.

373.     The Sole Arbitrator notes that the measure of damages for aiding and abetting a breach of

fiduciary duty is "the amount of damages as will reasonably compensate [plaintiff] for such

injury and damage as . . . [plaintiff] has sustained as a proximate result of [defendants']

wrongful conduct." *Nat. Union Fire Ins. Co. of Pittsburgh, PA v. Razzouk,* No. 653191/2012,

2022 WL 1117879, at *13 (N.Y. Sup. Ct. Apr. 14, 2022).

374.     The Sole Arbitrator will address damages in Section C of this Award.

### iv.     Unfair Competition and Unjust Enrichment

375.     UiPath asserts two equitable claims:  unjust enrichment and unfair competition.  It argues

that the evidence that supports these claims is largely the same as the evidence that supports

UiPath's claims for trade secret misappropriation. It notes that UiPath's Studio Source Code

is the result of years of development and investment, which affords it a significant

commercial advantage in the marketplace as the global market leader in RPA software. And

it argues that by stealing UiPath's Source Code to profitably develop and sell its own

competing Studio product, ENCOO unlawfully usurped the fruit and labors of years of

development, testing, and investment that went into UiPath's Studio Source Code. According

to UiPath, this is the essence of unfair competition and unjust enrichment.

376.     The Sole Arbitrator turns to consider these two equitable claims in turn.

### a.  Unjust Enrichment

377.     Under New York law, a claim for unjust enrichment is rooted in the equitable principle

that a person shall not be allowed to enrich himself or herself unjustly or at the expense of

another. *See Georgia Malone & Co. v. Rieder,* 19 N.Y.3d 511, 516 (2012); N.Y. Pattern Jury

Instr. Civil 4:2. To adequately plead unjust enrichment, the plaintiff must allege "that (1) the

other party was enriched, (2) at [the plaintiff]'s expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Id.*

378.     Here, the Sole Arbitrator finds that the determinations that support his conclusion that ENCOO is liable for trade secret misappropriation also support the conclusion that it is liable for unjust enrichment.  The record is clear that UiPath spent years and considerable expense developing its Studio Source Code, and that this Source Code is the main reason UiPath is a global market leader in RPA software. By simply stealing UiPath's software, ENCOO bypassed the years and investment and effort that it would have had to undertake to develop a successful RPA software product.  Indeed, without its theft of UiPath's software there is no evidence that it would have been able to develop a successful RPA product at all.  By misappropriating UiPath's software, ENCOO was clearly unjustly enriched at the expense of ENCOO.  Thus, the Sole Arbitrator finds it to be liable for unjust enrichment.

379.     Under New York law, "the measure of damages for an unjust enrichment claim is based on the amount of benefit retained by the defendant, rather than by a plaintiff's loss." *Swan Media Grp., Inc. v. Staub,* 841 F. Supp. 2d 804, 809–10 (S.D.N.Y. 2012).

380.     The Sole Arbitrator will address damages in Section C.

### b.  Unfair Competition

381.     Under New York law, "[t]he essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Bytemark, Inc. v. Xerox Corp.,* 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018). "[T]he primary concern in unfair competition is the protection of a

business from another's misappropriation of the business' organization or its expenditure of labor, skill, and money." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 277 F. Supp. 2d 269, 275 (S.D.N.Y. 2003). New York's unfair competition law is a "[b]road and flexible doctrine that depends more upon the facts set forth . . . than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person . . . a benefit or property right belonging to another." *Telecom Int'l Am., Ltd. v. AT & T Corp.,* 280 F.3d 175, 197–98 (2d Cir. 2001).

382.    Again, the Sole Arbitrator holds that the findings that support his determination that ENCOO is liable for trade secret misappropriation also support a determination that it is liable for unfair competition.  See *Bytemark*, 342 F. Supp. 3d at 505; Paz, 514 F. Supp. 2d at 408- 09 (finding "the same acts that support a claim for misappropriation of trade secrets also support a claim for unfair competition," where defendant developed a database similar to plaintiff's using proprietary data wrongfully obtained from plaintiff and took plaintiff "years of significant effort to develop").

383.    Here, Hu owed confidentiality obligations to UiPath under his Confidential Agreement, with respect to UiPath's confidential information, such as its Studio Source Code — which UiPath developed through an investment of considerable time and expense.  Hu acted deceptively and in breach of his confidential relationship in downloading that code and giving it to ENCOO which developed a competing product on the basis of it.  The Sole Arbitrator has no difficulty concluding that ENCOO "misappropriated the fruit of [UiPath's] labors and expenditures" by misappropriating UiPath Source Code, which it obtained from

Hu who downloaded it "deceptively" and in breach of his "confidential relationship" with
UiPath.

384.    UiPath notes that the measure of damages for unfair competition under New York
common law is "the loss of profits sustained by reason of the improper conduct [] limited to
lost profits resulting from the defendant's actual diverting" of business. *Suburban Graphics
Supply Corp. v. Nagle,* 5 A.D.3d 663, 666, (2d Dep't 2004). "Future lost profits . . . may also
be awarded based upon known reliable factors without undue speculation." *Id.*

385.    The Sole Arbitrator will address damages in Section C.

### B.    Breach of the Settlement Agreement

386.    This portion of the analysis relates to the Claimant's two remaining claims: 1) Breach of
the Settlement Agreement; and 2) Breach of the Covenant of Good Faith and Fair Dealing.

#### 1.    Statement of Facts

##### i.    Negotiation of the Settlement Agreement

387.    In March and April 2020, Umesh Amin, UiPath's Senior Vice President and Global Head
of Intellectual Property, whom, having observed him at the hearing, the Sole Arbitrator found
to be a highly credible and professional individual, saw ENCOO's press releases that
featured Hu (Umesh Amin Statement, ¶¶11-19). These press releases prompted Amin to
launch an internal investigation in April 2020 (*Id*. at ¶22). This investigation found evidence
that ENCOO had misappropriated UiPath's Studio Source Code (Amended Demand Exh. A
Draft Complaint ¶¶30-32).

388.    On May 22, 2020, UiPath sent a lawyer's letter and complaint ("Complaint") to ENCOO
alleging a violation of the Defend Trade Secrets Act, misappropriation of Claimant's trade
secrets in violation of New York common law, unfair competition, and unjust enrichment,

and attaching a draft complaint to be filed in the US District Court for the Southern District of NY ("SDNY") (He Fang Statement, ¶6).

389.    Following the letter and draft Complaint, ENCOO claims to have begun an internal investigation (Liu Statement, ¶¶50, 51-54). The apparent conclusions reached at the end of ENCOO's investigation is that the similarities between the source codes were due to the use of the same Microsoft WWF and .Net tools in developing the code, copying of UiPath's publicly available code, and reverse-engineering of some UiPath Studio executable code by a few ENCOO engineers (Shichao Hu Statement, ¶¶78-79, Exh. R-B-16). ENCOO's supposedly found that less than 1% of its source code was copied from UiPath (Exh. R-32). ENCOO claims to have removed any code it found to have been added to its source code through reverse engineering or copying of UiPath's publicly available code (Chungang Liu Statement, ¶63-64).

390.    Hu and ENCOO met with UiPath's counsel, Mr. He Fang ("He Fang") on June 3, 2020, to discuss the allegations (He Fang Statement, ¶7). After this meeting, the Parties began to negotiate a settlement eventually resulting in the signing of the Settlement Agreement on July 14, 2020 (Amended Demand, Exh. B).

391.    The Settlement Agreement listed four main business changes Respondent must implement, namely Respondent would:

> 1) Remove from all current and future product source code any and all similarities to UiPath source code;
>
> 2) Cease mentioning UiPath and UiPath's products in relation to the design, manufacturing, advertising, marketing and sale of its products;
>
> 3) Limit all marketing and sales activity of its RPA products line and related offerings and services; and
>
> 4) Permanently delete and/or destroy any and all UiPath confidential information

in their respective possession or control. (Clause 2, Settlement Agreement)

392.    In addition to these business changes, ENCOO also agreed that once annually for three years it would make its source code for its RPA product line available for review by a third-party reviewer (*Id*.). The third-party reviewer would be selected by UiPath subject to ENCOO's consent, which would not be withheld unreasonably (*Id*.). If UiPath's third-party reviewer found misappropriation of UiPath's Source Code, ENCOO would have the right to appoint its own third-party reviewer, and the Parties would negotiate in good faith to resolve the issue (*Id*.).

393.    Hu executed a Supplemental Settlement Agreement with UiPath on the same day, which required him to cease his employment with ENCOO within 15 days and have no substantive contact with ENCOO (He Fang Statement, ¶11, Exhs. F & G).

### ii.      Third-Party Review and Export Application

394.    On or around October 8, 2020, UiPath informed ENCOO that it had selected UnitedLex Corporation as its source code reviewer (He Fang Statement, ¶21). Kevin Duan ("Duan"), ENCOO's counsel, expressed concerns about UnitedLex to He Fang and proposed an alternative US-based reviewer (He Fang Statement, Exh. N at 9). Duan also raised concerns about ENCOO's ability to provide source code abroad due to the new Chinese Administrative Regulations on Technology Import and Export ("Chinese Export Regulations") and indicated ENCOO had begun speaking with the Shanghai Municipal Commission of Commerce ("Chinese Export Authorities") on export procedures.

395.    He Fang's response on October 13, 2020 was that Duan's concerns about UnitedLex were not reasonable and that if ENCOO could not produce its source code in time, that would constitute a breach of the Settlement Agreement (*Id*. at 6-7). On October 20, He Fang gave

Duan and ENCOO a two-week extension of the deadline to provide source code, making the

new deadline November 2, 2020, but reiterated that ENCOO should have been aware of and

resolved any export license issues earlier in time (*Id*. at 4-5). On October 23, Duan informed

He Fang that though ENCOO had begun the process of obtaining an export license, it would

not provide its source code without a license from the Chinese Export Authorities (*Id*. at 1-3).

On October 28, He Fang reminded Duan that the deadline to produce the source code was

November 2nd (*Id*. at 2). Duan's response was that the deadline had no basis in the

Settlement Agreement, and he accused UiPath of attempting to obtain ENCOO's source code

unlawfully, allegations that the Claimant denies (*Id*. at 1).

396.    After ENCOO's failure to provide its source code to UnitedLex by November 2, 2020,

UiPath commenced this arbitration on November 11, 2020.

