# Exhibit C

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION (ICDR)**
**International Arbitral Tribunal**

**CASE NUMBER: 01-20-0015-6666**

UiPath, Inc.

Claimant

and

Shanghai Yunkuo Information Technology Co., Ltd.,

Respondent

**PARTIAL FINAL AWARD ON THE SCOPE OF THE ARBITRATION**

**Sole Arbitrator**
**John Fellas**

**October 26 , 2021**

**Glossary**

| AAA Commercial Arbitration Rules | The Commercial Arbitration Rules and Mediation Procedures of American Arbitration Association |
| --- | --- |
| Arbitration Clause | Clause 4 of the Settlement Agreement |
| Claimant | UiPath, Inc. |
| Demand Letters | Respondent's Letters sent to Claimant on March 23 and 24, 2021 that triggered a legal process in China to ascertain Respondent's liability for trade secret misappropriation. |
| Claimant's Misappropriation Claims | The claims asserted in the Claimant's Demand for Arbitration identified in paragraph 23 of this Partial Final Award. |
| Parties | Claimant and Respondent |
| Respondent | Shanghai Yunkuo Information Technology Co. Ltd. |
| Settlement Agreement | The Settlement Term Sheet Agreement signed by both Parties on July 14, 2020 |
| Source Code | The Claimant's proprietary source code that Respondent is alleged to have misappropriated |

The undersigned Arbitrator, having been designated in accordance with the procedures agreed to in the Settlement Term Sheet Agreement signed by both Parties on July 14, 2020, and proceeding as agreed by the Parties pursuant to the AAA Commercial Arbitration Rules; having been requested by the Parties to resolve a dispute between them about whether the Misappropriation Claims fall within the scope of the Arbitration Clause; having received from the Parties various written submissions in connection with the issue of scope; and having duly reviewed and considered all the Parties' submissions, does hereby render this Partial Final Award pursuant to Rule 47(b) of the AAA Commercial Arbitration Rules resolving as a FINAL matter the question of whether Claimant's Misappropriation Claims fall within the scope of this arbitration and FINDS AND AWARDS as follows:

## I.      The Parties and Counsel

### A.      Claimant

1.      The Claimant is UiPath, Inc. ("Claimant" or "UiPath"), a company incorporated under the laws of Delaware.

2.      The Claimant is represented by:

> Vincent Filardo, Jr.
> Robert A. Whitman
> Sharon Lee
> Yi He
> King & Wood Mallesons LLP
> 500 Fifth Avenue, 50th Floor
> New York, NY 10110
> USA

### B.      Respondent

3.      The Respondent is Shanghai Yunkuo Information Technology Co. Ltd., also sometimes referred to by the Parties to these proceedings as ENCOO Tech. ("Respondent" or "ENCOO"), a company incorporated in and under the laws of the People's Republic of

China.

4.     The Respondent is represented by:

        Kevin Duan
        Zhao Baao
        Xianglin Chen
        Han Kun Law Offices
        9/F, Office Tower C1, Oriental Plaza
        No. 1 East Chang An Av., Beijing 100738, P.R. China

## II.     Constitution of the Tribunal

5.     On January 27, 2021, the ICDR appointed John Fellas as the Sole Arbitrator in this arbitration.

6.     With the exception of the question of whether Claimant's Misappropriation Claims fall within the scope of the Arbitration Clause, which is the subject of this Partial Final Award, there is no objection to the jurisdiction of the Sole Arbitrator.

## III.     Overview of the Dispute

### A.     Summary of the Dispute

7.     The issue addressed in the Partial Final Award concerns the scope of this arbitration as defined by the arbitration clause in Clause 4 of the Settlement Term Sheet Agreement ("Settlement Agreement"), and specifically whether the Claimant's Misappropriation Claims fall within the scope of the Arbitration Clause.

### B.     Jurisdiction of the Sole Arbitrator

8.     Clause 4 of the Settlement Agreement provides as follows:

    4. Governing Law:

    This Agreement will be governed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws principles. The parties to this Agreement will submit all disputes arising under this agreement to arbitration in New York City, New York before a single arbitrator of the American

Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in New York. Arbitration shall be in accordance with the commercial rules of the American Arbitration Association. The Award of the Arbitrator shall be final, and judgment may be entered upon it in any court having jurisdiction thereof. No party to this Agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent a party from obtaining an injunction. The prevailing party shall be entitled to reasonable legal fees expert fees, and costs.

9. The Sole Arbitrator's jurisdiction derives from Clause 4 of the Settlement Agreement, dated July 14, 2020, signed by both Parties.

10. The Respondent raises objections to the scope of this arbitration, namely that the Claimant's Misappropriation Claims, as defined in paragraph 23 below, do not fall within the scope of the Arbitration Clause of the Settlement Agreement.

11. The Respondent contends that the Arbitration Clause is to be narrowly construed and should only apply to disputes relating to the breach of the Settlement Agreement itself. The Claimant responds that the Arbitration Clause applies to its Misappropriation Claims and that applicable law, including US federal law which was relied upon by both Parties, supports a broad interpretation of the Arbitration Clause.

12. Under the Arbitration Clause, the Parties agreed that the Arbitration "shall be in accordance with the commercial rules of the American Arbitration Association" (the "AAA Commercial Rules").

13. Rule 7(a) of the AAA Commercial Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim" (emphasis added.)  Thus, when it comes to the

issue of whether the Misappropriation Claims fall within the scope of the Arbitration Clause, by agreeing to arbitrate under the AAA Commercial Rules, the Parties empowered the Sole Arbitrator to resolve any objection as to the "scope" of the Arbitration Clause.

### C.    Place of Arbitration

14.    As provided by Clause 4 of the Settlement Agreement, the place of arbitration is New York City, New York (U.S.A.).

### D.    Applicable Substantive Law

15.    Clause 4 of the Settlement Agreement provides that "This Agreement will be governed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws principles."

### E.    Procedural Rules

16.    Clause 4 of the Settlement Agreement provides that "Arbitration shall be in accordance with the commercial rules of the American Arbitration Association."

## IV.    Procedural History

17.    On May 22, 2020, the Claimant sent a Lawyer's Letter and draft Complaint to the Respondent, indicating that UiPath intended to file for litigation before the United States District Court for the Southern District of New York on June 8, 2020, and requesting a reply from the Respondent by June 1, 2020.  Among other allegations, the Complaint included allegations of the theft of Claimant's proprietary source code ("Source Code") and trade secret misappropriation.

18.    The Parties met to negotiate a potential resolution to avoid litigation on June 3, 2020, and continued to communicate throughout June 2020 and the first half of July 2020.

19.     On July 14, 2020, both Parties signed the Settlement Agreement, which stipulated that the Claimant would not pursue its litigation against the Respondent if the Respondent took certain steps specified in that Agreement.

20.     The Claimant commenced this Arbitration by submitting a Demand for Arbitration on November 11, 2020.

21.     In its Demand for Arbitration, the Claimant advanced the following claims: "(i) breach of the Settlement Agreement (defined herein), (ii) violation of the Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.), (iii) misappropriation of UiPath's trade secrets in violation of New York common law, (iv) unfair competition with UiPath in violation of New York common law, (v) unjust enrichment, and (vi) Shanghai Yunkuo's aiding and abetting Shichao Hu's breach of his fiduciary duty to UiPath." (Demand for Arbitration, ¶ 1.)

22.     The Respondent submitted its Answering Statement on November 30, 2020.  In its Answering Statement, the Respondent acknowledges that Claim (i) for breach of the Settlement Agreement falls within the Arbitration Clause.  It states, "It is clear that the arbitration clause covers only the contractual disputes that derive from the Settlement Agreement."  (Answering Statement ¶ 21).