397.    ENCOO submitted its application to the Chinese Export Authorities on November 19,

2020 without UiPath's involvement (Anyi Wang Statement, Exh. H). On December 9, 2020,

ENCOO met with the Chinese Export Authorities, during which it presented a slide deck (*Id*.,

Exh. I). On January 4, 2021, the Chinese Export Authorities denied ENCOO's first export

application, which triggered an appeal deadline of March 5, 2021 (*Id*., ¶20). UiPath and the

Sole Arbitrator were informed of the rejection of the initial application on April 28, 2021

(*Id*., ¶21).

398.    In Procedural Order No. 3, the Respondent was ordered to submit a new export

application and include the Claimant in the application process and all correspondence

related to the new application (Procedural Order No. 3, ¶15). In late May 2021, the

Claimant's counsel received a draft renewed export application from Respondent's counsel

(Anyi Wang Statement, ¶11). After receiving this draft, the Claimant's counsel attempted to

schedule a meeting with the Chinese Export Authority and the Respondent's counsel (*Id.*, ¶13). The Respondent's counsel asserted that this meeting was not necessary (Statement of Defence, ¶105). Eventually the Parties' counsel did meet with the Chinese Export Authority in late summer 2021 (Anyi Wang Statement, ¶¶17-18).

399.    The Respondent's counsel sent draft application materials to the Claimant's counsel for approval before filing on September 4, 2021 (Statement of Defence, ¶107). On October 29, 2021, the Claimant's counsel wrote to the Respondent's counsel to ask the Respondent to file the renewed application as soon as possible (Anyi Wang Statement, ¶25, Exh. N at 5-6). On November 23, 2021, the Respondent's counsel informed the Claimant's counsel that the application needed to be updated, which the Respondent attributes to a change in the mode of application (*Id.* at 4; Statement of Defence, ¶109). The Respondent provided the updated application materials on January 16, 2022 (Anyi Wang Statement, ¶29, Exh. N at 3-4). Since the Respondent has never received confirmation from the Claimant that it should file the renewed application, it asserts that the application has not been filed to date (Statement of Defence, ¶111).

### 2.    Claimant's Position

#### i.    Factual Arguments

400.    The Claimant alleges that starting from prior to the negotiations of the Settlement Agreement to the present day, the Respondent never intended to meet the requirements of the Settlement Agreement and acted in bad faith.

401.    The Claimant asserts that the Respondent's internal investigation, commenced on May 22, 2020, was flawed and biased and emphasizes that this internal investigation was conducted without the Claimant's knowledge or involvement. The Claimant criticizes the Respondent's decision to put Hu, the only employee who could have had access to UiPath's

95

Source Code, in charge of this internal investigation rather than Shi, who was the CTO and the person purportedly responsible for the development of the Studio product. Furthermore, the Claimant submits that the investigation only covered a subset of Studio code amounting to less than 1% and relied solely on self-reporting by employees who allegedly confessed to reverse engineering UiPath's executable code.

402.    Though the similarities in this small subset of code were changed by the same engineers who confessed to reverse engineering the code, the Claimant highlights that any other similarities, most of which were far more critical, were not removed. Furthermore, the Claimant notes that UiPath was not informed of this internal investigation until August 7, 2022, when the Respondent submitted its Witness Statements, despite the investigation taking place during negotiations over the Settlement Agreement.

403.    When it comes to the negotiations related to the Settlement Agreement, the Claimant highlights that Hu identified himself as an employee of ENCOO rather than a shareholder or investor and that his stated reason for leaving ENCOO was a disagreement with the other founders, not due to the products being inferior as he would later claim. The Claimant also indicates that when Hu's lawyer began to mention ENCOO's internal investigation, Hu cut him off and stated that such an investigation was not possible.

404.    The Claimant alleges that during negotiations, the Respondent attempted to narrow the terms of the source code review, specifically seeking to limit the review to only ENCOO's Studio products, conducting a parallel source code review in China, and only having a market restriction on the US. None of these provisions made it into the final agreement, which was signed on July 14, 2020.

405.    The Claimant identified UnitedLex as a third-party source code reviewer on or around

October 8, 2020, which triggered the Respondent's obligation to produce its source code by

October 22, 2020 under Section 2(a) of the Settlement Agreement. The Respondent's

counsel, Duan, raised concerns about UnitedLex, the Claimant's identified reviewer, but the

Claimant and its Chinese counsel, He Fang, who communicated with Duan, allege that the

concerns were unreasonable. The Claimant also casts doubt on Duan's purported concern

that ENCOO could be prevented from exporting its source code due to the new Chinese

Export Regulations. He Fang informed Duan that it was ENCOO's responsibility to procure

any licenses required and that ENCOO should have resolved any issues with the Chinese

Export Authority earlier, but he allowed for some flexibility with the deadline for the

Respondent to produce its source code for review. When the Respondent failed to produce its

source code to UnitedLex by November 2, 2020, Claimant commenced this arbitration.

406.    The Claimant also notes that Duan intimated to He Fang that ENCOO could likely

produce its source code to the US regardless of the Chinese Export Regulations if UiPath

withdrew its Arbitration Demand.

407.    The Claimant raises doubts about whether a Chinese Export License was even needed for

ENCOO to transfer its source code to UnitedLex. The Claimant points to the language of the

Chinese Export Regulations which state that a license is required for the transfer of

technology "by way of trade, investment, or economic and technical cooperation" (Ex. R-L-1

at Art. 2). Since none of these were the stated goals of ENCOO transferring its source code to

UnitedLex, the Claimant argues the new Regulations were irrelevant. The Claimant further

adds that the Respondent raised these issues when it was obligated to export its source code

for review but did not apply for an export license or any other permission from the Chinese

97

Export Authorities when using its source code for Fry's Expert Report, which required portions of the source code to be exported to the United States.

408.  The Claimant highlights that despite Duan telling He Fang that an Export License may be needed in October 2020, the Respondent did not submit its first application until November 19, 2020, which was nearly two weeks after this arbitration was commenced. The Claimant alleges that the application contained multiple misrepresentations designed to make the transfer seem as though it was for economic reasons, rather than for the purpose of allowing the Claimant to review the ENCOO's code for the purposes of the resolution of a specific dispute. The Claimant also notes that the Respondent not only failed to include the Claimant in this application process but also concealed the filing and crucial deadlines from the Claimant and the Sole Arbitrator.

409.  The Claimant also contends that the Respondent had a meeting with the Chinese Export Authorities on December 9, 2020 in which it affirmatively requested that they deny Respondent's application. The Claimant points to a slide deck ("Slide Deck") used during that meeting which, the Claimant asserts, misrepresents the purposes of the transfer and fails to mention that the transfer is non-commercial. The Claimant also emphasizes that neither the Claimant nor the Sole Arbitrator were aware of the Slide Deck because the Respondent did not produce it when ordered to produce all documents related to the first export application by April 24, 2021. Instead, the Respondent waited until August 24, 2021 to submit the Slide Deck. The Claimant asserts that after it received the Slide Deck, its Chinese counsel informally contacted the Chinese Export Authorities and was informed that if a renewed export application was filed with no major edits, it would also be denied.

410.    The Chinese Export Authority denied the Respondent's first export application on

January 4, 2021, which triggered an appeal deadline of March 5, 2021. The Claimant asserts

that the Respondent purposefully concealed the denial and appeal deadline from the Claimant

and Sole Arbitrator until April 28, 2021, nearly two months after the appeal deadline had

passed. The Claimant further asserts that this concealment is especially egregious because the

Sole Arbitrator had ordered the Parties to discuss the possibility of appealing in a March 22,

2021 email order.

411.    The Claimant emphasizes that in Procedural Order No. 3, issued on May 12, 2021, the

Sole Arbitrator ordered the Respondent to produce its source code and expedite a new or

additional export application with the Claimant's participation, including copying the

Claimant on all communications with any third party. The Claimant alleges that the

Respondent was uncooperative in the process of attempting to set up a meeting with the

Chinese Export Authority. The Claimant asserts that informal discussions with the Chinese

Export Authority, especially where an application has been rejected previously, are part of

industry practice and that without these informal consultations, the Chinese Export Authority

would reject an application. The Respondent allegedly refused to schedule or participate in

discussions with the Chinese Export Authority until the Claimant started copying the Sole

Arbitrator on emails.

412.    On October 29, 2021, the Claimant's Chinese counsel emailed the Respondent's counsel

to assert that they wished to file a new application as soon as possible and get actively

involved in the process. The Claimant asserts that the Respondent ignored these emails

despite several follow ups until November 23, when the Respondent indicated that it was in

the process of updating the application. The Respondent did not produce an updated export

application until January 16, 2022, which the Claimant alleges only had minor wording changes. The Claimant emphasizes that this new draft was received almost three months after the Claimant's counsel requested an expeditious filing, four months after the Respondent submitted an initial draft, and six months after the Sole Arbitrator's order to expeditiously file a renewed application.

413.    The Claimant chose not to further pursue the export application at that point because the Claimant's witness statements were due soon. The Claimant believed the Respondent would never file an export application or produce its source code, and thus chose to look for alternatives to show misappropriation.

### ii.    Legal Arguments

### a.    Breach of Settlement Agreement

414.    The Claimant asserts that the elements to establish a breach of contract are "(1) the existence of a contract; (2) the plaintiff's performance pursuant to the contract; (3) the defendant's breach of its contractual obligations; and (4) damages resulting from the breach." *Kollatz v. KOS Bldg. Grp., LLC*, 137 N.Y.S.3d 491, 494 (2d Dep't 2020). The Claimant also highlights the elements necessary to form a valid and binding contract, apparently in anticipation of an argument from the Respondent that it was coerced into accepting the Settlement Agreement. These elements are "(1) at least two parties with legal capacity to contract; (2) mutual assent to the terms of the contract; and (3) consideration" (N.Y. Pattern Jury Instr. Civil 4:1).

415.    The Claimant also argues that, under New York law, material breach of a contract — meaning a party has "substantially failed to perform its side of the bargain" — excuses the other party from performance. *Process Am., Inc. v. Cynergy Holdings, LLC,* 839 F.3d 125,

136 (2d Cir. 2016). A material breach is one that goes "to the root of the agreement between the parties" *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir. 1997).

416.    The Claimant asserts that the Respondent materially breached the Settlement Agreement for three reasons, any one of which would be grounds for excusing the Claimant's performance under the Settlement Agreement as they all defeat the purpose of the Settlement Agreement.