23.     However, in its Answering Statement, the Respondent took the position that claims (ii) to (vi) identified in the Demand for Arbitration at ¶ 1 ("Claimant's Misappropriation Claims") fall outside the scope of the Arbitration Agreement.  It states: "ENCOO has never agreed to submit any misappropriation claims by UiPath to the present proceedings. Accordingly, UiPath's claims (ii) to (vi) set forth in paragraph 1 of the DOA fall outside the scope of the arbitration clause in the Settlement Agreement." (Answering

Statement ¶ 21).

24.    On March 5, 2021, the Sole Arbitrator proposed a bifurcation of the proceedings with the first part focused on the issue of the Claimant's access to the Respondent's Source Code and the second part focused on addressing the remainder of the claims, including the Misappropriation Claims. Both Parties agreed to the bifurcation — the Claimant on March 5, 2021 and the Respondent on March 12, 2021.

25.    On March 22, 2021, the Sole Arbitrator held a preliminary video-conference with the Parties to discuss the Claimant's access to the Source Code under the Settlement Agreement, which Mr. Vincent Filardo and Mr. Robert Whitman from the law firm of King & Wood attended on behalf of the Claimant, and Mr. Kevin Duan, Mr. Zhao Baao and Mr. Xianglin Chen from the law firm of Han Kun attended on behalf of the Respondent.

26.    On March 23 and 24, 2021, the Respondent sent letters of demand ("Demand Letters") to the Claimant's Chinese and U.S. counsel, which, according to the Claimant, triggered a "legal process in China that would force Claimant to commence — prior to April 23, 2021 — a trade secret misappropriation lawsuit and other legal procedures in China to ascertain Respondent's liability for infringing Claimant's trade secrets under Chinese law." The Claimant alleges that this process would entitle the Respondent to a declaration from a Chinese court that it did not commit trade secret misappropriation. (Claimant's Motion for Preliminary Injunction and Interim Award of Legal Fees and Costs, March 29, 2021 (the "Motion") at 3).

27.    On March 29, 2021, the Claimant submitted the Motion asking the Sole Arbitrator to order the Respondent to withdraw the Demand Letter, enjoin Respondent from issuing

8

similar demands during this arbitration, and order an interim award of legal fees and costs
to the Claimant.

28.     The Claimant argued that the allegations raised in the Respondent's Demand Letter,
namely whether the Respondent misappropriated Claimant's trade secrets and copied
Claimant's Source Code (allegations included in the Misappropriation Claims), are
subsumed by the Settlement Agreement and thus fall within the scope of the Arbitration
Clause in that Agreement.  Claimant further alleged that by agreeing to enter into the
Settlement Agreement, "Respondent has agreed to arbitrate and waived its right to
litigate, or to force Claimant to litigate, on any issue arising from the Settlement
Agreement — including the issue of trade secret violation with respect to the Source
Code — in any jurisdiction." (Motion at 7).

29.     Following a review of the Motion, and also on March 29, 2021, the Sole Arbitrator wrote
to the Parties in the following terms:

> The parties are requested to confer about a briefing schedule for
> the claimant's motion, and revert with joint or separate positions
> by April 2.  In the meantime, pending any further ruling by the
> Tribunal, the Respondent is kindly DIRECTED TO TAKE NO
> FURTHER STEPS in connection with the Demand, as defined in
> the claimant's motion.  If the Respondent is unable or unwilling for
> any reason to follow this direction, it is kindly FURTHER
> DIRECTED to let me know IMMEDIATELY, as this will impact
> the timetable for consideration of the claimant's motion.
>
> The Tribunal FURTHER DIRECTS that the response time for the
> Respondent to respond to the Claimant's motion starts to run from
> March 30, and the Respondent is advised to begin the preparation
> of any response it wishes to submit on that basis.
>
> I note the Claimant's position that the Demand triggers formal
> legal process in China.  Each party is kindly DIRECTED to let me
> know its position on whether Chinese procedural law imposes any
> timetable for the initiation of such process, and, if so, what that
> timetable is.  I request that this information be provided on or

> before April 2.  It need not be a long outline of the law.  I simply
> would like to understand the position under Chinese law since it
> might impact the timetable for consideration of the claimant's
> motion.  If the Respondent wishes to make any other observations
> on the claimant's application, it, of course, free to do so.

30.    On April 2, 2021, the deadline set forth in the Sole Arbitrator's communication to the

Parties quoted above, both Parties made submissions regarding their "position on whether

Chinese procedural law imposes any timetable for the initiation of such process, and, if

so, what that timetable is."

31.    Having reviewed the Parties' respective April 2 submissions, the Sole Arbitrator issued

Procedural Order No. 1 on April 3, 2021, in which, among other things, he established a

briefing schedule for the Parties' submissions on the Motion.

32.    On April 9, 2021, the Respondent submitted its Opposition to Claimant's Motion for

Preliminary Injunction and Interim Award of Legal Fees and Costs (the "Opposition").

33.    On April 14, 2021, the Claimant submitted its Reply to Claimant's Motion for

Preliminary Injunction and Interim Award of Legal Fees and Costs (the "Reply").

34.    On April 18, 2021, after carefully considering the submissions of the Parties, the Sole

Arbitrator issued Procedural Order No. 2, which ordered the Respondent to withdraw the

Demand Letter by April 20, 2021, enjoined Respondent from issuing similar demands,

and invited Respondent to propose an expedited procedure for final determination of the

scope of the arbitration. The Sole Arbitrator also denied the Claimant's request for an

interim award of costs.

35.    One of the issues before the Sole Arbitrator on the Motion was "whether the Claimant

has established a likelihood of success on the merits on the Parties' dispute as to the

scope of the Arbitration Clause." (Procedural Order No. 2 ¶ 44).

36.  In addressing this issue in Procedural Order No. 2, the Sole Arbitrator explicitly stated that "he will not be in position to determine this question a final matter until he has heard the Parties' full cases.  But for the purposes of the Claimant's application for interim relief, where both Parties rely on the three-part test set forth in *UAH-Mayfair*, what the Sole Arbitrator must determine now is whether, on the record before him, the Claimant has established a likelihood of success on the merits of its position that the Misappropriation Claims, like the Contract Claim, fall within the scope of the Arbitration Clause." (Procedural Order No. 2, ¶ 44).  In Procedural Order No. 2, the Sole Arbitrator concluded that the Claimant "has established a likelihood of success on the merits of this claim."  (*Id.* at ¶45.)

37.  Thus, the Sole Arbitrator noted in Procedural Order No. 2 that his ruling that the Misappropriation Claim fell within the scope of the Arbitration Clause was assessed by reference to the "likelihood of success standard" and, as such, was an interim ruling and not a final one.

38.  Also in Procedural Order No. 2, the Sole Arbitrator invited the Respondent "to propose an expedited procedure for the final determination by the Sole Arbitrator of the issue of scope (that has been addressed in this Procedural Order No. 2 on an interim basis) to run parallel with the other proceedings in this case, should the Respondent wish to have the issue of scope resolved finally on an expedited basis."  (Procedural Order No. 2 ¶ 83(c).)

39.  On May 7, 2021, the Respondent wrote to the Sole Arbitrator to add an agenda item to the topics to be discussed at a forthcoming, previously scheduled video-conference to take place between the Parties and the Sole Arbitrator on May 11, 2021. Specifically, the Respondent wrote that "[in] addition to the Claimant's proposed agenda items, the

Respondent draws the Tribunal's kind attention to the following issues which should also be discussed at the conference of May 11, 2021: - a. The Respondent's motion and proposed timetable for the Tribunal to make a final decision on the scope of the arbitration clause in the Settlement Agreement."  In the same communication, the Respondent proposed a written briefing timetable that contemplated no evidentiary hearing for the resolution of the issue of scope.

40.     On May 11, 2021, the Sole Arbitrator held a videoconference with the Parties.  After hearing from the Parties, on the same day, the Sole Arbitrator sent an email recording the following briefing schedule.  "The Parties are directed to make submissions for the Sole Arbitrator's Final Decision on the Scope of the Present Arbitration on the following schedule:

- Respondent's Submission       – June 1, 2021
- Claimant's Opposition          – no later than June 22, 2021
- Respondent's Reply             – 14 days from submission of Claimant's Opposition."