417.    First, the Claimant argues that the Respondent's failure to provide its source code by the deadline November 2, 2020 constitutes a material breach because the requirement that ENCOO make its source code available for review by a third-party reviewer was a central element of its consideration for the Settlement Agreement. Under the Settlement Agreement, once UiPath identified a third-party reviewer, which it did on October 8, 2020, ENCOO was obligated to provide its source code within fourteen days. The Respondent failed to provide its source code within fourteen days or within the extended deadline provided by the Claimant. As such, the Claimant asserts that the Respondent has materially breached the Settlement Agreement.

418.    Second, the Claimant argues that the Respondent failed to remove any and all similarities to UiPath Source Code, as demonstrated by the Barth Report. As this constituted another of ENCOO's obligations under the Settlement Agreement, the Claimant alleges that this also constitutes a material breach.

419.    Third, the Claimant alleges that the Respondent sold its RPA Products outside of mainland China in violation of the Settlement Agreement, which states that Respondent was not allowed to sell its RPA products outside of mainland China for an 18-month restricted

period between July 15, 2020 and January 14, 2022. The Claimant asserts that the

Respondent's own press releases mention deals with U.S. Companies, working with

"overseas regions," and that 30% of its revenue comes from overseas. The Claimant also

highlights that the Slide Deck presented to the Chinese Export Authorities specifically

mentions offices in Japan and developing the Japanese market.

### b. Breach of Covenant of Good Faith and Fair Dealing

420.    The Claimant asserts that there is an implied covenant of good faith and fair dealing in

each contract (*E. Ramapo Cent. Sch. Dist. V. New York Sch. Ins. Reciprocal*, 158 N.Y.S.3d

173, 177 (2d Dep't 2021), which, under New York law, entails that parties are prohibited

from "act[ing] in a manner that, although not expressly forbidden by any contractual

provision, would deprive the other party of the right to receive the benefits under their

agreement" (*Frankini v. Landmark Const. of Yonkers, Inc.,* 937 N.Y.S.2d 80, 83 (2d Dep't

2012)). The implied covenant also contains "a promise not to act arbitrarily, irrationally or in

bad faith in exercising [its] discretion" (N.Y. Pattern Jury Instr. Civil 4:1).

421.    The Claimant alleges that the Respondent has violated the covenant of good faith and fair

dealing because it deprived ENCOO of the negotiated benefit of having an independent

source code review. Particularly, the Claimant argues the Respondent was misleading in

claiming that the Chinese Export Regulations required an export license and then

purposefully sabotaged the First Export Application. The Claimant further asserts that

Respondent concealed the rejection of the First Export Application until the appeal deadline

had passed, and then stalled and obstructed the Renewed Export Application. Because the

Respondent provides no rational basis for its alleged bad faith conduct regarding the Export

Applications, the Claimant affirms that its conduct must be considered a breach of the covenant of good faith and fair dealing.

### 3.     Respondent's Position

### i.     Factual Arguments

422.     The Respondent begins by asserting that, upon receiving the Claimant's Complaint on May 22, 2020, ENCOO commenced a thorough self-examination and concluded that no misappropriation had occurred but, rather, it discovered only that a few engineers had reverse-engineered portions of UiPath's public open-source code. The Respondent argues that these behaviors are not misappropriation but emphasizes that the portions taken from public source code and through reverse engineering were removed from ENCOO's source code. The Respondent alleges that the similarities were only present in a tiny amount of its source code and that all similarities from reverse engineering were removed.

423.     The Respondent alleges that based on this finding, Liu originally rejected UiPath's settlement offers on ENCOO's behalf, but Hu was concerned about the impact of the threatened lawsuit on his job search, which the Respondent alleges led to him pushing for a settlement. The Respondent also argues that in the process of negotiations, Hu repeatedly requested to speak with the Claimant to clarify what he perceived to be misunderstandings. The Respondent speculates that the refusal to meet with Hu was a tactic by Claimant to force the Respondent to accept terms that would limit its development rather than to attempt to resolve the alleged misappropriation.

424.     Turning to the source code review under the Settlement Agreement, the Respondent highlights that on August 28, 2020, shortly after the Parties executed the Settlement Agreement, the Chinese Ministry of Commerce and the Ministry of Science and Technology issued the Chinese Export Regulations, which the Respondent alleges applied to AI-based

103

interactive technology and OCR-related technology. The Respondent asserts that following the Claimant's selection of UnitedLex as the third-party reviewer, the Respondent filed an application with the Shanghai Municipal Commission of Commerce ("SMCC"), which was eventually rejected.

425.    The Respondent argues that a party cannot be compelled to violate the laws and regulations of its own jurisdictions, thus it did not act in bad faith when it refused to provide its source code to UnitedLex for review.

426.    The Respondent also contends that ENCOO's inability to export its source code to the United States did not render the Settlement Agreement unenforceable because the Claimant could have chosen a third-party reviewer based in China. The Respondent points out that the Settlement Agreement did not specify a venue or further details on how the review would take place, meaning the difficulties imposed by the Claimant's choice of UnitedLex should have to be addressed by the Claimant.

427.    The Respondent further argues that though it was not directly obligated under the Settlement Agreement to export its source code, it cooperated with the Claimant by applying for administrative approval to export its source code. The Respondent insists that applying for an export license was necessary because, under Chinese law, technology that falls under the categories identified in the law must apply for an export license and allow the Chinese Export Authorities to make a determination.

428.    The Respondent maintains it filed the application in good faith and unambiguously asserted the purpose of the export. The Respondent addresses the Claimant's critique that ENCOO failed to clarify the export was of a non-commercial nature by arguing that the nature of the export was not for the applicant to decide but the SMCC. The Claimant also

asserted that the Respondent did not mention the present arbitration in its application, which the Respondent acknowledges is true because at the time the form was filed, November 24, 2020, the Respondent had not yet officially participated in the arbitration. The Respondent further argues that, in its meeting with SMCC in December 2020, it made clear that the export related to this arbitration.

429.   In response to the Claimant's argument that the Respondent failed to keep UiPath informed of the process of export application, the Respondent argues that the Claimant unilaterally ceased communication. Namely, the Respondent interpreted communications from the Claimant asserting that it would respond to the Respondent through the arbitration as an indication that it did not require updates on the export application.

430.   The Respondent further asserts that it acted in good faith in the preparation of the Second Export Application. The Respondent argues that the reasons the Second Export Application were never filed were all due to the Claimant. Essentially, the Respondent contends that the Claimant raised multiple unnecessary disputes and labeled the Respondent's opinions that it did not agree with as bad faith.  It also states that the Claimant unilaterally ceased all communication with the Respondent, and that the Respondent could not file the Second Export Application without the Claimant's confirmation.

431.   The Respondent also alleges that, while the application process began amicably between the Parties, the Claimant's Chinese counsel was not adequately informed of the background of the Application, and the Claimant's American counsel interrupted communication often. The Respondent disagreed with the Claimant's contention that a pre-application conference with the SMCC was required. On September 4, 2021, the Respondent sent the application materials to the Claimant for review but did not hear back from the Claimant until October

28, 2021. At that time, the Respondent alleges that the Claimant's Chinese counsel asked the Respondent to submit the Second Export Application online but that a guidance issued by the SMCC required applications to be submitted through a service window.

432.    On January 16, 2022, the Respondent updated the application materials to reflect the process of the current arbitration and sent the updated materials to the Claimant for approval, but never heard back. As a result, the Respondent asserts that it could not file the Second Export Application because it needed the Claimant's approval to do so.

### ii.    Legal Arguments

433.    The Respondent maintains that it never breached the Settlement Agreement and that the Claimant rather than the Respondent was the Party that acted in bad faith. Though the Respondent's submissions do not directly address the arguments raised by the Claimant that the Respondent breached the covenant of good faith and fair dealing, it can be surmised by the arguments raised in relation to the alleged breach of the Settlement Agreement and to the Claimant's conduct that the Respondent perceives itself to have always acted in good faith.

### a.    Breach of the Settlement Agreement

434.    The Respondent does not contest the Claimant's statement of the elements of breach under New York law but asserts that it has always fully performed its obligations under the Settlement Agreement and has not breached the Settlement Agreement.

435.    The Respondent identifies four obligations it had under the Settlement Agreement, namely, (1) removal of source code similarities; (2) source code review; (3) marketing restrictions; and (4) non-compete in overseas markets. The Respondent alleges that it has performed all of these obligations and thus cannot be found to be in breach of the Settlement Agreement.

436.    For the first requirement, the Respondent asserts that it has identified and removed a tiny amount of code that was written either referring to public UiPath code or by reverse engineering of UiPath's publicly available products. The Respondent states that Hu and ENCOO have affirmed that none of the remaining source code is related to UiPath.

437.    The Respondent further asserts that the Claimant cannot require the Respondent to remove non-infringing and unrelated similar code that is in the public domain. Specifically, the Respondent argues that the Settlement Agreement cannot be read as precluding the Respondent from using public resource and open-source code because to do so would be absurd, inconsistent with the Parties' reasonable expectations, and commercially unreasonable. The Respondent contends that New York law prohibits such a contractual interpretation. *Lanmark Grp., Inc. v. New York City Sch. Const. Auth.*, 50 N.Y.S.3d 349, 351 (1st Dep't 2017). Thus, the Respondent's main argument is that the only similarities that are relevant for this analysis are those that come directly from UiPath's Source Code.

438.    The Respondent considers the obligation to remove all future similarities to be a restrictive covenant under New York law. The Respondent argues that restrictive covenants can only be enforced if reasonably limited in scope and duration and only to the extent necessary to protect legitimate interests. *Up-Grade Educ. Servs., Inc. v. Rappaport*, 523 N.Y.S.2d 872, 873 (2d Dep't 1988). The Respondent asserts that because the Settlement Agreement does not impose any scope or duration on the removal of all current and future similarities to UiPath's Source Code, it constitutes an impermissible restrictive covenant.

439.    For the second obligation, the Respondent argues that its inability to export its source code to UnitedLex is not a breach of the Settlement Agreement.

440.    As discussed in the Factual Arguments section above, the Respondent contends that it

always operated in good faith in its assertion that the Export Regulations applied and in its

two applications to the SMCC. The Respondent argues that Claimant's choice to have the

third-party reviewer in the United States does not mean the Respondent should be obligated

to violate Chinese law by exporting its source code without a license.