41.     This briefing schedule was later embodied in Procedural Order No. 3 issued on May 12, 2021.

42.     On June 1, 2021, the Respondent submitted the Respondent's Submission on the Scope of the Arbitration, with accompanying legal and factual exhibits (the "Respondent's Submission").

43.     On June 3, 2021, the Respondent submitted English translations of certain exhibits.

44.     On June 9, 2021, the Claimant submitted UiPath's Opposition to ENCOO's Submission on the Scope of the Arbitration with an accompanying factual exhibit (the "Claimant's Opposition").

45.     On June 23, 2021, the Respondent submitted Respondent's Reply to Claimant's

Opposition to Respondent's Submission on the Scope of the Arbitration (the "Respondent's Reply").

46.    On September 12, 2021, the Sole Arbitrator invited the Parties to provide any comments on *David L. Threlkeld Co. v. Metallgesellschaft*, 923 F.2d 245, 250 (2d Cir. 1991) (and related cases) addressing the issue of the scope of an arbitration clause, stating:

> I'm currently preparing a partial final award on the issue of the scope of the arbitration clause that the Parties have briefed.
>
> I wanted to give the Parties an opportunity to provide any comments they may wish to provide on Second Circuit law that bears on this issue.  Below is a quote from the case of *David L. Threlkeld Co. v. Metallgesellschaft*, 923 F.2d 245, 250 (2d Cir. 1991).  (Similar concepts also find expression in *Boss Worldwide LLC v. Crabill,* 2020 WL 1243805, at *3 (S.D.N.Y. March 16, 2020) and *In re Am. Express Fin. Advisors Sec. Litig.,* 672 F.3d 113, 128 (2d Cir. 2011)):
>
>> "We focus next upon the scope of the arbitration clauses to determine whether Threlkeld's claims are arbitrable. Federal policy 'requires us to construe arbitration clauses as broadly as possible.' *S.A. Mineracao da Trindade-Samitri v. Utah International, Inc.,* 745 F.2d 190, 194 (2d Cir. 1984). "[A]rbitration should be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *McAllister Bros., Inc. v. A & S Transportation Co.,* 621 F.2d 519, 522 (2nd Cir. 1980) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1352-53, 4 L. Ed. 2d 1409 [1960]. Additionally, we are mindful of the Supreme Court's directive with respect to broad arbitration clauses:  '[I]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419, 89 L. Ed. 2d 648 (1986) (*quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 584-85, 80 S. Ct. 1347, 1353-54, 4 L. Ed. 2d 1409 (1960))."

> There is no need for either party to provide any comment, but if either party wishes to make any, could they kindly do so by no later than September 24, 2021.

47. The Respondent submitted a comment on *Threlkeld* on September 25, 2021.

48. On September 30, 2021, the Claimant submitted an unauthorized response upon the Respondent's comment.

49. Also on September 30, the Respondent objected to the Claimant's submission on *Threlkeld* because it was nearly a week late, was a response to the Respondent's comment rather than a comment on *Threlkeld*, and contained accusations against the Respondent when the focus was supposed to be the application of *Threlkeld*.

50. As noted below (paragraph 55), the Sole Arbitrator accepts the Respondent's submission on *Threlkeld* and disregards the Claimant's.

## V.    Requests for Relief

### A.    Respondent

51. The Respondent requests that the Sole Arbitrator exclude the Misappropriation Claims from the scope of the present arbitration.

### B.    Claimant

52. The Claimant requests that the Sole Arbitrator:

(i)    Deny Respondent's Submission in its entirety; and

(ii)    Issue a final order to

(a) Confirm Procedural Order No. 2's determination on the scope of the arbitration clause,

(b) Direct the Respondent to withdraw its Demand Letters to the Claimant's Chinese and U.S. counsel on March 24, 2021 and March 25, 2021,

(c) Enjoin the Respondent from issuing similar demands or otherwise instituting and asserting legal proceedings and claims against the Claimant within the scope of the Arbitration Clause, and

(d) Such other and further relief as the Sole Arbitrator deems just and necessary.

## VI.    The Positions of the Parties

53.    This section summarizes each Party's position.  The Sole Arbitrator emphasizes that he has reviewed and considered all the factual and legal arguments presented by the Parties in their submissions. The fact that this Partial Final Award may not expressly reference all arguments does not mean that such arguments have not been considered; the Sole Arbitrator includes only those points which he considers most relevant for his decision.

54.    Each summary will first address the arguments raised in the Claimant's Motion and Reply, the Respondent's Response to the Motion, followed by a summary of the arguments raised in the Submissions on the Scope of the Arbitration.

55.    In considering the Parties' positions, the Sole Arbitrator notes that he disregards the Claimant's submission on *Thelkeld* because it was submitted well outside the deadline established by the Sole Arbitrator and had the unfair advantage of being prepared after the Claimant had an opportunity to see the Respondent's position.  While the Respondent's submission was one day late, it was not prepared following an advance review of any submission by the Claimant, and, as a result, the Sole Arbitrator admits it into the record, and considers Respondent's submission for the purposes of this Partial Final Award.

### A.    The Claimant's Position

56.    The Claimant's argument in its Original Motion is based on its receipt of the Demand

Letters from the Respondent to the Claimant's Chinese and U.S. counsel on March 23
and March 24, 2021, which, according to the Claimant, triggered a legal process in China
that would commence a trade secret misappropriation lawsuit in Chinese Courts. The
Claimant asserted that, unless the Claimant participated in the lawsuit, the Respondent
would be entitled to a declaration from a Chinese court that it had not engaged in trade
secret misappropriation.

57.     The Claimant's Motion sought interim relief on the ground that there is "no question that
the allegations raised in Respondent's Demand, namely, whether the Respondent
misappropriated the Claimant's trade secrets and copied Claimant's source code, are
subsumed by the Settlement Agreement. (*See* Settlement Agreement §4 ('The parties to
this Agreement will submit all disputes arising under this agreement to arbitration….')."
(Motion at 6.)

58.     The Claimant went on to argue that by "entering into the Settlement Agreement,
Respondent has agreed to arbitrate and waived its right to litigate, or to force Claimant to
litigate, on any issue arising from the Settlement Agreement – including the issue of trade
secret violation with respect to the Source Code – in any jurisdiction."  (Motion at 7.)

59.     The Claimant argued, therefore, that interim relief should be granted since "[a]s a result
of Respondent's Demand [Letters], Claimant must commence litigation on the issues of
trade secret misappropriation and copying of source code in China ***prior to April 23,
2021*** or be subject to a declaratory judgement of no trade secret misappropriation and
copying issued to Respondent. Allowing Respondent's Demand to take effect would
nullify the Arbitration Clause and render this Arbitration moot." (Motion at 7 (emphasis
in original).)

60.    The Motion asked the Sole Arbitrator to order three heads of relief:

> <u>first</u>, to "order Shanghai Yunkuo Information Technology Co., Ltd. ("Respondent") to withdraw the letter demand that Respondent's counsel issued to Claimant's Chinese and U.S. counsel on March 24, 2021 and March 25, 2021, respectively ("Demand"), in writing";

> <u>second</u>, to "enjoin Respondent from issuing similar demands during these proceedings of this Arbitration or otherwise instituting and asserting legal proceedings and claims against Claimant within the scope of the parties' arbitration clause"; and

> <u>third</u>, to "order an interim award of legal fees and costs to Claimant associated with this motion, and any other and further relief as the Arbitrator deems just and proper.

(Motion at 1.)