441.    The Respondent addresses the Claimant's argument that Shi's use of portions of

ENCOO's source code in his witness statement show that an export license was not needed

to export the source code by asserting that the Chinese Export Regulations only apply to the

source code as a whole and not to snapshots of small piece of code. The Respondent

contends that even if the source code was converted to word documents or screenshots, it

would not be able to export the entirety of the code but snapshots that contain fewer than one

hundred lines are permissible.

442.    The Respondent does not address the third obligation regarding marketing restrictions,

because the Claimant did not make a claim with respect to marketing restrictions.

443.    For the fourth obligation, the Respondent asserts that it did not sell RPA products

overseas in the 18-month non-compete period. The Respondent argues that the Claimant has

misread its press release that states that 30% of its revenue comes from overseas markets.

The Respondent asserts that ENCOO also sells non-RPA products and that the 30% of its

revenue referred to in the press release refers to sales of non-RPA products.

444.    The Respondent also clarifies that a deal concluded with YesComUS was only done in

China and in cooperation with a deal also signed with the Chinese local company, with

products that were only sold in Mainland China. The Respondent also points out that this

deal was completed outside the 18-month non-compete period.

445.    In sum, the Respondent argues that because it complied with all of its obligations under the Settlement Agreement, it cannot be found in breach.

### b. Breach of the Covenant of Good Faith and Fair Dealing

446.    The Respondent accepts that under New York law, every contract contains an implied covenant of good faith and fair dealing, *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228 (2d Cir. 1991) and that this covenant requires each party to "not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Id*. at 230. The Respondent identifies three grounds on which it alleges Claimant did not act in good faith.

447.    First, the Respondent argues that the Claimant acted in bad faith by choosing UnitedLex as its third-party source code reviewer. Because the Export Regulations were already in effect at the time of UnitedLex's appointment, the Respondent contends the Claimant should have identified a Chinese-based reviewer in order to facilitate the source code review in a timely manner.

448.    Second, the Respondent points out that after the First Export Application was rejected, the Respondent invited the Claimant to consider conducting its source code review in China but was harshly rejected. The Respondent asserts that though the Claimant has been fiercely hostile to China as a venue for the source code review, its rejection of China as a venue is without contractual basis. Additionally, the Respondent argues that the Claimant never tried to confer with the Respondent on alternative ways to undertake a source code review other than require the Respondent to file export applications.

449.    Third, the Respondent alleges that the Claimant's request to review the Respondent's historical versions of its object code invited a source code review that was not in compliance

with the Settlement Agreement and was not reliable. The Respondent supplied its object code, at which point the Claimant stopped requesting its source code. The Respondent argues that it had to use its source code in its defense, despite not making it available to the Claimant, in order to address the arguments raised in the Barth Report.

450.     The Respondent argues that these three instances prevented the Respondent from facilitating the enforcement of the Settlement Agreement, which deprived ENCOO of its rights under the Settlement Agreement. In sum, the Respondent argues that the Claimant's own alleged bad faith conduct frustrated the performance of the Settlement Agreement, not the other way around.

### 4.     Sole Arbitrator's Analysis

### i.     Breach of the Settlement Agreement

451.     To begin, the Claimant has alleged three grounds for breach of the Settlement Agreement. The Sole Arbitrator agrees with the Claimant that a finding of breach on any of these three grounds would constitute a material breach of the Settlement Agreement. Since the Sole Arbitrator finds that the Respondent breached the Settlement Agreement on the ground that the Respondent failed to provide its source code to UnitedLex, it is not necessary to discuss the other grounds in detail.

452.     To begin, the Parties differ on whether an export license was actually required in order for the Respondent to export its source code to UnitedLex. The Claimant maintains no export license was necessary because exporting source code for third-party review is not a commercial activity.

453.     However, the fact that the Respondent offered to export the source code if the Claimant dropped this arbitration and was willing to import portions of its source code to the United States as part of Shi's Witness Statement, are strong indications that the export license may

not have been necessary. The Sole Arbitrator has the greatest respect for the laws of China and would be very surprised if the Respondent was offering to violate that law in exchange for the Claimant dropping this arbitration.

454.    In any event, in determining whether the Respondent breached the Settlement Agreement, the central issue is that even if the Respondent genuinely believed that an export license was necessary, it is clear that the Respondent did not seek an export license in good faith, in violation of the implied covenant of good faith and fair dealings.  One of central terms of the Settlement Agreement was the Claimant's right to review the Respondent's source code using a third party reviewer.  By failing to act in good faith in seeking an export license, the Respondent deprived the Claimant of the central element of its bargain.

455.    The Respondent had the obligation to act in good faith in seeking an export license process regardless of whether Claimant's choice to use a US-based. After all the Respondent entered into an agreement with a US-based entity, it is hardly a surprise that it would choose a US-based reviewer and nothing in the Settlement Agreement precluded such choice.

456.    Thus the Settlement Agreement entitled the Claimant to select a third-party reviewer for the source code review process and allowed the Respondent to raise objections within three days. (Settlement Agreement, §2(a)). Rather than object to the selection of a US-based reviewer, Respondent raised vague objections to UnitedLex that the Claimant found to be unreasonable and proposed its own US-based reviewer, Quandry Peak (He Fang Statement, Exh. R-L-1). If the Respondent's central issue had been the Claimant's choice of the US as a venue for the review, it would not make sense for the Respondent to suggest an alternative US-based reviewer.

111

457.    When the Claimant designated UnitedLex as its third-party reviewer on October 8, 2020,

it set off a fourteen-day deadline for ENCOO to make its source code available for review.

Failure to submit its source code within this deadline would have triggered a right of the

Claimant to commence an arbitration, which is eventually what happened. However, rather

than seek an export license prior to this deadline, the Respondent waited until November 19,

2020 to submit its First Export Application, long after the original fourteen-day deadline had

passed, as well as after a new deadline of November 2, 2020, the Claimant had set in light of

the potential issues with obtaining an export license.

458.    The submission of the First Export Application also came after the Claimant initiated this

arbitration on November 11, 2020. The Respondent has provided no justification for why

there was so much delay in submitting the First Export License, especially since it

maintained the stance that receiving an export license was critical in order to export its

source code for review. This delay indicates that the Respondent was not proceeding in good

faith.

459.    Moreover, further evidence of bad faith on the part of the Respondent is that the First

Export Application contained language that seemed to indicate the export was for

commercial purposes rather than for a third-party review in the context of a dispute. The

application contained language saying the transfer was "to obtain technology benefits,"

"perform technology entrustment contract," and "[u]se technology export **to drive export of**

**complete sets of equipment**." (Claimant's Post-Hearing Brief, pg 20 *quoting* Anyi Wang

Statement, Exh. H at 6 (emphasis added)).  The reference to "driv[ing] export[s]" certainly

suggests a commercial purpose rather than a dispute-resolution purpose. Though the

Respondent argues that it was up to the SMCC to determine whether the transfer was for

economic purposes for not, it was also the Respondent's duty to present information for the export license in a way that reflected the true nature of the transfer. The Export Application was not for a commercial purpose, but for the purpose of allowing a party to ensure that ENCOO's software was not the product of its misappropriation of UiPath's trade secrets.

460.    Similarly, ENCOO's presentation to the SMCC on December 9, 2020 also failed to clarify the true purposes of the transfer. The Respondent asserted that the Export Regulations applied to this transfer but did not clarify in its presentation that the transfer would be non-commercial and only for the purposes of a source code review. Some of the language of the Slide Deck seems to indicate that the source code was already transferred for review, *see e.g.* "Although we are actively conducting source code comparison work . . ." (Anyi Wang Statement, Exh. I at 11). This failure to clarify the true purpose of the transfer made it more likely that the SMCC would reject the First Export Application, which it eventually did.

461.    Moreover, the Respondent provided no reasonable explanation for why it failed to reveal both the rejection of the First Export Application and the passing of the appeal deadline within a reasonable time frame. The SMCC rejected the First Export Application on January 4, 2021, which triggered an appeal deadline of March 5, 2021. Yet despite this rejection and possibility to appeal, the Respondent concealed both from the Claimant and the Sole Arbitrator until April 28, 2021, over three months after the rejection and nearly two months after the appeal deadline had passed. In the Sole Arbitrator's view, the Respondent's decision to allow the deadline for an appeal to run and to conceal this from the Claimant is simply the height of bad faith.

462.    Moreover, the Respondent continued to thwart efforts to obtain an export license in the Renewed Export Application. The Respondent delayed and tried to convince the Claimant to

forgo a pre-application consultation with the SMCC, which Claimant alleges, based on information from its Chinese counsel, is necessary for a successful application. Whether or not this meeting was necessary, the Respondent clearly demonstrated its importance by scheduling such a meeting in connection with the First Export Application.

463.    Yet the Respondent took over two months to return the Renewed Export Application with minimal edits, which continued to delay the export application process. The Respondent alleges that this delay was because the Claimant had requested the Respondent file the Application online, which did not correspond with the manner in which the Application was prepared. Rather than communicate this to the Claimant when it submitted the Renewed Export Application or when it sent multiple follow-ups, the Respondent inexplicably chose instead to wait over two months to submit a draft Application in what it deemed to be acceptable form for submission online. Given that the Hearings were fast approaching at that point, it is understandable that the Claimant would determine the its efforts to obtain the Respondent's source code for third-party review through the terms of the Settlement Agreement were fruitless. The Respondent had amply demonstrated that it was not operating in good faith and the Claimant was not required to play along with the Respondent when the Respondent refused to play by the rules.

464.    In sum, all of the Respondent's actions described above suggest that the Respondent acted in bad faith in connection with the source code review in breach of the Settlement Agreement and the implied covenant of good faith and fair dealing.

465.    The Claimant has stated that the elements required to establish a breach of contract are "(1) the existence of a contract; (2) the plaintiff's performance pursuant to the contract; (3) the defendant's breach of its contractual obligations; and (4) damages resulting from the

breach." *Kollatz v. KOS Bldg. Grp., LLC*, 137 N.Y.S.3d 491, 494 (2d Dep't 2020). Respondent has not contested this application of the law and thus this analysis of whether Respondent's actions constitute a breach will apply the law as cited by Claimant. The analysis will focus on elements (2) and (3) since the Parties have not contested the existence of a contract and based on the election of remedies under New York law, the Claimant has opted to not receive damages for breach in favor of damages being assessed based on its Misappropriation Claims.