61.    The Claimant also requested that the Sole Arbitrator "enter an interim award of legal fees and costs to Claimant, including but not limited legal fees and costs incurred on this Motion, pursuant to Rule 23(d) of the AAA Commercial Arbitration Rules for Respondent's willful non- compliance with the parties' agreement to the bifurcation proposal and to otherwise achieve a fair, efficient and economical outcome of this dispute." (*Id.*)

62.    In the Claimant's Opposition, the Claimant cited cases from the Second Circuit that limited a finding of a narrow arbitration clause to the precise language of the clause in *In Re Kinoshita Co.*, 287 F.2d 951 (2d Cir. 1961). Claimant contends that the holding in *ACE Capital Re Overseas Ltd/ v. Central United Life Ins. Co.*, 307 F.3d 24 (2d Cir. 2002), cited by Respondent in support of applying *Kinoshita*, instead supports a broad interpretation of the arbitration clause because it limits *Kinoshita* to its precise facts. Consequently, since the wording of the Arbitration Clause is not exactly the same as that in *Kinoshita*, nor is there evidence that the Parties intended to use the exact wording,

17

Claimant argues that the Arbitration Clause must be read broadly as supported by the pro-arbitration liberal federal policy.

63.     In response to the Respondent's arguments that the plain meaning of the Settlement Agreement supports the view that the Arbitration Clause is narrow because it was only intended to be an interim agreement, the Claimant maintains that the Settlement Agreement is the final agreement between the Parties. The Claimant points to the text of Clause 1 of the Settlement Agreement to argue that the Settlement Agreement is final: "the parties now wish to settle all claims between UiPath and ENCOO and Mr. Hu, including those UiPath has threatened to assert in the Complaint." The Claimant also emphasizes that the Misappropriation Claims are not a collateral issue because the Claimant's forbearance from pursuing the Claims provided its consideration of the Settlement Agreement.

64.     Finally, the Claimant alleges that the Respondent took various emails out of context in arguing that the Misappropriation Claims and Settlement Agreement were separate matters or that the Misappropriation Claims were outside of the scope of the Arbitration Clause.  For example, it asserts that an email in which the Claimant is seemingly postponing a resolution of the Misappropriation Claims was in actuality the Claimant's rejection of a last-minute revision proposed by Respondent. The Claimant also maintains that the Respondent is wrong to contend that the Settlement Agreement was not intended to settle the Misappropriation Claims since its agreement to remove the similarities from its source code was a term of the settlement.

        **B.      The Respondent's Position**

65.     In its Opposition, the Respondent argues that the claims that are the subject of its

Demand Letters "do not *arise under* the Settlement Agreement. There are no clauses in the Settlement Agreement which provide for the parties' admission or denial of the Claimant's misappropriation and infringement claims. Instead, the parties' respective obligations under the Settlement Agreement take effect without touching upon the IP Disputes. Suffice it to say that, the merits of the Misappropriation disputes are irrelevant to the performance of the Settlement Agreement." (Opposition at ¶ 4.a.(b) (emphasis in original).)

66.     The Respondent relies heavily on *In Re Kinoshita Co.*, 287 F.2d 951 (2d Cir. 1961) as supporting a narrow reading of the Arbitration Clause. The Respondent emphasizes the relevance to this arbitration of the Second Circuit case, which found that fraud claims were not covered by an arbitration clause because of the choice to use the wording "arise under" rather than "relating to." The Sole Arbitrator rejected the applicability of *Kinoshita* in Procedural Order No. 2, finding that more recent precedent supports a liberal federal policy towards interpretation of arbitration clauses in U.S. Courts, especially the Second Circuit.

67.     In the Respondent's Submission on the Scope of the Arbitration, the Respondent raises three main arguments to support its contention that the Misappropriation Claims fall outside of the scope of the Arbitration Clause and addresses the issues the Sole Arbitrator raised with *Kinoshita*.

68.     First, the Respondent argues that, even when taking into consideration the main legal developments since *Kinoshita*, current precedent supports a narrow reading of the arbitration clause. Namely, the pro-arbitration liberal federal policy on interpretation of arbitration clauses cited by the Sole Arbitrator in Procedural Order No. 2 should not

apply because this policy only arises when there is an ambiguity in the arbitration clause, and the Respondent insists that there is no ambiguity in the Arbitration Clause.

69.  Furthermore, the Respondent contends that, even if *Kinoshita* is limited to its specific facts, it is still applicable to the current case and supports a narrow scope of arbitration because the language of the Arbitration Clause is nearly identical to that contained in *Kinoshita*, which indicates an intent to narrow the scope of the arbitration.

70.  The Respondent also asserts that the Misappropriation Claims are collateral in nature and that the Second Circuit case, *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001), supports finding that collateral matters are generally not covered by narrow arbitration clauses.

71.  Second, Respondent contends that the plain meaning of the language employed by the Parties explicitly and unambiguously defines the scope of arbitration as confined to the obligations provided explicitly in the Settlement Agreement.  It asserts that the Misappropriation Claims do not constitute an obligation under the Settlement Agreement, and that, as a result, they fall outside the scope of the arbitration. The Respondent argues that the Settlement Agreement was only intended to be an interim agreement and that if violated, the Claimant had the right to initiate its claim against Respondent in U.S. Court, not in arbitration. The Respondent also claims that nowhere in the main text of the Settlement Agreement do the Parties mention the merits of the Misappropriation Claims or future disputes that might arise out of these claims.

72.  Third, the Respondent asserts that the negotiating history between the Parties demonstrates that they did not intend to include the Misappropriation Claims in the Settlement Agreement and have not ruled out the possibility of filing a lawsuit. The

Respondent claims that the Parties' intent in negotiating the Settlement Agreement was not to settle the Misappropriation Claims but rather to reach an agreement to remove the similarities between each Parties' source codes. Further, the Respondent argues that the Parties did not rule out the possibility of future litigation over the Misappropriation Claims. As mentioned in their section on plain meaning, the Respondents treat the Settlement Agreement as an interim agreement rather than a final settlement.

## VII.    The Sole Arbitrator's Analysis

73.   The Sole Arbitrator has carefully reviewed the submissions of the Parties and considers whether the Claimant's Misappropriation Claims fall within the scope of the present arbitration and whether he should issue a final order confirming Procedural Order No. 2's determination and granting in final terms the interim relief sought by the Claimant in its Original Motion.

74.   This analysis will address the Respondent's three contentions that: a) the applicable law supports a narrow reading of the Arbitration Clause; b) the plain meaning of the Arbitration Clause shows the Parties intended to exclude the Misappropriation Claims from the Arbitration Clause; and c) the history of negotiation shows the Parties did not intend to include the Misappropriation Claims in the scope of this arbitration. The final section will address the impact of this Partial Final Award on Procedural Order No. 2.

### A.   Proper Interpretation of the Arbitration Clause Based on New York Law

75.   The issue of scope rests entirely on the proper interpretation of the Arbitration Clause of the Settlement Agreement. For ease of reference, the full text is reproduced here:

> 4. Governing Law:
>
> This Agreement will be governed and enforced in accordance with the laws of the State of New York, without regard to its conflict of

laws principles. The parties to this Agreement will submit all disputes arising under this agreement to arbitration in New York City, New York before a single arbitrator of the American Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AA, or by mutual agreement of the parties, except that such arbitrator shall be an attorney admitted to practice law in New York. Arbitration shall be in accordance with the commercial rules of the American Arbitration Association. The Award of the Arbitrator shall be final, and judgment may be entered upon it in any court having jurisdiction thereof. No party to this Agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent a party from obtaining an injunction. The prevailing party shall be entitled to reasonable legal fees expert fees, and costs.

76.     The key phrasing for determining the scope of this arbitration lies in how one interprets "all disputes arising under this agreement to arbitration" and here is where the Parties' views differ.