466. The Claimant has performed its obligations under the Settlement Agreement. The Claimant's sole obligation under the Settlement Agreement was to not file a litigation against Respondent in the SDNY, which it did not do. The fact that the Claimant is now bringing its Misappropriation Claims in arbitration is not a violation of its performance because any decision on the Misappropriation Claims is predicated on a finding that the Respondent has breached the Settlement Agreement. Since the Sole Arbitrator now finds that the Respondent did materially breach the Settlement Agreement, the Claimant is freed of its obligations under that contract.

467. The Respondent undoubtedly breached its contractual obligation to provide its source code for review. Putting aside whether the Export Regulations applied in the first place, the Respondent had the obligation to facilitate that process as soon as it insisted that it would need to apply for an export license. Instead, the Respondent repeatedly sabotaged the Export Applications in breach of the terms of the contract and the implied covenant of good faith and fair dealing, falsely suggesting that the review was for a commercial purpose, concealing rejections and the passing of an important appeal deadline, and misstating facts. One can only

surmise that the Respondent did so in order to avoid ever having to submit its source code for review, which it was required to do under the Settlement Agreement.

### ii.        Breach of Covenant of Good Faith and Fair Dealing

468.    As discussed above, the Respondent did not act in good faith in connection with the expert control process.  But the Respondent's bad faith went beyond that.  The Respondent has provided no explanation for why the Claimant was not informed of the internal investigation nor why ENCOO's findings were not discussed during the Settlement Agreement negotiations. In relation to the export license, the Respondent alleges that the Claimant unilaterally cut off communication. The emails quoted in the Respondent's submissions do not reflect a desire from the Claimant to not be informed of the export license process and do not absolve the Respondent from not keeping the Claimant informed about the process. However even if the Sole Arbitrator were to accept that the Claimant's emails are a representation that the Claimant unilaterally cut off communication between the Parties, this would not explain why the Respondent did not inform the Claimant of its internal investigation or ENCOO's findings during negotiations, a time when the Parties were clearly in close communication.

469.    As to the Respondent's arguments that the Claimant acted in bad faith, the Respondent points to the fact that Hu never had the chance to meet with UiPath during the Settlement Agreement and Supplemental Settlement Agreement negotiations, and asserts that this lack of communication was evidence of the Claimant's bad faith conduct in the negotiations. However, the Respondent also makes references to multiple communications and at least one meeting between Hu and He Fang, who is the Claimant's Chinese counsel and was acting on the Claimant's behalf at the time. Hu had more than sufficient opportunity to make his perspective on the dispute known to the Claimant through He Fang. While the Sole

Arbitrator appreciates Hu making himself available to testify, his presence at the hearings cannot be considered as evidence that Hu did not commit any misappropriation nor that UiPath's management acted in bad faith by refusing to meet with Hu.

470.    To the Respondent's other arguments that the Claimant acted in bad faith, as addressed above, the Claimant had no obligation to import its Source Code into China just because the Respondent alleges the review process would have been easier there. First, just as the Respondent argues that there was no set venue under the Settlement Agreement that would require it to import its source code into the US, similarly the Claimant was not required to import its Source Code into China. Second, the Claimant was acting as one would expect from a company that had found evidence that one of its most valuable trade secrets had been misappropriated. It was reasonable for it to want to maintain control over its Source Code by keeping it close to home.

471.    Having found one breach of the Settlement Agreement relating to the Respondent's obligation to make it source code available for review, the Sole Arbitrator considers the other alleged breaches only briefly, since the finding of a single breach is sufficient for this case. However, based on the evidence considered in the misappropriation section of this Award, the Sole Arbitrator finds it clear the Respondent failed to remove similarities to UiPath's Source Code in its own source code.  And the Sole Arbitrator attaches no weight to the review carried out by ENCOO itself regarding the source of these alleged similarities, which it concealed from UiPath at the time. Having misappropriated UiPath's Source Code, ENCOO could not be relied to conduct a review in good faith.

472.    The Sole Arbitrator also addresses in this context the Respondent's assertion that the requirement that it remove any and all similarities to UiPath's Source Code from ENCOO's

117

source code is an impermissible restrictive covenant under New York law because it does not specify a scope or duration. The Respondent misreads the law. Restrictive covenants based on confidentiality and trade secrets are not limited in time or scope and may last forever. *Ayco Co. v. Frisch*, 795 F. Supp. 2d at 209.

473.    The question of whether there is sufficient evidence to find that ENCOO violated the 18-month non-compete is a close one, since not much evidence beyond the press release has been submitted to show ENCOO sold its products abroad.  Since the Sole Arbitrator has already found ENCOO to be in breach, and since the question of whether ENCOO violated the 18-month restrictive covenant is moot, since the 18-month time-period has passed, the Sole Arbitrator declines to find that ENCOO violated the 18-month non-compete.

## C.    Damages and Injunctive Relief

### 1.    Claimant's Position

474.    UiPath has requested three types of relief: compensatory damages, punitive damages, and injunctive relief. Since the Claimant is seeking damages with respect to its Misappropriation Claims, damages relate solely to misappropriation and not breach of the Settlement Agreement.

475.    As the Claimant outlines in its discussion of the legal standard, under the DTSA and New York law, the measure of compensatory damages is as follows: "(i) Claimant's actual losses from the misappropriation, 'which may include the cost of developing the trade secret,' and may also include lost profits; and (ii) profits unjustly received by Respondent; or (iii) in case the foregoing two measures are inapplicable or otherwise inadequate, a reasonable royalty." (Claimant's Post Hearing Brief, pg 32 *quoting In re Cross Media Mktg. Corp.*, 06-CIV-4228, 2006 WL 2337177, at *5 (S.D.N.Y. Aug. 11, 2006).

476.    Similarly, the damages measure of aiding and abetting breach of fiduciary duty is "the amount of damages as will reasonably compensate [plaintiff] for such injury and damage as . . . [plaintiff] has sustained as a proximate result of [defendants'] wrongful conduct." *Nat. Union Fire Ins. Co. of Pittsburgh, PA v. Razzouk,* No. 653191/2012, 2022 WL 1117879, at *13 (N.Y.Sup.Ct. Apr. 14, 2022).

477.    For unfair competition, the measure of damages is the loss of profits caused by the respondent's diverting of business, as well as potential future lost profits if they can be calculated without undue speculation *Suburban Graphics Supply Corp. v. Nagle,* 5 A.D.3d 663, 666, (2d Dep't 2004).

478.    For unjust enrichment, the measure of damages is based on the benefit retained by the respondent rather than the claimant's loss *Swan Media Grp., Inc. v. Staub,* 841 F. Supp. 2d 804, 809–10 (S.D.N.Y. 2012).

479.    In calculating damages, the Claimant relied on its expert Pamela O'Neill, who undertook a damages calculation under three different approaches:  the income, market, and cost approach.  She summarizes these three approaches in paragraph 13 of her expert report:

- Calculation 1:

    - Theory:  Under the premise of the income approach, which involves examining a projection of future benefits, I calculated UiPath's Lost Profits.  This model applied an incremental profit margin to lost revenue (the difference between what UiPath could have generated and what the Company actually earned).

    - Amount: $253.93 million, which reflects a damage period of approximately two-years (April 1, 2020 to May 6, 2022).4 The lost profits calculation may increase with an extended damage period if the dispute continues or a resolution is further

119

delayed/fails.

- Calculation 2:

  - <u>Theory:</u> Under the premise of the market approach, which estimates value through an analysis of recent sales of comparable assets, I reviewed the purchase prices of RPA software technology companies that were acquired to enter the market or promote their technology offering to the next level.

  - <u>Amount:</u> 3 (three) of the 4 (four) transactions that disclosed their purchase price ranged between $100.00 million to $228.00 million.[5] Given that UiPath is ahead of the comparable transactions in terms of commercial feasibility, Calculation 2 is lower compared to other analyses performed in this report.

- Calculation 3:

  - <u>Theory:</u> Under the premise of the cost approach, which estimates value according to the cost of reproducing or replacing the asset, I examined UiPath's costs to develop the source code as identified by research and development expenditures.

  - <u>Amount:</u> $275.98 million

480.    Thus, using the first approach — the "yardstick method" — O'Neill compares UiPath's performance to an index of comparable software companies, and she found UiPath's lost profits to be US$253.93 million. The second approach — the market approach — examines recent sales of similar technologies to value UiPath's Source Code.  The third approach — the costs approach — estimates the value of the Source Code based on UiPath's research and development expenditures. The average of these three calculations led to the final number of US$265 million. The Claimant argues that since the Respondent has not offered any evidence

or rebuttal expert testimony on damages, the Sole Arbitrator should rely on O'Neill's

calculations.

481.    In relation to punitive damages, the Claimant highlights that both the DTSA and New

York law allow for punitive damages in cases of willful and malicious misappropriation 18

U.S.C. §1836(b)(3)(C) and where the defendant's conduct is gross and wanton *Paz Sys., Inc.*

*v. Dakota Grp. Corp.,* 514 F. Supp. 2d 402, 409 (E.D.N.Y. 2007). The DTSA caps punitive

damages at not more than two times the amount of compensatory damages awarded

§1836(b)(3)(C).

482.    The Claimant argues that the Respondent's behavior to attempt to conceal the

misappropriation rise to the level of gross and wanton misappropriation, highlighting the

destruction of relevant evidence when Hu wiped his computer, the Respondent's refusal to

produce earlier object codes, claiming an export license was required to review source code

and then sabotaging the export application, engaging in discovery malfeasance, producing

only obfuscated, locked-down executable code rather than source code or object code, and

commencing parallel proceedings in China in violation of the arbitration clause.

483.    For injunctive relief, the Claimant outlines the requirements under New York law, which

are that a party moving for a permanent injunction must show (1) irreparable harm; (2) actual

success on the merits; and (3) that the balance of hardships tips decidedly in favor of the

moving party. *See Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d

Cir. 1999). The Claimant also adds that in cases of trade secret misappropriation, irreparable

harm is presumed on the grounds that a trade secret cannot be replaced once it has been

misappropriated *Monovis,* 905 F. Supp. at 1234.

484.     The Claimant argues that it has met all of the requirements to enjoin ENCOO from
further using, disclosing, or exploiting UiPath's trade secrets. The Claimant also asks that the
Sole Arbitrator "order ENCOO to remove all similarities between its products' codes and
UiPath's Source Code, and provide its Source Code to a third-party Source Code reviewer of
UiPath's choosing for verification on demand, but no more than twice annually" (Claimant's
Post-Hearing Brief, pg 85).