77.     In its response to the Original Motion, the Respondent relied heavily on *Kinoshita*. The Sole Arbitrator determined in Procedural Order No. 2 that *Kinoshita* was not applicable to the case at hand, because the overwhelming weight of Second Circuit authority since *Kinoshita* has held that that case should be limited to its precise facts.  The Sole Arbitrator quotes below his analysis in Procedural Order No. 2, which is incorporated as part of this Partial Final Award:

> 49.  What the Respondent overlooks in relying solely on *Kinoshita* is that, since that decision over 50 years ago, there have been a series of cases, including by the United States Supreme Court and the Second Circuit, that have rejected the *Kinoshita* approach to determining the scope of arbitration clauses and that have explicitly limited *Kinoshita* solely to its specific facts.

> 50.  The Sole Arbitrator must base his decision on the law as it stands currently, not as it stood over 50 years ago.

> 51.  There have been two main legal developments since the decision in *Kinoshita* over 50 years ago.  First, about twenty years after *Kinoshita*, the United States Supreme Court declared that there is "a liberal federal policy

favoring arbitration agreements," requiring that "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

52.  Second, since the Supreme Court's announcement of the liberal federal policy in favor of arbitration agreements in *Moses*, courts throughout the United States, including in the Second Circuit, have criticized and limited the decision in *Kinoshita* to its specific facts.

53.  In *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.,* 307 F.3d 24 (2d Cir. 2002), the Second Circuit stated: "*Kinoshita,* which was decided before the Supreme Court's more recent decisions emphasizing the strong federal policy in favor of arbitration, has frequently been criticized in this Circuit, and no decision of recent vintage mentions the case without confining it to its precise facts." *Id.* at 32-33 (footnote omitted). S*ee also Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 225 (2d Cir.),  ("We have ... since limited [*Kinoshita* 's] holding to its facts, declaring that absent further limitation, only the precise language in *Kinoshita* ["arising under"] would evince a narrow clause."), *cert. denied,* 534 U.S. 1020, 122 S.Ct. 546, 151 L.Ed.2d 423 (2001); *S.A. Mineracao da Trindade–Samitri v. Utah International, Inc.,* 745 F.2d 190, 194 (2d Cir.1984) ("We decline to overrule *In re Kinoshita,* despite its inconsistency with federal policy favoring arbitration, particularly in international business disputes, because we are concerned that contracting parties may have (in theory at least) relied on that case in their formulation of an arbitration provision. We see no reason, however, why we may not confine *Kinoshita* to its precise facts."); *St. Paul Fire & Marine Ins. Co. v. Employers Reinsurance Corp.,* 919 F. Supp. 133, 135 (S.D.N.Y.1996) ("As a result [of later Second Circuit cases], the authority of *Kinoshita* is highly questionable in this Circuit.").  *See also Donner v. GFI Cap. Res. Grp.,* No. 16 CIV. 9581 (CM), 2017 WL 2271533, at *4 (S.D.N.Y. May 2, 2017) (Kinoshita is "an ancient and disfavored decision").

54.  Other circuits have questioned *Kinoshita* as well.  *See, e.g., Battaglia v. McKendry,* 233 F.3d 720, 725 (3d Cir.2000) ("[The *Kinoshita* ] line of cases has been discredited both in the Second Circuit and in other jurisdictions."); *Gregory v. Electro–Mech. Corp.,* 83 F.3d 382, 385 (11th Cir.1996) (rejecting *Kinoshita* as "not being in accord with present day notions of arbitration as a viable alternative dispute resolution procedure").

55.  Thus, the overwhelming weight of legal authority is that *Kinoshita* is a "discredited," "highly questionable," and "ancient and disfavored" decision, that the Second Circuit has made clear should be confined to its precise facts.

56.  The Sole Arbitrator also notes in this context that there is a difference between the language of the Arbitration Clause in this case and that in *Kinoshita*. In this case, the Parties agreed in the Arbitration Clause that "[t]he parties to this Agreement will submit <u>all</u> disputes arising under this agreement to arbitration in New York City" (emphasis added).  In *Kinoshita*, by contrast, the parties agreed to arbitrate "if <u>any</u> dispute or difference should arise under this Charter . . ."  *Kinoshita & Co.,* 287 F.2d at 952.

57.  Since *Kinoshita* has been held by the Second Circuit to be confined to its specific facts and since the language of the Arbitration Clause in this case is different from that in *Kinoshita*, requiring that arbitration of "<u>all</u> disputes" and not simply, as in *Kinoshita,* of "<u>any</u> dispute or difference," *Kinoshita* simply has no application to this case.

58.  Thus, the Sole Arbitrator interprets the Arbitration Clause in this case by reference to the current law, rather than the outdated law in *Kinoshita*. Under current law, since there is "'a liberal federal policy favoring arbitration agreements," it is a general rule that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 223 (2d Cir. 2001) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983))."

59.  Applying that law, the Sole Arbitrator finds the Arbitration Clause to be broad, providing that "the parties <u>will</u> submit <u>all</u> disputes" to arbitration.  Construing the mandatory language "will" and the broad language "all" in the light of the federal policy in favor of arbitration, which requires the Sole Arbitrator to resolve "any doubts concerning the scope of arbitrable issues . . . "in favor of arbitration," the Sole Arbitrator finds that the Claimant has a likelihood of success on the merits of its assertion that the Misappropriate Claims fall within the scope of the Arbitration Clause.

78.  For the Respondent to succeed on its argument that the Misappropriation Claims fall outside the scope of the Arbitration Clause, it is necessary for it to explain either why the Sole Arbitrator should ignore the overwhelming weight of Second Circuit authority cited in Procedural Order No. 2 finding that *Kinoshita* is questionable and must be confined to its precise facts or to offer a reason why that weight of authority does not apply to this case.

79.  The Respondent offers three arguments.

80.   First, the Respondent argues that though a liberal federal policy favoring arbitration

       exists, this policy only applies where there is an ambiguity in an arbitration clause. The

       Respondent argues that the Arbitration Clause in the Settlement Agreement is

       unambiguous and thus not subject to the liberal federal arbitration policy. In both its

       Submission and its comment on *Threlkeld*, the Respondent highlights that the liberal

       federal policy of interpreting arbitration clauses cannot supersede the Parties' intentions

       in the clear language of the contract, citing *Granite Rock Co. v. Int'l Bhd. Of Teamsters*,

       561 U.S. 287 (2010). Since the language of "arising under" is the same as the language

       used in *Kinoshita*, the Respondent states that the Parties' intent was to have a narrow

       arbitration clause.

81.   Second, the Respondent emphasizes that its prior reliance on *Kinoshita* was proper

       because, even though *Kinoshita* has been limited to its specific facts, its holding bears on

       arbitration clauses using specific the words "arising under," as here.  The Respondent

       asserts that the Sole Arbitrator should only focus on this phrasing rather than all the other

       differences between this case and *Kinoshita*, including the difference in the language of

       the two clauses — "all disputes" (this arbitration) and "any disputes" (*Kinoshita*).

82.   The Respondent also raises a third point characterizing the Misappropriation Claims as a

       collateral matter to the Settlement Agreement. This argument is more fully explored in

       Section B.

83.   In response to these arguments, the Claimant emphasizes that the Second Circuit's

       position is that an arbitration clause must have identical language to *Kinoshita* in order to

       be narrowly construed, not just a small portion of the clause. The Claimant states that the

       Parties could not have intended to create a narrow arbitration clause since the language of

the Arbitration Clause is different than the one in *Kinoshita*, which stated "if any dispute

or difference should arise under this Charter…" The Claimant alleges this language is

clearly distinguishable from "all disputes arising under this agreement to arbitration."

84.     To Respondent's second point, the Claimant argues that the Respondent misreads *ACE*

*Capital*, which finds that "arising under" can serve as one of many pieces of evidence of

a narrow arbitration clause but cannot serve as the only evidence of the Parties' intent.

85.     To begin, the Sole Arbitrator must consider whether an ambiguity exists in the

Arbitration Clause that would warrant an application of *Moses*. The Respondent argues

that the reference from *Moses*, "**any doubts** concerning the scope of arbitrable issues

should be resolved in favor of arbitration" (emphasis added, *Moses* at 24-25), means that

an arbitration clause must first be found to be ambiguous before its scope should be

construed in favor of arbitration.