485.     The Claimant asserts that the first ground for injunctive relief is met because irreparable
harm is presumed in trade secrets cases, and the second ground is also met if the Claimant
receives a favorable decision on its Misappropriation Claims. For the third ground, the
Claimant argues that the balance of hardships favors the Claimant because without an
injunction, the Respondent will continue to illegally exploit UiPath's Source Code while the
impact on ENCOO would be to limit illicit business operations.

### 2.     Respondent's Position

486.     The Respondent begins by arguing that O'Neill's report should be disregarded because
ENCOO has neither breached the Settlement Agreement nor misappropriated UiPath's
Source Code.

487.     The Respondent submits that the calculations in O'Neill's report do not reflect
permissible damages under the DTSA or New York common law. Namely, both laws
measure damages based on the loss of profits suffered by the claimant and the unjust
enrichment received by the respondent. The Respondent argues that O'Neill instead focused
her calculations on acquisitions of similar RPA products and the cost to replace the
Claimant's misappropriated trade secrets. The Respondent alleges this choice is because

ENCOO's financial statements show that its RPA business operates at a loss, which would have greatly reduced the total amount alleged by the Claimant.

488.   The Respondent also argues that the Claimant has not shown proximate causation for the lost profits, as required under New York Law. *Scentsational Techs., LLC v. Pepsico*, 2018 WL 2465370, at *6-7 (S.D.N.Y. May 23, 2018), aff'd, 773 F. App'x607 (Fed. Cir. 2019). The Respondent emphasizes that ENCOO is not UiPath's only competitor in China and that UiPath's sale of RPA products in China is limited. The Respondent additionally highlights that O'Neill did not provide evidence that big companies chose to purchase ENCOO's product instead of UiPath's. Consequently, The Respondent argues that the Claimant has not shown a causal link between the alleged US$265 million loss and the Respondent's operation of an RPA business in China.

489.   The Respondent raises the additional argument that O'Neill's report is unreliable because she lacked core details of the dispute.

### 3.   Sole Arbitrator's Analysis

490.   Having found that ENCOO is liable under the Misappropriation Claims, the Sole Arbitrator turns to consider the relief to which UiPath is entitled.  UiPath seeks three forms of relief:  (i) compensatory damages; (ii) punitive damages; and (iii) injunctive relief.

491.   The Sole Arbitrator considers each of these heads of relief in turn.

### i.   Compensatory Damages

492.   In terms of compensatory damages, under New York law, as discussed, there are in the broadest sense two approaches to damages.  One approach places the focus on UiPath and looks to the profits it has lost as a result of ENCOO's misappropriation.  The other places the focus on the ENCOO and looks to what it has gained from its misappropriation.

493.    New York law authorizes both approaches in trade secret cases.  As the Claimant outlines

in its discussion of the legal standard, under the DTSA and New York law, the measure of

compensatory damages is as follows: "(i) Claimant's actual losses from the misappropriation,

'which may include the cost of developing the trade secret,' and may also include lost profits;

and (ii) profits unjustly received by Respondent; or (iii) in case the foregoing two measures

are inapplicable or otherwise inadequate, a reasonable royalty." (Claimant's Post Hearing

Brief, pg 32 *quoting In re Cross Media Mktg. Corp.*, 06-CIV-4228, 2006 WL 2337177, at *5

(S.D.N.Y. Aug. 11, 2006).

494.    Similarly, the measure of damages for unjust enrichment — a cause of action upon which

the Sole Arbitrator has found UiPath to have prevailed — is based on the benefit retained by

the respondent rather than the claimant's loss.  *Swan Media Grp., Inc. v. Staub,* 841 F. Supp.

2d 804, 809–10 (S.D.N.Y. 2012).

495.    Indeed UiPath specifically seeks such damages asserting:  "by misappropriating UiPath's

Source Code, ENCOO was unjustly enriched in that it was able to save tens of years and

millions of dollars of development and testing that would otherwise have been required to

develop marketable RPA Software with ENCOO's level of sophistication." (Claimant's Post-

Hearing Brief, pg 82).

496.    In assessing damages in this case, the Sole Arbitrator is persuaded that ENCOO has

gained an enormous benefit as a result of its misappropriation of UiPath's Source Code — its

development of a far superior RPA product than it would have been able to develop in the

absence of its misappropriation of UiPath's intellectual property, as demonstrated by its

ability to attract millions of dollars in investments.

497.    In seeking to assess the value of the benefit acquired by ENCOO through its misappropriation of ENCOO's software, O'Neill can reasonably be understood to calculate what ENCOO gained by examining the costs of acquiring companies in the RPA space.  She noted that "3 (three) of the 4 (four) transactions that disclosed the purchase price to acquire an RPA software company were in excess of $100.0 million" (Pamela O'Neill Expert Report, ¶53).

498.    While the Sole Arbitrator finds this to be a reasonable approach to assessing the benefit to ENCOO from its misappropriation of UiPath's software, he believes it appropriate to test O'Neill's analysis by reference to evidence in the record regarding the value of ENCOO specifically.

499.    The evidence in the record overwhelming supports that view that the value of ENCOO rested on its work in the RPA sector.  Thus ENCOO itself repeatedly touted its work in the RPA sector.

500.    In a March 18, 2020, press release, ENCOO stated that it "is committed to providing standardized RPA products, by continuously lowering the product use threshold in a rapid and iterative manner. Since its establishment in July 2017, [ENCOO] has released version updates on a monthly basis, and carry out product upgrades every half a year approximately." (Umesh Amin Statement, Exh. K).

501.    In a later press release, ENCOO stated that it was hiring Hu precisely because of his supposed RPA expertise:  "In early 2019, HU left Microsoft to work for UiPath, a world-renowned RPA giant, and became the global R&D director of UiPath. At that time, UiPath's valuation exceeded US $ 7 billion. Knowing that HU was working at UiPath, LIU and SHI discussed inviting him to return to China, bringing the industry's leading technical labor force

back to China. In fact, more than one headhunter sought HU. [HU] became the object of

'competition' among many domestic RPA companies." (Umesh Amin Statement, Exh. L).

502.    Liu testified that he gave Hu almost ████ of the stock of the company that was worth

almost ████████ :

> THE ARBITRATOR:  So if [Hu] is getting ████ percent -- you said
> he's  getting ████████ shares.  ██ percent -- that's ████ percent of
> the company.
>
> THE WITNESS:  Almost ████ .
>
> THE ARBITRATOR:  You could extrapolate and say that's ████
> ████ Is that ████ percent of 70 million is ████████ ?
>
> THE WITNESS:  ████████ .  Yeah.
>
> 9/14/22 Tr. (Liu) 175: 15-25.

503.    Hu himself testified:

> So when you joined, you got ████████ in value stock
> options with UiPath, but when you joined ENCOO, you got close
> to ████████ worth of value and stock options.
>
> A.    Yes.
>
> 9/14/22 Tr. (Hu) 248: 3-8.

504.    Thus, at around the time Hu joined ENCOO, based on the value of the stock options

given to him, ENCOO could be viewed to have a value of approximately $70 million.  While

this is likely to be a conservative estimate based on the fact that one of ENCOO's

competitors in China, Cyclone, was apparently valued at around $200 million (Hu Statement,

¶ 42) and that O'Neill opined that RPA companies generally had a value of between ████

million to ████ million, the Sole Arbitrator believes that, in assessing damages, a

conservative approach is preferred.

126

505.    The Sole Arbitrator finds O'Neill's analysis to be useful as a starting point, giving some

indication of the value of ENCOO.  However, in evaluating the damages to be awarded to

UiPath based on the benefit received by ENCOO from the misappropriation of UiPath's

Source Code, the Sole Arbitrator believes it appropriate to rely not on comparables like

Cyclone and those identified by O'Neill, but, instead, on the approximate value ENCOO

assigned to itself — $70 million.

506.    Because the record overwhelming demonstrates that ENCOO's value rests on its

offerings in the RPA sector, and that a $70 million valuation is a conservative one, the Sole

Arbitrator awards damages to UiPath of $70 million based upon the benefit received by

ENCOO from its misappropriation of UiPath's Source Code and based on a determination

that ENCOO has been unjustly enriched by misappropriating UiPath's Source Code.

### ii.      Interest

507.    UiPath seeks interest at the rate applicable under New York law of 9% simple interest.

The Sole Arbitrator finds it appropriate to award interest starting from 30 days after the date

of this Partial Final Award on the Merits.

### iii.      Punitive Damages

508.    Given that the award of punitive damages is discretionary, the Sole Arbitrator declines to

award them.  The damages awarded by the Sole Arbitrator are solely to compensate UiPath

based on well-established principles of New York law.

### iv.      Injunctive Relief

509.    The Sole Arbitrator finds it appropriate to award UiPath injunctive relief to prevent

ENCOO from further use of the software it has misappropriated.  Left unchecked, ENCOO

will likely continue to sell its competing RPA product, and it is plausible that over time

ENCOO will divert UiPath's customers and cause it to suffer substantial lost profits, well beyond the $70 million damages awarded to UiPath at this time.  Thus, the Sole Arbitrator finds it appropriate to issue injunctive relief directed at ENCOO.

510.    It is well established under New York law that an injunction is appropriate relief for cases involving a theft of trade secrets. *See Flexible Techs., Inc. v. World Tubing Corp.,* 910 F. Supp. 109, 115 (E.D.N.Y. 1996) (the balance of hardships "weighs decidedly" in favor of plaintiff, whose "risk of losing forever its trade secrets clearly outweighs the inconvenience and additional costs imposed on [defendant] by granting the preliminary injunction."); *Brainwave Sci., Inc. v. Arshee, Inc.,* 2021 WL 6211630, at *6 (E.D.N.Y. Dec. 14, 2021) (preliminary injunction found necessary because even if "plaintiff's suit is ultimately successful, plaintiff's trade secrets and work are still likely to be incalculably damaged.").

511.    As evidenced by ENCOO's breach of the Settlement Agreement and disregard of the Sole Arbitrator's orders, UiPath will be unable to confirm ENCOO's compliance with any injunction unless ENCOO is also required to provide independent proof.