86.     Here the Respondent asserts that the Arbitration Clause is not ambiguous.  It asserts that

the language of the Arbitration Clause is for relevant purposes identical to that of

*Kinoshita*, which evinces an intent to select a narrow arbitration clause, and so there is no

ambiguity.

87.     This argument overlooks two important points.

88.     First, this case is distinguishable on the facts from *Kinoshita* — a case that the Second

Circuit states must be confined to its precise facts.  Unlike in *Kinoshita,* the claims that

are the subject of the dispute about the scope of the arbitration clause in this case were

the subject of the underlying agreement out of which the dispute arises, (i.e., the

Settlement Agreement).  Thus Clause 1 of the Settlement Agreement, which states "the

parties now wish to settle ***all claims*** between UiPath and ENCOO and Mr. Hu, ***including***

*those UiPath has threatened to assert in the Complaint*" (emphasis added). As noted

above, the Complaint included claims of misappropriation.  For example, paragraph 92

alleges "defendant Shanghai Yunkuo conspired with defendant Hu to have Mr. Hu

*misappropriate UiPath's confidential and proprietary information, including UiPath's*

*trade secrets*, to target UiPath's existing and prospective customers by designing,

developing, marketing and selling their line of RPA products in direct competition with

UiPath's products" (emphasis added).

89.  Thus, given that allegations of misappropriation were among the claims settled by the

Settlement Agreement, as evidenced by the explicit reference in the Settlement

Agreement to the Complaint which included allegations of misappropriation, a dispute as

to whether the Respondent engaged in misappropriation is one that "*arises under*" the

Settlement Agreement and thus falls within the scope of the Arbitration Clause.  The fact

that Arbitration Clause in this case does not include words "relating to" — which is at the

heart of Respondent's scope objection — is immaterial.  On the facts of this case, the

words "arising under" are sufficient to encompass the Misappropriation Claims.

90.  The second reason why the Respondent's reliance on *Kinoshita* is unpersuasive is that the

language of the Arbitration Clause is not identical to the clause at issue in *Kinoshita*.

While the Respondent is correct that "aris[ing] under" does appear in both clauses,

minimum the clauses are distinguishable due to the difference between "any disputes"

(*Kinoshita*) and "all disputes" (the Arbitration Clause).  Given that the Second Circuit has

directed that *Kinoshita* be confined to its precise facts, this difference is language cannot

be ignored.

91.  The Respondent's argument that the Sole Arbtirator should ignore this linguistic

difference between the two clauses ignores the explicit reason given by the Second Circuit for why it did not overrule *Kinoshita,* namely, that parties may have relied on the arbitration clause in that case to formulate their own arbitration clause. *S.A. Mineracao da Trindade–Samitri v. Utah International, Inc.,* 745 F.2d 190, 194 (2d Cir.1984) ("We decline to overrule *In re Kinoshita,* despite its inconsistency with federal policy favoring arbitration, particularly in international business disputes, because we are concerned that contracting parties may have (in theory at least) relied on that case in their formulation of an arbitration provision. We see no reason, however, why we may not confine *Kinoshita* to its precise facts.").

92.     Based on the Second Circuit's teachings in *Mineracao,* parties ought to formulate their arbitration clause in precisely the same terms as those used in *Kinoshita* to evidence their intent to select a narrow arbitration clause.  In this case they did not — here seeking to arbitrate "all disputes" in contrast to *Kinoshita* where the parties agreed to arbitrate "any disputes."  While it is possible to debate the meaning of this difference as a linguistic matter, one thing clear:  the difference in the language used in the arbitration clause in this case and the one in *Kinoshita* means that, at a minimum, there is an ambiguity as to whether the Parties in this case intended to draft a narrow clause as in *Kinoshita* (in accordance with the guidance of *Mineracao*), or to draft a *different* clause from that used in *Kinoshita.*

93.     Because of this ambiguity, the well-established law that doubts about the scope of arbitration clauses should be resolved in favor of arbitration is implicated, leading to the conclusion that the Arbitration Clause covers the Misappropriation Claims.

94.     Moreover, there is ample authority in the Second Circuit since *Kinoshita* that arbitration

clauses should be construed as broadly as possible, ambiguous or not.  S*ee, e.g., Threlkeld* at 250  (reversing denial of motion to compel arbitration and noting that "Federal policy 'requires us to construe arbitration clauses as broadly as possible.'""); *Boss Worldwide LLC v. Crabill*, 2020 WL 1243805, at *3 (S.D.N.Y. March 16, 2020) (granting motion to compel arbitration and stating that "[t]he federal policy favoring arbitration 'requires [courts] to construe arbitration clauses as broadly as possible'") (quoting *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

95.  *Threlkeld* relies upon the Supreme Court decision in *United Steelworkers of America v. Warrior & Gulf Navigations Co.*, 363 U.S. 574 (1960), which found that "arbitration should be compelled 'unless is may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute'" (*McAllister Bros., Inc. v. A & S Transportation Co.*, 621 F.2d 519, 522 (2nd Cir.1980) *citing United Steelworkers* at 582-3) and "in the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." (*AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 *citing United Steelworkers* at 584-5).

96.  In responding to *Threlkeld*, the Respondent relies on *In re Am. Express*, 672 F.3d 113 as an example of a case in which, despite the liberal federal policy, the court found the arbitration clause did not apply because the parties had, in the court's view, intentionally excluded certain types of claims for arbitration. But *In re Am. Express* does not support the Respondent's position.  The arbitration clause in that case included explicit language referencing the claims to be excluded in the arbitration clause. In this case, the Parties put

no language in the arbitration clause excluding any claims, even though the Settlement Agreement was designed to settle "all claims" including allegations of misappropriation and even though the Arbitration Clause covered "all disputes."

97.     The Respondent also argues that *Threlkeld* and related cases privilege party intent over the broad arbitration policy, writing "[i]ndeed, although in those cases the judges expressed their supportive attitudes toward a broad construction of arbitration clauses, all of them clearly acknowledged that the federal policy is not decisive and it is the parties' intentions that should prevail."

98.     But this argument is not helpful to the Respondent for two reasons.  First, *Threlkeld* makes clear that, in seeking to determine the intent of the parties to an arbitration clause based on the language of that clause, that clause must be construed broadly.  Second, in this particular case, the best that can be said for the Respondent's position is that the fact that the arbitration clause does not exclude any claims and that the language of the clause is not identical to that in *Kinoshita* renders the Arbitration Clause ambiguous, which in turn triggers the application of the rule in *Moses* that any doubts should be construed in favor of arbitration.

99.     Turning to the arguments on the Parties' intent, the Respondent's reliance on *Granite Rock* is misplaced. While it is true that a "court may submit to arbitration only those disputes . . . the parties have agreed to submit," *Granite Rock* also finds that in determining which disputes the parties have agreed to submit, an arbitration clause must be construed as broadly as possible and all doubts resolved in favor of arbitration. (*Granite Rock* at 302).

100.    The Sole Arbitrator further notes that the Second Circuit has held: "[A]rbitration should

be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *McAllister Bros., Inc. v. A & S Transportation Co.,* 621 F.2d 519, 522 (2nd Cir. 1980) (*quoting United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1352-53, 4 L. Ed. 2d 1409 [1960].

101. For the reasons set forth above, it cannot be said with positive assurance that the arbitration clause in this case does not cover the Misappropriation Claims.  Thus, the Arbitration Clause must be interpreted as including the Misappropriation Claims.

### B.    Plain Meaning of the Settlement Agreement

102. The Respondent asserts that the plain meaning of the Settlement Agreement shows that the Parties intended for the Settlement Agreement to serve only as an interim agreement and did not intend for the Misappropriation Claims to be included within the scope of the Arbitration Clause.  In particular, it argues that the Parties agreed that the Claimant would refrain from filing a suit in court in exchange for the Respondent's fulfillment of its obligations under the Settlement Agreement. The Respondent contends that the Arbitration Clause would only apply if there were disputes related to whether the Respondent violated its obligations under the Settlement Agreement and that if the Respondent was found to be in breach of the Settlement Agreement, the Claimant's remedy would be to file its claims in court, not initiate an arbitration.