512.    UiPath seeks the following injunctive relief: "UiPath seeks injunctive relief enjoining ENCOO from further using, disclosing, or exploiting UiPath's trade secrets . . . Accordingly, UiPath respectfully requests that the Tribunal order ENCOO to remove all similarities between its products' codes and UiPath's Source Code, and provide its Source Code to a third-party Source Code reviewer of UiPath's choosing for verification on demand, but no more than twice annually." (Claimant's Post-Hearing Brief, pg. 85).

513.    Thus, the Sole Arbitrator issues the following injunctive relief:

- ENCOO is hereby ENJOINED from further using, disclosing, or exploiting UiPath's trade secrets;

128

- ENCOO is ORDERED to remove all similarities between its products' codes and UiPath's Source Code;

- Upon 30 days' notice by UiPath, ENCOO shall make available to UiPath its source code for all its RPA products for review by a third-party reviewer selected by UiPath twice a year for the next five years.

- If ENCOO takes the position that it cannot make its RPA source code for review for any reason, it must inform UiPath within 5 business days of the notice, and shall promptly take all legally available steps to remove any such obstacle from review and promptly communicate with, and seek UiPath's input into such steps.

### v.     Attorneys' Fees

514.    As set forth in paragraphs 194 and 195 above, both Parties have sought an award of attorneys' fees and costs.  Based on the fact that UiPath has substantially prevailed in this arbitration and the fact that the Respondent engaged in obstructive behavior during the course of this arbitration, the Sole Arbitrator finds that UiPath is entitled to an award of its reasonable attorneys' fees and costs.

515.    As the prevailing Party, UiPath may make a submission on costs within 14 days of the date of the issuance of this Partial Final Award on the Merits.  The Respondent may submit a reply within 14 days of the Claimant's initial submission on costs, and the Claimant may submit a rejoinder within 7 days of the Respondent's reply.

### D.    Claimant's Motion for Sanctions

#### 1.    Claimant's Position

516.    The Claimant argues that the Respondent's conduct during the course of the arbitration has repeatedly and intentionally frustrated the Claimant's ability to obtain relevant evidence enough to warrant a granting of sanctions against the Respondent.

517.    The Claimant previously submitted multiple applications for sanctions on four grounds. The Claimant alleges the Respondent has not remedied any of the conduct that was the basis for these applications, and thus they remain outstanding.

518.    First, the Claimant cites the Respondent's failure to withdraw the Demand Letters. In Procedural Order No. 2, the Respondent was explicitly asked to withdraw its Demand Letters, which it had issued on March 25, 2021. The Respondent claimed to have withdrawn the Demand Letters on July 29, 2022 after the Claimant raised ethical violation concerns under New York law to the Respondent's new co-counsel. The Claimant alleges that since the Respondent has not shown any evidence of withdrawing the Demand Letters and has not issued any assurance that it would not re-issue those letters, there is a strong likelihood the violation will reoccur.

519.    Second, the Claimant points to the Respondent's failure to produce its source code or an unobfuscated version of its object code. The Claimant observes that at the date of the submission of its post-hearing brief, nearly two years had passed in which the Respondent failed to provide its source code, in contravention of the Settlement Agreement and the Sole Arbitrator's orders. As detailed above, the Claimant does not accept the Respondent's defenses for its lack of production, calling them "blatant misrepresentations."

520.    In relation to object code, the Claimant cites the multiple procedural orders requiring the Respondent to produce its object code, to no avail. The Claimant argues that the Respondent

ignored the Sole Arbitrator's initial order for six months before telling the Claimant to download a trial version of its software with only customer side executable code. The Claimant alleges that the Respondent continuously produced obfuscated codes and declined to provide authorization codes that would grant the Claimant access. Liu testified that ENCOO could have provided an authorization code easily. The Claimant also emphasizes that obfuscation is not an automatic process but requires additional steps, suggesting ENCOO purposefully obfuscated its code. Finally, the Claimant notes that object code and obfuscated executable code strip down comments imbedded in the source code and change variables and naming, which the Claimant takes as an indication that Respondent sought to make the Claimant's comparison of ENCOO's product with UiPath's as difficult as possible and hide evidence of its misappropriation.

521.    Third, the Claimant alleges the Respondent made misrepresentations with respect to the First and Second Export Applications, the arguments for which are described above.

522.    Fourth, the Claimant take issue with the Respondent's destruction of historical code as detailed in the Liu Affidavit. The Respondent was ordered to produce all historical versions of its object code from January 2019 to the present in Procedural Order No. 5. Liu testified in his Witness Statement that ENCOO automatically deleted historical versions of its product code after one year, so the Respondent would be unable to produce any historical versions. During the Hearings, Liu testified that ENCOO always had the ability to recompile historical object code, and the Respondent used recompiled historical object code for its own defense. The Claimant highlights that both the Claimant and the Claimant's expert had suggested multiple times previously that the Respondent could recompile its historical object code in order to comply with the Sole Arbitrator's orders. Since the Respondent failed to so until the

historical object code could be used for its own benefit, the Claimant alleges that the

Respondent must have done so to hide evidence of its misappropriation.

523.    In its Renewed Sanctions Application, the Claimant raised an additional three grounds for

sanctions based on the Respondent's conduct during the Hearings including 1) use of

relevant evidence not produced in discovery; 2) continuing to engage in significant and

ceaseless discovery misconduct; and 3) failure to translate evidence.

524.    To the first ground, the Claimant argues that during the discovery process, the

Respondent repeatedly claimed to be unable to produce much of the requested evidence, only

to present that same evidence in conjunction with its defense. This evidence includes

historical versions of the Respondent's object and executable code, excerpts of its source

code, and business plans and marketing documents. The Claimant asserts that the

Respondent's failure to produce these documents in discovery made the Claimant's

misappropriation analysis significantly more difficult and time-consuming than necessary.

Further, the Respondent's stance during discovery was that none of its source code could be

exported without a license from the Chinese Export Authorities, but in turn, it was able to

export portions of the source code for its expert reports. The Claimant contends that if the

Respondent was able to export portions of its source code, it should have done so when

ordered by the Sole Arbitrator. Because of this purposeful failure to produce evidence, the

Claimant argues that the evidence should be given no weight in evaluating the Respondent's

defenses and that the Sole Arbitrator should draw adverse inferences.

525.    The second ground connects with the first in that the Claimant alleges the Respondent

repeatedly refused to produce multiple documents and responses to interrogatories on the

grounds that they were subject to an export license, had been destroyed, or were overly

burdensome to produce. The Claimant had to file two motions to compel and sent multiple emails in an attempt to gain access to these documents. The Claimant argues that given a long list of purposeful delays and lack of production for multiple documents, an adverse inference is warranted.

526.    For the third ground, the Claimant argues that the Respondent had an obligation to provide translations for any documents not in English based on Procedural Order No. 4. The Claimant contends that due to the Respondent's violation of that obligation, the Claimant has been forced to pay for certified translations of the Respondent's documents and evidence. The Claimant cites 14 instances in which the Respondent has submitted evidence in Chinese without an accompanying translation, mostly from evidence responsive to the Claimant's document production requests but also submitted with the Statement of Defence and during the Hearing. The Claimant also mentions that when the Respondent did submit translations, they were not certified, were often incomplete, and were submitted in PDF format rather than Microsoft Word, which made software translation nearly impossible. The Claimant argues that this was a bad faith effort to impede the Claimant's access to material evidence, take up preparation time, and incur costs for the Claimant. The Claimant requests that the Sole Arbitrator order the Respondent to cover the costs of the translations and accord no weight to documents submitted in Chinese.

527.    The Claimant argues that the Sole Arbitrator has authority to grant sanctions under the AAA Commercial Arbitration Rule 58(a), which empowers an arbitrator to implement a wide range of relief in order to resolve the dispute in a fair and expeditious manner. This approach is supported by New York case law *RelaStar Life Insurance Co. v. EMC National Life Co.*, 564 F.3d 81, 87 (2d Cir. 2009). In this vein, the Claimant asserts that New York case law

supports drawing an adverse inference from Respondent's refusal to produce its source code or object code. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002); *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2019 WL 5957221 at *1; *HMS Holdings Corp. v. Arendt*, 48 Misc. 3d 1210(A), 18 N.Y.S.3d 579 (N.Y. Sup. 2015). The Claimant also contends that New York law supports giving no weight to documents that were withheld in bad faith and later produced in support of the party who failed to produce them. *Daval Steel Prod., a Div. of Francosteel Corp. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir. 1991).

528.    In regard to relief, the Claimant asks that the Sole Arbitrator:

> i.    Implement sufficient adverse inferences to find that ENCOO:
>
>    1. Breached the Settlement Agreement;
>    2. Misappropriated UiPath's trade secrets;
>    3. Aided and abetted Hu's breach of fiduciary duty; and
>    4. Was unjustly enriched and unfairly competed with UiPath, as set forth in the Amended Demand and the Complaint; and
>
> ii.   Accord no weight to ENCOO's untimely produced and partially translated evidence;
>
> iii.  Permanently enjoin ENCOO from filing subsequent Demand Letters and pursuing litigation in China or elsewhere on any claim related to this dispute; and
>
> iv.   Award UiPath reasonable legal fees and costs incurred as a result of ENCOO's contempt detailed herein.

### 2.    Respondent's Position

529.    In response to the Claimant's Motion for Sanctions, the Respondent vehemently denies that it acted in bad faith and points to the Claimant's own bad-faith conduct in the course of the proceedings.

530.    To begin, the Respondent asks the Sole Arbitrator to take into account when deciding on the motion the Claimant's bad-faith conduct in document production. During the Hearing, the Respondent identified seven instances of what it alleges is bad-faith conduct, which were: 1) the Claimant attempted to block Hu's testimony even though he was a material witness; 2) the Claimant failed and refused to provide evidence related to Hu's work at UiPath; 3) the Claimant refused to review ENCOO's source code or provide its own Source Code for review; 4) the Claimant attempted to block evidence of ENCOO's independent development of its Studio Product; 5) the Claimant attempted to block the Respondent's submission of expert testimony; 6) the Claimant abused the AEO designation on several of its witness and expert reports to delay the Respondent's access to resources needed for its defense; and 7) the Claimant filed excessive motions for adverse inferences and sanctions.

531.    In addition to these instances, the Respondent raised five additional instances in its Post-Hearing Brief. First, the Respondent maintains that the Claimant allegedly coerced the Respondent into accepting the Settlement Agreement by threatening litigation.