103. In support of these contentions, the Respondent alleges that the main body of the Settlement Agreement makes no mention of the merits of the Misappropriation Claims, nor does it regulate or anticipate any future disputes that might arise from the Misappropriation Claims.

104. In response, the Claimant asserts that the Settlement Agreement is the final agreement between the Parties, citing Clause 1 which states "the parties now wish to settle all claims. . ." The Claimant emphasizes that the Misappropriation Claims cannot be considered a collateral matter to the Settlement Agreement because the Claimant's forbearance from pursing the Claims provided consideration for the Settlement Agreement. Accordingly, the Misappropriation Claims arise under the Arbitration Clause because "they are the very subject matter of Claimant's performance of the Settlement Agreement." (Claimant's Opposition at 8).

105. The Respondent cites several cases to the effect that the parties' intent should be determined by the plain language of an agreement. The Claimant raises no objection to the pertinence of this case law.  However, none of these cases displace the well-settled law that in ascertaining the scope of arbitration clauses, the federal policy in favor of arbitration mandates that any doubts be resolved in favor of arbitration and they be construed as broadly as possible.

106. The Respondent has stated repeatedly that the Settlement Agreement was only intended to be an interim agreement, thus creating a distinction between an agreement not to assert the Misappropriation Claims (interim agreement) and the Misappropriation Claims per se (final agreement).  The Respondent suggests that if the Settlement Agreement is characterized as an interim agreement, then it follows that the Parties always intended that the Claimant would file the Misappropriation claims in the U.S. Court.

107. But it is not clear why this distinction, between an "interim" or "final" agreement — even if the Respondent could sustain it — makes any different to the interpretative question before the Sole Arbitrator about the scope of the Arbitration Clause.  As a threshold

matter, it is important to note that the Respondent accepts that some disputes fall within the scope of the Arbitration Clause, regardless of its status as interim or final. Thus, in its Answering Statement submitted on November 30, 2020, the Respondent acknowledges that Claim (i) for breach of the Settlement Agreement falls within the Arbitration Clause. It states, "It is clear that the arbitration clause covers only the contractual disputes that derive from the Settlement Agreement." (Answering Statement ¶ 21). And that remains the case whether or not the Settlement Agreement is characterized interim or final.

108.    But even if the distinction were relevant to the question of the scope of the Arbitration Clause, it is not helpful to the Respondent. To begin, the first paragraph of the Settlement Agreement reads "If the parties are unable to achieve mutual execution of such a longer-form definitive agreement within forty-five (45) calendar days of mutual execution of this Settlement Term Sheet Agreement ("Agreement"), this Agreement shall be the final binding settlement agreement between the parties." This portion shows that while the Parties may have initially treated the Settlement Agreement as an interim agreement, once 45 calendar days passed without a longer-form agreement, the Agreement became "the final binding settlement agreement between the parties."

109.    The Respondent ignores the portion quoted above and cites other language of the first paragraph of the Settlement Agreement: "[n]othing in this Agreement shall be deemed to constitute an admission of wrongdoing by ENCOO or Mr. Shichao Hu," and "[n]either this Agreement nor any of its terms shall be used as an admission or introduced as evidence as to any issue of law or fact in any proceeding, suit or action, other than an action to enforce this Agreement."

110.    This language does not assist the Respondent. The Respondent treats these phrases as

evidence that the Misappropriation Claims were purposefully left out of the Settlement Agreement because they refer to "any proceeding, suit or action, other than an action to enforce this Agreement."

111.   But these provisions do not go to the question of whether the Misappropriation Claims are or are not included within the scope of the Settlement Agreement, but rather are designed to make it clear that the mere signing of the Settlement Agreement is not an admission of liability regarding any claim covered by that Agreement.  This language, which is typical of settlement agreements, is simply neutral on the question of what claims are covered that agreement.  Rather, the provisions preclude the Claimant from using the Settlement Agreement as evidence on liability if it decides to pursue claims covered by that agreement (whatever those claims are) in, among other places, "any proceeding," which would include an arbitration proceeding.

112.   Moreover, the Respondent's argument overlooks Clause 1 of the Settlement Agreement, which states "the parties now wish to settle **all claims** between UiPath and ENCOO and Mr. Hu, **including those UiPath has threatened to assert in the Complaint**" (emphasis added). As noted above, the Complaint included claims of misappropriation in paragraph 92.

113.   If the intent of the Parties had been to merely fix the issues with the Source Code and conduct a source code review, as Respondent alleges, the language of Clause 1 would not have referenced "all claims . . . including those UiPath has threatened to assert in the Complaint."  Rather, this language makes it clear that the Parties intended, by the Settlement Agreement, to settle, among other things, the then-existing disputes between the Parties as to whether the Respondent had engaged in misappropriation, as alleged in

the draft Complaint.  Given that the Arbitration Clause in this case covers "all disputes" arising under the Settlement Agreement, and given that that agreement settled "all claims," including those alleging misappropriation, a dispute about Respondent's alleged misappropriation "arises under" the Settlement Agreement.

114.    Moreover, the Respondent's interpretation of the Arbitration Clause makes little commercial sense.  By the Settlement Agreement, the Parties explicitly settled "all claims" including allegations of misappropriation and agreed to an Arbitration Clauses that encompassed "all disputes."  On the Respondent's reading of the contract, if the Respondent breached the Settlement Agreement, claims of a breach of that agreement could be brought in arbitration, but claims relating to misappropriation (which were intended to be settled by that agreement) could not be brought in arbitration, but would have to be brought in court.

115.    It would be little commercial sense to conclude that the Parties intended that claims of breach of the Settlement Agreement would go to arbitration, while the Claimant's Misappropriation Claims would go to court, unless the Parties explicitly set forth this outcome in the Settlement Agreement. This interpretation could lead to parallel proceedings in arbitration and the courts in connection with the same basic dispute, with the additional cost and risk of inconsistent decision this entails.  If these commercial parties intended to adopt such an inefficient approach, they would have explicitly excluded allegations of misappropriation from the Arbitration Clause, or made it clear that the Arbitration Clause did not extend to "all disputes" or set forth a separate dispute resolution provision in the agreement covering the Misappropriation Claims.

116.    The combination of an interpretation of the text of the Settlement Agreement as well as a

consideration of the role the Misappropriation Claims play in its negotiation and performance leads to a conclusion that a breach of the Settlement Agreement implicates the Misappropriation Claims per se. Since an arbitration clause should be construed as broadly as possible, as discussed above, the only reasonable conclusion is that it covers those claims.

### C. Impact of the History of Negotiation

117.  Finally, the Sole Arbitrator turns to the Respondent's argument that the history of negotiation of the Settlement Agreement demonstrates that the Parties intended to treat the Misappropriation Claims as separate from the settlement and therefore that those Claims are outside of the scope of the Arbitration Clause. Specifically, the Respondent points to various emails supporting this position.  The Sole Arbitration concludes that these various emails are not persuasive in overcoming the only plausible reading of the Settlement Agreement.

118.  One email is from the Claimant dated July 11, 2020, in which the Claimant states: "For the record, UiPath disagrees with ENCOO's interpretation of what is or is not theft and misuse of UiPath's confidential information, but we can leave those discussions for the final agreement." (Exhibit R-6). Since this email was sent days before the final Settlement Agreement was signed, the Respondent claims that there was no further consensus or final agreement and thus indicates that the Claimant anticipated further discussions related to the Misappropriation Claims to occur.