532.    Second, the Respondent argues that the Claimant concealed evidence and suborned false testimony by Shah on the AI Fabric integration project likely ending before June 2019 when Hu's performance review stated the project concluded on June 14, 2019.

533.    Third, the Respondent asserts that the Claimant concealed and failed to disclose notes from Hu's June 3, 2020 meeting with He Fang.

534.    Fourth, the Respondent argues that the Claimant submitted the Barth Reports which were false and misleading and then used the false portions of the reports to deprive the Respondent of the opportunity to review the Reports and manufactured false pretenses for various sanctions disputes in this case. The Respondent alleges that the Claimant represented that

Barth's Report contained portions of UiPath's Source Code and thus redacted large portions of the Report, only for Barth to reveal that the portions in his report were executable code that was available through UiPath's software installation package.

535.    Fifth, the Respondent alleges that the Claimant defied the Sole Arbitrator's instructions to provide to the Respondent's expert the materials on which Barth relied.

536.    The Respondent does not seek similar sanctions against the Claimant for these allegations but merely asks that they be taken into account when considering the Respondent's actions.

537.    In response to Claimant's Motion, the Respondent alleges that the Claimant has not met the high bar required for drawing an adverse inference. The Respondent cites several sources that support the requirements for drawing an adverse inference to be 1) presence of corroborating evidence to support the inference; 2) the inference must be reasonable, consistent with the facts in the record and logically related to the likely nature of the evidence withheld; and 3) Respondent's failure to comply with discovery orders was wilful and not reasonably explained.

538.    For the first and second requirements, the Respondent asserts that the Claimant has not established that the inference has corroborating evidence and is consistent with the existing evidence in the record. The Respondent highlights that the Barth Reports have been rebutted by the Fry Report and Shi Witness Statements, the GitHub access log presented by the Claimant is incomplete, and the Claimant's theory that Hu, Liu, and Shi had a conspiracy to misappropriate UiPath's Source Code is not supported by the record. The Respondent argues that in contrast it has produced significant evidence that ENCOO's Studio product was developed independently and produced full chat records between Liu, Shi, and Hu that establish they were not engaged in a conspiracy.

539.    For the third requirement, the Respondent argues that it has complied with the Sole Arbitrator's Procedural Orders. The Respondent asserts that it immediately ceased all legal actions against Claimant in China and never pursued any other legal actions following Procedural Order No. 2 when the Sole Arbitrator ordered the Respondent to withdraw its Demand Letters and enjoined the Respondent from issuing similar demands. The Respondent also mentions that it officially withdrew the Demand Letters on July 29, 2022.

540.    The Respondent also maintains that it produced a majority of documents requested by the Claimant and provided genuine explanations for those that it could not produce. For example, the Respondent was able to produce 14 historical versions of its Studio object code but was unable to produce early historical versions because ENCOO does not keep early historical versions. Following submission of the Statement of Defence, the Respondent recompiled two early versions and produced them to the Claimant, but emphasized that to recompile all versions would have been overly burdensome.

541.    The Respondent further submits that ENCOO has always been willing to provide a license key for the Claimant's access to its object code. The Respondent reiterates that there are two ways to gain access: register an account through ENCOO's website or provide a machine serial to ENCOO to generate an offline code to use on that device. The Respondent alleges that the Claimant refused to access the object code through either mechanism and instead asked the Respondent to remove its authentication system, which would have required a significant re-write. The Respondent further claims that the Claimant did not need a license key to review the object code.

542.    To the issue of translation raised by the Claimant, the Respondent quotes the language of Procedural Order No. 4, which only requires translation of relevant portions if the evidence is

submitted to the Sole Arbitrator but not for any documents produced to the other Party. Respondent maintains it had not obligation to translate documents for the Claimant.

543.    Finally, the Respondent argues that there was no prejudice to the Claimant's case due to the alleged lack of production of relevant documents. The Respondent alleges the Claimant did not rely on any financial statements in its calculation of damages despite complaining about the missing 2021 financial statement. The Respondent further claims that the Claimant was still able to rely on the Respondent's object code for its expert reports and argues that if it had found the Respondent's production of object code insufficient, the Claimant would have taken the Respondent's proposal to undertake source code review.

### 3.    Sole Arbitrator's Analysis

544.    The Sole Arbitrator found in favor of UiPath on its claims of Misappropriation and Breach of the Settlement Agreement.  He did so without drawing adverse inferences or disregarding evidence submitted by the Respondent.  Thus, the Sole Arbitrator does not need to reach the question of whether to impose such sanctions, since they would not affect the final outcome of this arbitration.

545.    Even without any adverse inference, the evidence is overwhelming that ENCOO misappropriated UiPath Source Code. Nonetheless, the Parties have raised arguments that merit some discussion because they may impact the Sole Arbitrator's decision as to the award of costs.  Thus, ENCOO's actions in delaying and refusing compliance with various orders forced UiPath to incur costs in this arbitration that it would not otherwise have had to incur.

546.    To begin, the Sole Arbitrator finds merit in the concerns raised by the Claimant relating to the Respondent's failure to produce its source code and object code, as ordered in

Procedural Order No. 1, and the license key to the object code once the object code was finally produced. The Sole Arbitrator had to repeatedly order the Respondent to produce its object code over several months and then had to repeatedly warn the Respondent that its failure to comply could result in an adverse inference in multiple procedural orders. The Respondent repeatedly acknowledged the Sole Arbitrator's concerns but continuously failed to produce its object code.

547.    The Claimant's argument about the Respondent's failure to translate certain documents seems misplaced. The language of Procedural Order No. 4 relating to translation is as follows:

> At this time, the party producing any existing document in response to a document request shall produce it in English if it possesses a copy in that language, but it shall not be required to translate a non-English language document into English. If a party is required to prepare a new document to provide information ordered by the Sole Arbitrator (as is the case under this Procedural Order No. 4), it shall do so in the English language.  If a Party submits any non-English language document to the Sole Arbitrator as part of its case, it shall translate the relevant part into English.

548.    Of the 24 documents identified by the Claimant as lacking a translation, the vast majority are documents submitted in response to the Claimant's document production requests, which do not require a translation from the Respondent provided a translation did not already exist under Procedural Order No. 4. Furthermore, for the documents submitted with the Statement of Defence, Procedural Order No. 4 specifies that only relevant parts need be translated to English, thus explaining why some documents were only partially translated. Thus there is little merit in the Claimant's argument that the Respondent's failure to translate certain documents was in bad faith.

549.    To conclude, the Sole Arbitrator briefly addresses the arguments raised by the Respondent about the Claimant's conduct at the hearings and in this arbitration. None of the allegations raised by the Respondent constitute bad faith in these proceedings. To address a few of the complaints raised by the Respondent, threatening to sue a company believed to have misappropriated another's intellectual property rights is not grounds for arguing that a settlement agreement was coerced, otherwise all settlement agreements would constitute coercion. A witness' mix up on dates is not suborning false testimony, especially when other exhibits in the record can be used to correct this error. Submitting an expert report that presents a different interpretation of the facts is also a normal part of advocacy for a client, not bad faith.

550.    The Sole Arbitrator finds that UiPath consistently conducted itself with good faith throughout the course of this arbitration.

551.    In sum, the Sole Arbitrator finds that the complaints lodged against the Respondent's behavior in the sanctions motion are valid.  However, he declines to draw any adverse inferences and declines to disregard any evidence submitted by the Respondent.

552.    The Sole Arbitrator's decision in this arbitration is based solely on the evidence submitted by both Parties, and not the drawing of adverse inferences based on the Respondent's alleged misconduct during these proceedings or the disregard of any evidence.

## I.    AWARD

553.    WHEREFORE, for the reasons set forth above, the Sole Arbitrator hereby DECLARES and AWARDS as follows:

(a)      The Sole Arbitrator DECLARES that Respondent ENCOO has breached its obligations under the Settlement Agreement and violated New York and federal law as set forth in this Partial Final Award on the Merits.

(b)      The Sole Arbitrator ORDERS Respondent ENCOO to pay UiPath compensatory damages in the amount of $70 million within 30 days from the date of the issuance of this Partial Final Award on the Merits.

(c)      The Sole Arbitrator ORDERS Respondent ENCOO to pay Post-award interest on the sum awarded in sub-paragraph (b) above at the rate of 9%, running for 30 days from the date of the issuance of this Partial Final Award on the Merits.

(d)      The Sole Arbitrator ENJOINS Respondent ENCOO from further using, disclosing, or exploiting UiPath's trade secrets.

(e)      The Sole Arbitrator ORDERS Respondent ENCOO to remove all similarities between its products' codes and UiPath's Source Code.

(f)      The Sole Arbitrator ORDERS Respondent ENCOO to make available to UiPath, upon 30 days notice by UiPath, its source code for all its RPA products for review by a third-party reviewer selected by UiPath twice a year for the next five years. If ENCOO takes the position that there exists any obstacle to making its source code available for review for any reason, it must inform UiPath within 5 business days of UiPath's notice, and ENCOO shall, at ENCOO's cost, promptly take all legally available steps to remove any such obstacle and promptly communicate with UiPath and seek UiPath's input into such steps.

(g)      Based on the fact that UiPath has substantially prevailed in this arbitration, the Sole Arbitrator FINDS that the administrative fees of the ICDR and the compensation of the Sole Arbitrator shall be borne by ENCOO. These costs will be quantified in the Final Award.

(h)      Based on the fact that UiPath has substantially prevailed in this arbitration, the Sole Arbitrator FINDS that UiPath is entitled to its reasonable attorneys' fees and

costs.  As the prevailing Party, UiPath may make a submission on costs within 14 days of the date of the issuance of this Partial Final Award on the Merits.  ENCOO may submit a reply within 14 days of the UiPath's initial submission on attorneys' fees and costs, and the UiPath may submit a rejoinder within 7 days of the ENCOO's reply.

(i)     This Partial Final Award on the Merits is in full settlement of all claims submitted to this Arbitration, with the exception of the issues of the award of attorneys' fees and costs of this arbitration, and the quantification of the costs of this Arbitration, which will be addressed in the Final Award.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award on the Merits was made in New York City, New York, United States of America.

Dated: May 10, 2023

John Fellas

142

State of New York          )
                           )    SS:
County of New York         )


I, John Fellas do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award on the Merits.


May 10, 2023
_____                    _____
Date                                        John Fellas, Arbitrator