119.  In response, the Claimant argues that this email was taken out of context in that the Respondent had proposed last-minute revisions and the July 11, 2020, email was a rejection of these revisions, so the "final agreement" referenced was the executed

Settlement Agreement. Furthermore, the Claimant asserts that the plain language of the Settlement Agreement indicates the Parties' intent for the scope of the arbitration to cover the Misappropriation Claims, and the Entire Agreement Clause forecloses the application of any "prior understandings" of the Settlement Agreement.

120.   The Sole Arbitrator must first consider whether the text of the Settlement Agreement lends itself to the explanation given by the Respondent that the Misappropriation Claims per se are distinct from the agreement not to assert the Misappropriation Claims. As the Respondent puts it "the Parties' true intention was to propose a forward-looking approach by agreeing on the removal of similarities in source code and then conducting the source code review" (Respondent's Submission at ¶40), rather than as a method to settle the Misappropriation Claims.  But as noted above, the Settlement Agreement on its face was designed to settle "all claims" including allegations of misappropriation.

121.   In any event, the Respondent's argument that emails (even if they supported the Respondent's position) should take precedence over the terms of the Settlement Agreement disregards the parol evidence rule.  Under New York law, the well-established precedent on parol evidence is as follows: "the parol evidence rule bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous" (*Wayland Inv. Fund LLC v. Millennium Seacarriers Inc.*, 111 F.Supp.2d 450, 454 (2000) *citing W.W.W. Assocs. Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). In a similar vein, extrinsic evidence cannot be used to create an ambiguity that does not exist in the plain meaning of the text (*Id*. at 455).

122.   The Settlement Agreement is a complete written agreement under New York law. As the

Claimant points out, the Settlement Agreement contains an Entire Agreement clause, which reads:

> 5. Entire Agreement
> This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, fully supersedes any and all prior understandings, representations, warranties and agreements between the parties hereto, or any of them pertaining to the subject matter hereof, and may be modified only by written agreement signed by all the parties hereto. No express or implied promises, inducements or agreements have been made by any party to the other except as specifically and expressly set forth within this Agreement.

123.  Namely, under Clause 5, the Settlement Agreement is limited to the four corners of the contract. Under the parol evidence rule, extrinsic evidence can be used to add to or alter the terms of an agreement, but may be used as aid to interpretation in the event of an ambiguity.  But, if there is an ambiguity in the Arbitration Clause, such ambiguity would trigger the well-settled jurisprudence that "**any doubts** concerning the scope of arbitrable issues should be resolved in favor of arbitration" (*Moses* at 24-25 (emphasis added).)

124.  Thus, the negotiating history does not assist the Respondent's position and to the extent it is to be considered at all, it is only on the premise that the Arbitration Clause is ambiguous, which implicates the rule that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

125.  Finally, even if the emails cited by the Respondent were applicable to determine the Parties' intent, they do not evidence any clear intent to exclude the Misappropriation Claims from the scope of the Arbitration Clause which applies to "all disputes" or otherwise limit that clause solely to a dispute about the breach of the Settlement Agreement, which settles "all claims."

126.  The Respondent argues that the Claimant's statement, "we can leave those discussions

for the final agreement" (Exhibit R-6), demonstrates that the Settlement Agreement was not the final agreement and thus the merits of the Misappropriation Claims are not included in the Arbitration Clause.  But those words have to be read in the context of the term of the Settlement Agreement.  That Agreement states that the Parties were obligated to negotiate in good faith "a longer-form definitive agreement containing the terms herein," but that the Settlement Agreement itself would be considered the final, binding settlement agreement if no longer-form agreement were executed in 45 days.  The email, read in context rather than in isolation, demonstrates an intent to leave certain discussions to the "longer form definitive agreement" contemplated by the Settlement Agreement.  However, as the Settlement Agreement made clear, it would be the final agreement if, as here, no longer-form agreement was executed within 45 days. And the Settlement Agreement settled "all claims," including allegations of misappropriation.

### D.    The Claimant's Request For Additional Relief

127.    In making a request for rulings beyond that of the issue of the scope of this arbitration, the Claimant seeks an early final determination on issues where such determination was not authorized by the Sole Arbitrator.  As set forth in paragraph 36-40 above, the Sole Arbitrator authorized an early final determination of a single issue: whether the Claimant's Misappropriation Claims fall within the scope of the Arbitration Clause.  The Claimant is free to apply for a final award with respect to other matters it has raised in its submissions at the appropriate time.  As a result, at this time, the Sole Arbitrator denies the Claimant's other requests for relief.

128.    For the avoidance of any doubt, however, the Sole Arbitrator stresses that his ruling in Procedural Order No. 2 still stands and remains in effect.  In fact, the interim relief

granted therein is only reinforced by the ruling in this Partial Final Award. Whereas the interim relief granted in Procedural Order No. 2 rested on a finding that the Claimant had a likelihood of success on the merits on the issue of the scope of this arbitration, in this Partial Final Award the Sole Arbitrator determines as a final matter that the Misappropriation Claims fall within the scope of this Arbitration and, as a result, that the Parties have a contractual obligation to resolve those claims in this arbitration rather than in any other forum, based on the Arbitration Clause that provides that the Parties "will submit all disputes arising under this agreement to arbitration in New York City, New York before a single arbitrator of the American Arbitration Association."

## VIII.    Costs

129.    In its Motion, the Claimant requested an interim award of costs on the grounds that Respondent's Demand forced Claimant to incur unnecessary legal fees and costs in order to prepare a response in the U.S. and China.

130.    The Sole Arbitrator previously determined in Procedural Order No. 2 that there was no immediate need to grant a costs award on an interim basis because the Claimant had not been compelled to litigate in Chinese courts, and the Respondent had not commenced any litigation in the Chinese courts. The Sole Arbitrator indicated that he might have a different view if the Respondent had commenced a litigation in Chinese courts or if the Claimant had been compelled to commence a litigation as a result of the Demand Letters. However, since no such litigation had been commenced, an interim award of costs seemed premature. Rather, the Sole Arbitrator invited the Claimant to apply for an award of legal fees and costs at the end of this case either under Rule 23(a) of the AAA Commercial Rules or under the Arbitration Clause itself which provides that "[t]he

prevailing party shall be entitled to reasonable legal fees, expert fees and costs."

131.    Neither Party raised the issue of costs in the latest round of submissions and, as far as the

Sole Arbitrator is aware, no litigation has gone forward in China that would cause the

Claimant to incur costs beyond those incurred in this arbitration.

132.    As a result, the Sole Arbitrator confirms his decision in Procedural Order No. 2 to defer

the issue of costs until the Final Award or until litigation in China may warrant a revisit

of the issue.

## IX.    PARTIAL FINAL AWARD

133.    The Sole Arbitrator AWARDS as follows:

   a.  The Sole Arbitrator DECLARES as a final matter that the Claimant's

   Misappropriation Claims fall within the scope of the Arbitration Clause and, as such,

   under the terms of the Arbitration Clause — which provides that the Parties "will

   submit all disputes arising under this agreement to arbitration in New York City, New

   York before a single arbitrator of the American Arbitration Association — the Parties

   are obligated to resolve those claims in this arbitration and not in any other forum;

   b.  For the avoidance of any doubt, the Sole Arbitrator's orders in Procedural Order No.

   2 remain in full force and effect; and

   c.  All other requests for relief are denied.

Date:                    October 27, 2021

Place of Arbitration:   New York, New York

John Fellas
Sole Arbitrator

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award is deemed made in New York, USA the formal seat of this arbitration.

Dated as of:  October 26, 2021

John Fellas

State of New York )
)   SS:
County of New York )

I, John Fellas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

___10/26/21___
Date

_____
, Arbitrator

State of New York )
)   SS:
County of New York )

On this 26th day of October, 2021 before me personally came and appeared _____, to me known and known to me to be the individual described in and who executed the foregoing instrument and he/she acknowledged to me that he/she executed the same.

_____
Notary Public

TARYN S. HYSON
Notary Public - State of New York
No. 01HY6376914
Qualified in Queens County
My Commission Expires June 18, 2022